IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| DDR HOLDINGS, LLC, ) | |
|     Plaintiff and Counterdefendant, ) | |
| ) | |
| vs. ) | |
| ) | CIVIL ACTION NO. 2-06-CV—42 (RG) |
| HOTELS.COM, L.P., EXPEDIA, INC.; ) | |
| TRAVELOCITY.COM, L.P.; ) | |
| SITE59.COM, LLC; ) | |
| INTERNETWORK PUBLISHING ) | |
| CORPORATION d/b/a LODGING.COM; ) | |
| NEAT GROUP CORPORATION; ) | |
| ORBITZ WORLDWIDE, LLC; ) | |
| INTERNATIONAL CRUISE & ) | |
| EXCURSION GALLERY, INC.; ) | |
| OURVACATIONSTORE.COM, INC.; ) | |
| NATIONAL LEISURE GROUP, INC.; ) | |
| WORLD TRAVEL HOLDINGS, INC.; ) | |
| and DIGITAL RIVER, INC., ) | |
|     Defendants and Counterclaimants. ) | |

**RESPONSE TO MOTION TO STRIKE DDR'S
AMENDED AND SUPPLEMENTAL EXPERT REPORTS**

DDR Holdings, Inc. ("DDR") herein responds to Defendants' Motion to Strike the Amended and Supplemental Reports of DDR's experts ("Defendants' Motion"). The amendments at issue fall into three categories: they incorporate references to Defendants source code and other evidence produced by Defendants after the original expert reports were served; they respond to Defendants' expert reports; and they address minor errors in DDR's original reports. The timing of the amendments results from Defendants' unreasonable delays and obstruction in complying with their discovery obligations. For example, ICE/OVS had to be ordered to provide revenue information (Dkt 385); Digital River had to be ordered to provide corporate representatives to testify (Dkt 384); and the Defendants did not fully satisfy requests

for prints of their source code until August 21, a mere 6 days before the amendments. Far from delaying, DDR amended its expert reports as soon as it was possible.

### A. **Defendants' Disregard of the Rules Governing This Motion.**

In their haste to file their Motion to Strike,[1] Defendants totally disregarded this Court's rules. This Court requires permission, through the submission of letter briefs, before filing Motions to Strike Expert Testimony.[2] Defendants failed to do so. This Court also requires parties to meet and confer before filing motions.[3] This Rule requires a *substantive* discussion where the parties "present the merits of their respective positions and meaningfully assess the relative strengths of each position."[4] The wisdom of the Rule is obvious: if you have a substantive discussion, you may learn that your opponent has a justifiable response; maybe you can reach agreement or narrow the dispute. Here, what Defendants call a meet and confer amounted to a single question ("Will you oppose a motion to strike Keller's Amended Expert Report?"). And that question was asked *before* one of the reports at issue was even *served*.[5]

In their Motion Defendants claim that DDR has "no basis" for the supplements, and that DDR has "no legitimate explanation" for supplementing.[6] But how can Defendants in good faith say that? Defendants don't know DDR's bases or reasons because they ***never*** asked. A simple review of Defendants' Certificate of Conference shows this: "The undersigned certifies that the parties have complied with the meet and confer requirement in Local Rule CV-7(h). DDR is opposed to the relief requested in this motion." This certificate fails to the requirements of Local

---

[1] Defendants failed in the same ways to meet and confer on their Motion for Expedited Briefing.
[2] The Court's Motion Practice Order (Dkt. 226) states that "Prior to filing any Motions to Strike Expert Testimony or Daubert Motions, the parties must obtain permission through the submission of letter briefs to the Court."
[3] *See* Local Rule CV-7(h) & (i)
[4] "In the personal conference, the participants must give each other the opportunity to express his or her views concerning the disputes. The participants must also compare views and have a discussion in an attempt to resolve their differing views before coming to court. Such discussion requires a sincere effort in which the participants present the merits of their respective positions and meaningfully assess the relative strengths of each position."
[5] The question was asked on August 27, 2012. Chandler's report was not served until August 28, 2012.
[6] Motion at 2 & 4.

Rule CV-7(i) to state the date and manner of the conference; the names of the participants; an explanation of why no agreement could be reached; and, a "statement that discussions have conclusively ended in an impasse." The reason why is simple: there was *no* meet and confer.

We raise these issues not to call a technical foul but instead to highlight that if the Rules had been followed, then this Motion would have been avoided. If Defendants had asked, they would have learned the justifiable bases and reasons why DDR's expert reports were amended. Let's turn now to those reasons and bases.

### A. Dr. Keller's Amended Infringement Report Is Proper.

The timing of the supplementation in Keller's report is the result of the late production of prints of Defendants' source code. Because it was Defendants who delayed in producing these prints, Defendants should not be allowed to complain that as a result of their delay, Dr. Keller did not supplement his report sooner.

*Defendants' Source Code*. Defendant's made the source code available for inspection on laptops at a highly-restricted escrow facility with no on-site printing capabilities.[7] The source code was available for inspection until April 10, 2011, when it was unilaterally and without notice withdrawn from the escrow facility. DDR had to seek relief from this Court to remedy this conduct. (Dkt. 330). After a telephonic hearing, the Court ordered Defendants to restore the source code into escrow and maintain the source code there until June 29, 2012. (Dkt. 332)

DDR began making requests for prints of the source code in April 2012. Pursuant to Fed. R. Civ. P. 34,[8] DDR also provided written specifications for how the source code was to be printed.[9] But, because Defendants delayed in producing the prints and/or failed to comply with

---

[7] NLG/WTH, which is not a party to Defendant's motion, elected to provide their source code on a disk and forego the escrow process.
[8] Rule 34 allows a party to specify the form in which electronically stored information ("ESI") must be produced.
[9] For example, specifically requested that the printouts be made using a code editor and in color so as to preserve the ability to view and analyze the code structure.

the written specifications for printing (thus necessitating that the source code be re-printed), the majority of those prints were not tendered to Dr. Keller until August 2012. For example:

- ICE/OVS did not satisfy DDR's requests until August 8, 2012[10];
- Expedia did not satisfy DDR's requests until August 10, 2012[11];
- Travelocity did not satisfy DDR's requests until August 10, 2012[12];
- Digital River produced some by August 21, but still has not satisfied DDR's requests[13].

Dr. Keller could not prepare his supplement until he had received and reviewed the source code requested. That did not happen until August 21, 2012. As soon as Dr. Keller received most of the source code, he began in earnest supplementing his report. Dr. Keller supplemented his report 6 days later. Thus, any delay was due solely to Defendants' delays in providing prints of their source code.

*Defendants' Interrogatory Answers*. Defendants also failed to provide Dr. Keller with meaningful information about their non-infringement theories in response to interrogatories. DDR served its first set of common interrogatories in this case over six years ago, in July 2006. DDR's third interrogatory required identification of all fact supporting Defendants' defenses. *Id*. The Defendants affirmatively pled non-infringement as a defense. Yet no Defendant provided substantive answers to this interrogatory identifying all the alleged facts relied upon by their experts in claiming non-infringement. Thus, Dr. Keller lacked the opportunity to anticipate all of defendants' non-infringement theories in his opening report. It was not until Defendants served their rebuttal expert reports that Defendants provided this information.

---

[10] For the history of requests seeking prints of ICE/OVS source code see Exhibit 1-A.
[11] For history of requests seeking prints of Expedia source code see Exhibit 1-B.
[12] For the history of requests seeking prints of Travelocity source code see Exhibit 1-C.
[13] For the history of requests seeking prints of Digital River source code see Exhibit 1-D.

*Amendments to the Keller Report.* The amendments to the main body of Dr. Keller's report are rebuttal to arguments raised for the first time in Defendants' responsive reports on infringement.[14] For example:

- Paragraphs 44 and 50 addresses a red herring, raised in Mr. Kent's rebuttal report, that customers of the American Express and RCI Travel sites hosted by ICE/OVS may purchase cruises over the phone as opposed to online. This fact was never identified by ICE/OVS as a reason for non-infringement in their responses to DDR's interrogatories. These new paragraphs explain that it is not an element of any asserted claim that customers make a purchase through Defendant's web site.

- Paragraph 45 addresses the argument, raised in Mr. Gray's rebuttal report, that users may navigate to a Defendant's web site by entering a link directly into a browser, rather than clicking on a link in one of Defendants' partners' web sites, as provided in the asserted claims. This fact was never identified by NLG/WTH as a reason for non-infringement in their response to DDR's interrogatories. This paragraph explains that it would be highly unusual for a user to directly enter the URL of one of NLG's accused sites into their browsers, and that if any were to do so, it would not affect infringement in relation to the vast majority of visitors who visit by means of clicking a link.

- Paragraphs 46, 47, and 65 address the argument, made by some Defendants, that their systems do not perform the steps of capturing a look and feel description and serving a web page in the sequence required by claim 8 of the '135 patent. These new paragraphs rebut this argument by showing that in the capturing process described in Dr. Keller's original report, the claim sequence is preserved, because the capturing step will ordinarily complete before the serving step.

- Paragraphs 48 and 49 address the argument, raised in Mr. Tittel's rebuttal report, that the ability of users to configure CSS display in their browsers negates DDR's claim that Defendants' directly infringe the capturing step of claim 8 of the '135 patent by taking control of users' computers. Dr. Keller rebuts this argument by showing that no major browser allows a user to block the download of stylesheets when they visit Defendants' accused sites.

- Paragraph 51 addresses Mr. Tittel's argument that CSS does not constitute a "look and feel description" because it does not include graphical elements. In this paragraph, Keller explains that a "look and feel description" need not actually include graphical elements under the Court's construction of that term.

- Paragraph 52 addresses the argument raised by Defendants that web sites having minor differences in appearance do not have matching look and feel. This paragraph merely

---

[14] An exception is Dr. Keller's amendment of Paragraph 27 of the main body of his report to agree with Defendants' expert on validity about the level skill of a person of ordinary skill in the art.

reiterate his position, stated repeatedly in Dr. Keller's original report, that substantial similarity is sufficient to establish corresponding look and feel.

- Paragraph 53 addresses a hypothetical raised by Tittel concerning the application of a shared stylesheet to a blank page. Dr. Keller points out that even though the blank page will not look like a page that has content to which the shared stylesheet may be applied, the pages will still share a common look and feel description.

- Paragraph 54 elaborates on a point made in Dr. Keller's original report that only the '399 patent requires the merchant, outsource provide, and host to be three distinct parties, and that the merchant and host may be the same party under the '135 and '572 patents. This elaboration is responsive to Mr. Mercer's contrary opinion, which was never made by Digital River in their responses to interrogatories.

- Paragraph 55 addresses the argument made by Mr. Kent and Mr. Merce, that ICE/OVS and Digital River's web sites are not "in communication" with a host web site, as required by claim 13 of the '572 patent.  Dr. Keller explains that a requirement of communication between the servers of the outsource provider and the host is not required by the claim language and is inconsistent with the preferred embodiment of the invention, in which the outsource provider is in communication with the host web page that has been served to a user's computer.

- Paragraph 56 and 57 address Mr. Tittel's and Mr. Kent's confusion about the meaning of "composite web page" and "navigational link."  Dr. Keller explains the usage of these term (as previously used in Dr. Keller's original report), and does not add any new issues or subject matter.

- Paragraph 58 addresses Mr. Kent's distinction between "recognizing [a] source page" and recognizing a host associated with a source page.  Dr. Keller explains that recognizing a source page as being of a host literally satisfies the claim language.

- Paragraph 59 addresses Mr. Kent's argument that a commerce object that is associated with multiple merchants is not "associated with a buying opportunity of a selected one of a plurality of merchants." Dr. Keller explains that each of a plurality of merchants associated with a commerce object is a selected merchant.

- Paragraph 64 addresses Mr. Tittel's argument that CSS must be previously stored by the outsource provider to infringe claim 8 of the '135 patent.  Dr. Keller explains that prior storage by the outsource provider is not an element of the claim.

- Paragraph 66 addresses Mr. Kent's argument that a look and feel description must be captured from the same single server that provides the host website. Dr. Keller explains that the claim language only requires that a look and feel description be "associated" with a host website, not that it be captured from the same server.

- Paragraph 67 addresses Mr. Tittel's argument that Dr. Keller's examination of Defendants' sites at particular points in time may not establish correspondence of look

and feel throughout time. This argument is based on a document[15] produced by Defendants after Dr. Keller's original report. Dr. Keller points out that he examined the records for the times that information is available from the Defendants and publicly available sources, and concluded that the correspondence more likely than not endured through time given the Defendants' business objective of providing corresponding sites, and the absence of evidence to the contrary.

The remaining changes to the main body of Dr. Keller's report are minor or clerical in nature, with the exception of the discussion of Digital River's platforms, which was revised in response to additional discovery ordered by the Court and completed on August 17, 2012.

*Amendments to the Travelocity Appendix.* The majority of the amendments to the Travelocity appendix are insubstantial, relating to correcting minor errors, making word changes, citing bates numbers, or expanding discussion based on prints of the Travelocity source code received after Dr. Keller's original report. For example, Dr. Keller replaced the word "affiliate" with "partner" to be consistent with what Defendants call the infringing programs (and avoid confusion with certain of Defendants' referral programs). Nearly all of the changes relate to the background discussion of Travelocity's technology platforms and do not affect Dr. Keller's description of the accused web sites or the infringement of the claims. The changes to the Travelocity appendix are:

- Paragraph 8 addresses an implication raised by Mr. Tittel's in his rebuttal report that Travelocity is not responsible for serving matching outsource pages because the design of those pages is specified by its customers. Dr. Keller explains that creating a matching page is not an element of the claims.

- Paragraph 11 addresses the same issue addressed in paragraph 67, regarding the purported audit log produced by Travelocity after Dr. Keller's original report and raised for the first time in Tittel's report.

- Paragraphs 18-21 elaborate on Dr. Keller's previously expressed infringement opinions with reference to prints of source code produced after Keller's original report. These paragraphs do not introduce any new theories, accused sites, or platforms.

---

[15] TRAVSITE59-277368.xls

- Paragraph 57 elaborates on Dr. Keller's opinion on inducement, in response to Mr. Tittel, by citation to a form contract requiring Travelocity's partners to include links to their outsourced pages. This citation is no longer strictly necessary in light of the *en banc* Federal Circuit decisions in *Akamai Techs. Inc. et al. v. Limelight Networks*, No. 2009-1372 and *McKesson Techs. Inc. v. Epic Systems Corp.*, 2010-1291 (Aug. 31, 2012) that direction and control of a single entity to perform all the steps of a method is no longer a requirement for inducement.

None of these changes will prejudice Travelocity in the slightest in presenting its defenses.

*Amendments to Expedia Appendix.* Once again, the amendment to Dr. Keller's Expedia appendix makes no changes to his discussion of the accused instrumentalities and detailed analysis of the claims beyond the substitution of "partner" for "affiliate," the citation of a contract for the inducement of the "including . . . a link" element of '572 claim 17, and a very minor change of wording in one sentence in paragraph 20. All of the substantive changes pertain to the introductory sections.

- Paragraphs 2 and 3 and new headings in the "Overview" section name the technology platforms associated with the domain names used to provide the accused outsource sites for clarity of reference. These domain names were identified and their associated functionality discussed in Dr. Keller's original report, and naming them as technology platforms does not introduce any new subject matter.

- Paragraph 3 is also amended to make clear that United.com is only alleged to infringe through November 2011. This limitation was already stated in the detailed discussion of the accused instrumentalities of Dr. Keller's original report and is not new information.

- Paragraphs 5 through 7 rewrite and expand upon a previous description of the Travelnow platform with reference to later-produced source code. While this discussion provides additional detail on the operation of the code, it does not change Dr. Keller's overall presentation of its functionality or change his infringement positions with respect to the claims.

- Paragraph 8 is modified to reference discussions above and below, and to make clear that the identified CSS color elements can be applied to the contents of a dynamically generated page. The application of elements to page contents was already discussed in Dr. Keller's original report so this statement adds no new subject matter.

- As in paragraph 8 of the Travelocity appendix, paragraph 9 responds to the same implication raised by Tittle that Expedia is not responsible for the design of its outsource pages by pointing out that designing the page is not an element of the claims.

- Paragraph 10 summarizes the functionality of the WWTE platform that was already described in the detailed analysis of the claims in Dr. Keller's original report, which has not changed.

*Amendments to the ICE/OVS Appendix.* Defendants incorrectly claim that Dr. Keller's original report only accused ICE/OVS American Express website of infringing the '135 patent, and that his amended and supplemental report expands DDR's contentions to include infringement of the '572 and '399 patents as well. This is incorrect. As the Court can plainly see from inspecting Exhibit I to Defendants' motion, "americanexpresscruise.com" was identified as infringing the '572 patent in prior paragraph 42 (now paragraph 47) of Dr. Keller's original report, and of infringing the '399 patent by reference to the preceding discussion of the '572 patent in prior paragraph 53 (now paragraph 59) of Dr. Keller's original report. The principal effect of the amendments relating to the American Express website relate to specifying the time of the transition from infringing the '572 and '399 patents to infringing the '135 patent. The rest of the amendments are not substantive changes:

- Paragraphs 1 and 4 corrected the names of the companies Dr. Keller was referring to, such as changing "Our Vacation Stores, Inc." to "OurVacationStore.com, Inc."; clarifying that he was referring to "the partner-branded websites" of "American Express and RCI" rather than the "branded websites such as AmericanExpress.com and RCI.com"; and changing "RCI Travel" to simply "RCI" for consistency.

- Paragraphs 7 - 11 included citations to the newly produced source code that ICE/OVS provided DDR on August 8, 2012 and minor changes to wording to address the lack of clarity that Mr. Kent addressed in Paragraph 75 of his infringement report. Similarly, paragraphs 30, 36, 46, 47, and 67 included citations to and explanations of the newly produced source code.

- Paragraphs 13 - 18 were added to clarify DDR's infringement allegations against ICE/OVS for the American Express partner-branded website.  DDR realized that ICE/OVS might have a mistaken understanding of Dr. Keller's opinions regarding American Express [based on Dkt. 351] and asked Dr. Keller to clarify his opinions.

The remainder of Dr. Keller's edits are either further clarifications of ICE/OVS's relationship with American Express that he already described in his original report or other minor edits.

None of the changes to the Expedia appendix introduce new information or theories that would prejudice Expedia in preparing and presenting its case for trial.

*Amendments to Digital River Appendix.* The Digital River appendix is substantially revised to reflect additional information following from the depositions that the Court ordered Digital River to provide after sanctioning Digital River for having deliberately failed to provide knowledgeable witness when requested well before the close of discovery. Digital River concedes that some supplementation is in order in light of this additional discovery, but asks that it be strictly limited to facts discovered in the depositions and not relate to any information that it had previously produced. But this ignores that the depositions as originally requested were supposed to have been a point of entry into the balance of Digital River's discovery by identifying and describing the relevant technology platforms that it uses to provide outsourced pages for its customers. Had Digital River timely provided knowledgeable witnesses on DDR's topics, DDR would have been able to use the information discovered in those depositions to identify and interpret relevant materials. Strictly limiting Dr. Keller's supplementation to the information disclosed in the depositions would allow Digital River to retain the fruits of its discovery abuse that was sanctioned by the Court.

The opportunity to follow up on these depositions would have been especially important with respect to Digital River's source code, which was so voluminous that it could not be searched without crashing the laptop on which Digital River provided it in escrow to DDR. Without the ability to search the code, the only way to explore its contents is via its directory structure, which is organized according to Digital River's technology platforms. Without first knowing what technology platforms pertained to which customers, DDR had no effective way to drill down on the relevant code for those customers. Digital River has acknowledged this fact by making its code available for an additional inspection, and DDR is will tend a further

supplementation of its report regarding Digital River as soon as it has received the printouts of code selected during that review.

### B. Chandler's Amended Damages Report of August 28, 2012 Is Proper.

Defendants complain about Mr. Chandler's amendments. Defendants claim that Chandler's amendments are "not based on new information received." That is simply not true. After his initial report of May 18, 2012, Chandler received new information including the Orbitz Settlement Agreement, the deposition of Danny Ross, and the rebuttal expert report of Keith Ugone as well as Keller's Amended Infringement Report.

***The Orbitz Amendment***. On June 11, 2012, Orbitz and DDR entered into a Settlement and License Agreement (the "Orbitz Agreement"). On June 27, 2012 (a week *after* Orbitz was dismissed from the litigation[16]) Orbitz's lawyers produced the Orbitz Agreement in this litigation.[17] On July 11, 2012, counsel for DDR raised this highly unorthodox production and asked that the Orbitz Agreement be excluded. On July 27, 2012, Defendants refused stating:

> This agreement was entered into after the close of fact discovery and after DDR's initial expert disclosure deadline, and it was already in DDR's custody, possession, and control when Orbitz re-produced a Bates numbered version. Therefore, there is no basis for DDR to complain about this document."[18]

DDR's lawyer then responded:[19]

> As to the Orbitz agreement, we will withdraw our objection and remedy the situation by supplementing Chandler's expert report with his calculations of Orbitz' infringement damages.

Defendants did not object to this remedy. It was not until Chandler actually calculated Orbitz' infringement damages that Defendants complained. Defendants complained because they now

---

[16] Orbitz was dismissed on June 19, 2012.
[17] Orbitz's lawyers also represent defendants Expedia and Travelocity and presumably these lawyers caused their client Orbitz to produce this document post-dismissal to help their other clients.
[18] *See* email of Carl Bruce of July 27, 2012 at 3:04 pm, attached as Exhibit 2.
[19] *See* email of Ophelia Camina of July 30, 2012 at 7:05 pm, attached as Exhibit 3.

2397057v1/012448                                11

realize that the Orbitz Agreement carries an implied royalty rate of 6.8%.  This of course is more than the 5.5% royalty rate that Chandler opined the Defendants should pay to DDR.

Defendants claim that the Orbitz amendment is the "most prejudicial" addition.  If that is so, then Defendants brought this prejudice on themselves.  Defendants chose to produce the Orbitz Agreement, and then refused to exclude it.  DDR had no choice but to remedy the situation by having Chandler supplement.  Defendants did not object to this supplementation until they learned that it was harmful to them.  Defendants should not be allowed to exclude Chandler's supplement now.

*The Other Amendments*.  Defendants other complaints deal with other materials that were produced after the initial Chandler report was tendered:

- In mid-June 2012, Chandler received the deposition of Danny Ross.  That deposition was not available to DDR because the court reporter failed to provide it, and this oversight was not remedied until June 2012.

- On June 29, 2012, Defendants tendered the Keith Ugone report which attempted to rebut and criticize the Chandler report.

- On August 27, 2012, Chandler received the Amended Keller Infringement Report.  Chandler's damages calculations are necessarily driven by the royalty base, which is necessarily driven by the infringement claims.

In sum, all of Chandler's amendments address materials produced or made available to Chandler after his initial report.  Chandler was entitled to respond to the Ugone rebuttal, was entitled to amend based on the later produced materials, and was required to amend based on Keller's amended infringement opinions.  Chandler's amendments should not be stricken.

**C.  Dr. Keller's Supplement to his Validity Report Is Proper.**

Dr. Keller's supplement on validity ("Validity Supplement") concerns an Office Action that occurred after Dr. Keller's initial report on validity.  That Office Action relates to a pending application that is a continuation of the three patents-in-suit.  The Motion argues that the report's

content is "more prejudicial than probative" under FRE 403. DDR cited the prior art references Defendants raised, including all of the art Defendants cited when they filed invalidity contentions in 2006[20] and 2011.

Defendants' validity expert relies on legal advice that DDR patents can be considered weaker if the Patent Office granted them without having allegedly invalidating prior art references in front of it.[21] Apparently, Defendants intend to argue that their new or unconsidered prior art references make it easier for them to show obviousness of the DDR asserted claims. This assertion can be rebutted in part by arguing that the Patent Office would not have acted differently had the defendants cited their current art earlier, so that it was considered in the reexaminations. The fact that the examiner of the application knew of Defendants' current art and did not make any art rejections (anticipation or obviousness) is evidence that Defendants' position is wrong.

The Motion relies on two facts to claim that the Office Action in the application has "little, if any, probative value": (1) the Office Action *rejects* the claims of the Fourth Application, as opposed to allowing them, and (2) the claims of the Fourth Application are "not the same as" any of the asserted claims-in-suit.

---

[20] In 2006, DDR filed a request for reexamination and stayed this case so that defendants' 2006-cited prior art could be considered by the Patent Office. After the reexamination concluded, with the Patent Office concluding that the 2006-cited art did not invalidate DDR's claims, DDR resumed the case in 2010. When the time came for defendants to file invalidity contentions in 2011 (supplemented earlier 2012), defendants largely switched the prior art on which they relied. For the most part they dropped the references considered by the Patent Office in reexamination and relied principally on either new references not mentioned in 2006 or references that they had mentioned in 2006 (although not necessarily emphasized) but that the Patent Office could not consider because of the limitations of the reexamination process.

[21] Kent report ¶75. "It is further my understanding that if the PTO did not have all material facts before it, the challenger's burden to persuade the fact finder of its invalidity defense by clear and convincing evidence may be easier to sustain. I further understand that, in such instances where the PTO did not have all material facts before it, the fact finder can and should consider that it has heard evidence that the PTO had no opportunity to evaluate before granting the patent."

As to the first point, the Office Action specifically says that the Patent Office examiner considered the prior art references listed in paragraph 6 of Keller's Validity Supplement. The key point is that the examiner did not make any rejections based on that prior art, neither anticipation nor obviousness. The rejections that the Office Action made are beside the point: First, there is a rejection for lack of clarity of some but not all of the claims, which the Office Action (pp. 4, 5) says "can be overcome" by minor rewording, including using some words that the examiner specifically suggested. Second, there is a rejection for "double patenting," but here too the Office Action (p. 6) says a terminal disclaimer (a simple form document) "may be used to overcome" that rejection as well.

The motion's second point is contrary to Dr. Keller's opinions.[22] Dr. Keller's opinion that the claims are similar enough matches the view of the Patent Office, which concluded, in the same Office Action (p. 7), that "the inventions claimed in both the parent and the instant application are directed to the same inventive concept" as the claims of the '572 and '135 Patents-in-suit.

The Motion also argues that Dr. Keller's opinion would be "prejudicial" because DDR might "confuse the jury into believing the PTO has already rejected Defendants' prior art." DDR does not intend to confuse the jury and Defendants concern should be raised in a motion in limine, not a motion to strike. What the Motion really means by "prejudicial" is that the evidence is harmful to their case. But that is not grounds for exclusion under FRE 403.

---

[22] In paragraph 9 of the Keller Validity Supplement, Dr. Keller explains that he *compared* the claims of the Fourth Application with the claims in suit: "Although the claims of the Fourth Application and the claims in suit are not identical, I have studied the claims in question, and compared them to the claim limitations of the claims in suit that Mr. Kent said were found in or made obviousness by the combinations of references listed above. The claim limitations discussed by Mr. Kent are also found in certain claims of the Fourth Application, in some instance in the same words and in other instances in words that are different but concern similar subject matter. Accordingly, the fact that the Patent Office did not find anticipation or obviousness of the claims of the Fourth Application based on any of the cited references, or any combinations, provides strong confirmation that the anticipation and obviousness arguments tendered by Mr. Kent are not correct."

Finally, Defendant Digital River has already used what happened in the application in an effort to support their motion for summary judgment. *See* Dkt 401 at 8. Digital River attached as Exhibit 18 the very Office Action on which Dr. Keller opines. It would appear that at least one Defendant agrees the Office Action is highly relevant to the issues in this case.

## CONCLUSION

Defendants delayed and obstructed in providing discovery after DDR's expert reports were due. Having caused these delays, Defendants should not be allowed to complain that DDR's experts amended their reports to address this late-produced discovery. Defendants will not be prejudiced because their experts can address the amendments if they choose to do so. And at any rate, the prejudice they complain of, they brought upon themselves. Defendants say they don't need a continuance, and desire to go to trial. DDR does too. But DDR is entitled to go to trial with its experts and their opinions, and not as Defendants want to do, by preventing all the facts and all the opinions to be presented.

Respectfully submitted,

/s/ Ophelia F. Camiña
Ophelia F. Camiña
Texas Bar No. 03681500
LeElle Krompass
Texas Bar No. 24074549
SUSMAN GODFREY L.L.P.
901 Main Street, Suite 5100
Dallas, Texas 75202
Telephone:  214.754.1900
Facsimile:   214.754.1933
Email:   ocamina@susmangodfrey.com

Ian B. Crosby
Washington Bar No. 28461
SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
Telephone: 206.516.3861
Facsimile: 206.516.3883
Email: icrosby@susmangodfrey.com

        Louis J. Hoffman
        AZ Bar #009722 *(Pro Hac Vice)*
        LOUIS J. HOFFMAN, P.C.
        14301 North 87th Street, Suite 312
        Scottsdale, Arizona 85260
        Telephone: 480.948.3295
        Facsimile: 480.948.3387
        Email: louis@valuablepatents.com

        Michael C. Smith
        Texas Bar # 18650410
        Siebman, Burg, Phillips & Smith, LLP
        113 East Austin Street
        Marshall, TX 75671
        Telephone: 903.938.8900
        Facsimile: 972.767-4620
        Email: michaelsmith@siebman.com

        ATTORNEYS FOR PLAINTIFF
        DDR HOLDINGS, LLC

## CERTIFICATE OF SERVICE

     I certify that this document was filed electronically pursuant to Local Rule CV-5(a) on the 6th day of September, 2012.  Pursuant to Local Rule CV-5(a)(3)(A), this electronic filing acts to electronically serve all counsel who have consented to electronic service via the Court's CM/ECF system and in addition has been served electronically pursuant to the Electronic Service Agreement.

                             /s/ Ophelia F. Camiña