```
1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF TEXAS
2                        MARSHALL DIVISION

3  DDR HOLDINGS, LLC          *    Civil Docket No.
                              *    2:06-CV-42
4  VS.                        *    Marshall, Texas
                              *
5                             *    October 8, 2012
   NATIONAL LEISURE GROUP     *
6  WORLD TRAVEL HOLDINGS      *
    & DIGITAL RIVER           *    8:00 A.M.
7
                   TRANSCRIPT OF JURY TRIAL
8        BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP
                 UNITED STATES DISTRICT JUDGE
9  APPEARANCES:

10 FOR THE PLAINTIFFS:        MS. OPHELIA CAMINA
                              MS. LeELLE KROMPASS
11                            Susman Godfrey
                              901 Main Street, Suite 5100
12                            Dallas, TX   75202

13                            MR. IAN CROSBY
                              Susman Godfrey
14                            1201 Third Avenue, Suite 3800
                              Seattle, WA   98101
15
                              MR. LOUIS HOFFMAN
16                            Louis J. Hoffman, PC
                              14301 North 87th Street
17                            Suite 312
                              Scottsdale, AZ    85260
18
                              MR. MICHAEL SMITH
19                            Siebman Burg Phillips & Smith
                              P.O. Box 1556
20                            Marshall, TX  75671

21 APPEARANCES CONTINUED ON NEXT PAGE:

22 COURT REPORTERS:           MS. SHELLY HOLMES, CSR
                              MS. SUSAN SIMMONS, CSR
23                            Official Court Reporters
                              100 East Houston, Suite 125
24                            Marshall, TX   75670
                              903/935-3868
25 (Proceedings recorded by mechanical stenography,
   transcript produced on CAT system.)
```

```
1   APPEARANCES CONTINUED:

2
    FOR THE DEFENDANTS:        MR. BRETT GOVETT
3   (Digital River)           MR. KARL DIAL
                              MS. MIRIAM QUINN
4                             MR. DUSTIN MAUCK
                              Fulbright & Jaworski
5                             2200 Ross Avenue, Suite 2800
                              Dallas, TX   75201
6
                              MR. CHRIS BUNT
7                             Parker Bunt & Ainsworth
                              100 East Ferguson, Suite 1114
8                             Tyler, TX   75702

9

10  (National Leisure Group   MR. LANCE LEE
     & World Travel Holdings)  Attorney at Law
11                            5511 Plaza Drive
                              Texarkana, TX   75503
12
                              MR. NORMAN ZIVIN
13                            MS. TONIA SAYOUR
                              Cooper & Dunham
14                            30 Rockefeller Plaza
                              New York, NY   10112
15
                      * * * * * * * * * * * * * * * * * * * * * * * * * * * *
16

17                        P R O C E E D I N G S

18            (In chambers, jury out.)

19            THE COURT:  Okay.  On our DDR case,

20  2:06-CV-42, first of all, are there any objections or

21  proposed changes to the Court's preliminary jury

22  instructions?  Anything from the Plaintiff?

23            MR. SMITH:  Yes, Your Honor.  Did you

24  want to go page-by-page or just an agreement first?

25            THE COURT:  Let's just go page-by-page.
```

1                     MR. SMITH:  Okay.  We have none for the

2   first three pages.

3                     THE COURT:  Obviously, I need to strike

4   the first bullet point on Page 4?

5                     MR. SMITH:  Yes, Your Honor.

6                     THE COURT:  And I'm going to do that.

7   What else?

8                     MR. SMITH:  On Page 6, the second full

9   paragraph, seventh line, the word, product -- where it

10  says a product meeting all the requirements, we propose

11  striking the word product and insert the word system or

12  practicing a method.

13                    THE COURT:  That sentence now reads:  In

14  general, however, Defendants may infringe the asserted

15  patents by making, using, selling, or offering for sale

16  in the United States or importing into the United States

17  a product meeting all the requirements of a claim of the

18  asserted patent.

19                    And, again, you propose to replace the

20  word product with what?

21                    MR. SMITH:  System or practicing a

22  method.

23                    THE COURT:  What's the Defendants' reply

24  to that request?

25                    MR. BUNT:  We don't have any objection,

1  Your Honor.

2                    MR. ZIVIN:  We have no objection, Your

3  Honor.

4                    THE COURT:  Okay.  So, again, Mr. Smith,

5  a system or...

6                    MR. SMITH:  Practicing a method.

7                    THE COURT:  Come in.

8                    (Other counsel entered chambers.)

9                    THE COURT:  A system or practicing a

10  method meeting all the requirements.

11                    MR. SMITH:  System or practicing.

12                    THE COURT:  That's what I asked.

13                    MR. SMITH:  System or practicing a

14  method.

15                    THE COURT:  That's what I have.

16                    MR. SMITH:  Yes.  Okay.

17                    THE COURT:  A system or practicing a

18  method.

19                    MR. SMITH:  Yes, Your Honor.

20                    THE COURT:  Okay.  Anything else on 6

21  from the Plaintiff?

22                    MR. SMITH:  No, Your Honor.

23                    THE COURT:  What's next?

24                    MR. SMITH:  The next change we have is on

25  Page 13, first line of the third full paragraph,

1  after -- after Defendants will present their evidence,

2  insert after the word evidence, five words:  In support

3  of their contention.

4                 It just tracks the language the Court has

5  in the previous paragraph.

6                 THE COURT:  After DDR rests, the

7  Defendants will present their evidence.

8                 MR. SMITH:  In support of their

9  contention.

10                 THE COURT:  In support of their

11  contention.

12                 Responses from the Defendant?

13                 MR. ZIVIN:  No objection, Your Honor.

14                 MS. QUINN:  No objection.

15                 THE COURT:  In support of their

16  contention or contentions?

17                 MR. SMITH:  Contention, singular.

18                 THE COURT:  All right.  Anything else?

19                 MR. SMITH:  None from the Plaintiff, Your

20  Honor.

21                 THE COURT:  What changes or objections to

22  the preliminary instructions from the Defendants?

23                 Let's start with Digital River.

24  Anything?

25                 MR. BUNT:  Nothing further, Your Honor.

1            THE COURT:  All right.  NLG?

2            MR. ZIVIN:  Nothing.

3            THE COURT:  Okay.  So no other -- no

4  other changes or suggestions or objections to the

5  preliminary instructions from anybody else?

6            MR. BUNT:  Correct, Your Honor.

7            THE COURT:  Okay.  Next, I reviewed the

8  motion filed by Plaintiff over the weekend, in effect

9  requesting the Court to amend the claim construction

10  chart at the outset of the case in light of the Court's

11  ruling on Digital River's motion for summary judgment.

12            I don't think we have the luxury of

13  arguing both sides of this issue.  Here's what I've

14  decided to do:  I'm not going to alter the claim

15  construction chart at this point.  I'm going to leave

16  the claim construction chart as it exists, based on the

17  prior claim -- claim construction order.

18            However, I'm putting the Defendants,

19  particularly Digital River, on notice.  I do intend to

20  instruct the jury as part of the final instructions at

21  the time they're charged, when I excuse them to

22  deliberate on their verdict.

23            And that instruction will be consistent

24  with my ruling on that motion for summary judgment.  I

25  don't have the exact wording to give you now.  We'll

present that and hear it and argue it at the time we

have the final charge conference, but I do intend to

include an instruction on the two-party versus

three-party issue as a part of the final instructions to

the jury.

So if you want to go out there and put on

the same evidence you would have in light of the fact

that you're going to get a contradictory instruction,

you're welcome to do so, but I don't advise it.  But I'm

not going to change the chart as it exists presently.

So the present chart should go into the

jury notebooks as it is.

Do we have any disputed deposition clips

for day two of the trial?

MR. MAUCK:  Yes, Your Honor.  There's a

couple portions of Randy May's deposition that they

never designated previously.  So we object to that

portion.

THE COURT:  And from the Plaintiffs, when

is this scheduled in your trial plan to be put on?

MS. CAMINA:  I believe, if it's played,

it will be played today, so...

THE COURT:  Well, is there a reason this

didn't come up at the last pretrial?  As I indicated, I

wanted deposition clip disputes for day one to come up.

1              MR. MAUCK:  Because they gave us the

2  deposition clips last night.

3              MS. CAMINA:  Actually, we gave them

4  timely.  We just reduced the number.

5              MR. MAUCK:  Right.  But there were three

6  portions that weren't in the original.

7              MS. CAMINA:  Yeah.  And I can cut to the

8  chase here.  They were in the Defendants' designations,

9  so it's not like it hadn't been designated.

10              MR. MAUCK:  I don't believe that's the

11  case.

12              MS. CAMINA:  I can show you where they

13  were, if you'd like.  I don't have them with me, but --

14              MR. MAUCK:  Okay.

15              THE COURT:  Ms. Camina, if they come in

16  today, are they going to come in today before lunch or

17  after lunch?

18              MS. CAMINA:  No, sir.  No, sir.  It will

19  be after lunch.

20              THE COURT:  All right.  It sounds like to

21  me there's a need for y'all to meet and confer further

22  on this, so I'm going to instruct you to do it.  If

23  there's still a dispute, we'll take it up over the lunch

24  hour.  If you resolve this issue, be sure you let one of

25  my clerks know so I'll be aware of it.

```
 1                    MS. CAMINA:  Yes, sir.

 2                    MR. MAUCK:  And one more issue.  Ali

 3   Raesi's deposition, we don't object to the testimony,

 4   but there's an exhibit there that has not been

 5   submitted, and so we object to them showing the exhibit

 6   along with his testimony.

 7                    THE COURT:  All right.  And is the use of

 8   that exhibit --

 9                    MS. CAMINA:  Right.  If it's not been

10   admitted, then we're not going to use it.

11                    MR. MAUCK:  Sure.

12                    THE COURT:  All right.  Then that should

13   be no issue.

14                    All right.  Anything else on deposition

15   clips?

16                    Any disputed exhibits we need to take up

17   that are coming in day one that haven't been otherwise

18   deposed of?

19                    I understand there's an issue -- a

20   possible issue regarding adjusting the caption of the

21   case for purposes of the juror notebooks.

22                    MR. SMITH:  We've reached agreement on

23   that, Your Honor.

24                    THE COURT:  Okay.

25                    MR. BUNT:  Along that line, Your Honor,
```

 1   when you're reading the style, could we just have DDR,

 2   versus NLG WTH, and Digital River as opposed to -- I

 3   think the first Defendant is Hotels.com.

 4                    THE COURT:  Hotels.com and they're gone

 5   now.

 6                    MR. SMITH:  I think everyone's gone down

 7   to the last three lines.

 8                    MS. CAMINA:  We started at the top.

 9                    MR. BUNT:  We should have asked that you

10   sue us at the top of the list instead.

11                    THE COURT:  I'll do my best.

12                    MR. BUNT:  Thank you, Judge.

13                    THE COURT:  Are there any issues

14   regarding demonstratives that either sides are going to

15   use during opening?

16                    I didn't say this before, let me say it

17   on the record while we're all in the courtroom before

18   the first witness utters the first syllable.

19                    This Court does not like surprises, so if

20   you have any demonstratives or something a little bit

21   out of left field that you think might be an issue,

22   let's disclose it and talk about it beforehand.

23   The last thing I want is somebody to have a

24   demonstrative come up that the other side hasn't seen

25   and then there's an objection.  So if there aren't any

1  issues, I'm not trying to create one.  I'm just putting

2  everybody on notice this Judge doesn't like surprises.

3  So bear that in mind.

4            MS. CAMINA:  We have an agreement, Your

5  Honor, to exchange demonstratives at 6:00 o'clock the

6  night before, and we did give them our demonstratives

7  for today.

8            THE COURT:  Great.

9            MR. SMITH:  But our agreement did not

10 include exchanging demonstratives for opening.

11            MS. CAMINA:  For opening.

12            MR. SMITH:  So we have not exchanged on

13 that.

14            THE COURT:  If there are any issues that

15 need to be resolved, now's the time to get them

16 resolved, not during the opening when somebody comes up

17 with something and the other side stands up in the

18 middle of the courtroom in front of the jury and starts

19 making objections about it.

20            So, Mr. Lee, do you have a personal

21 matter you need to bring up with the Court?

22            MR. LEE:  Your Honor, I was just going to

23 raise the issue of splitting time on the openings, and

24 just let the Court know that Mr. Govett and I are going

25 to split our time.

1           THE COURT:  I don't have any problem with

2    that.  You-all can sort that among yourselves as will

3    the other parties.

4           MR. LEE:  We've sorted that out.

5           THE COURT:  And whatever warning you

6    want, just ask for it when the first speaker goes to the

7    podium.

8           MR. LEE:  Thank you, sir.

9           THE COURT:  There's not a funeral in your

10   family you need to be excused for?

11          MR. LEE:  Yes.  Yes, there is, and I

12   would like to be excused after lunch today and then I'm

13   going to need to be excused tomorrow.

14          THE COURT:  That's no problem, and just

15   travel safely.

16          MR. LEE:  Thank you, sir.

17          THE COURT:  You have our condolences.

18          MR. LEE:  Thank you.

19          THE COURT:  Are there any other issues

20   from the parties before we call the jury in and start

21   with the openings -- preliminary instructions and then

22   the openings?

23          MR. SMITH:   Your Honor, I think the only

24   issue we have raised, and I think it's been filed with

25   the Court now, we provided the Defendants' notice on

1  Friday that we were dropping some claims, including one

2  patent.

3             THE COURT:  Oh, and the Defendant Digital

4  River filed that with the Court.  I do want to discuss

5  this with the parties.

6             I understand how these things get cleaned

7  up at the very end of the process before the trial

8  starts, but it's my view that this withdraw is in effect

9  is either a partial dismissal or an amendment to the

10 live pleadings to go before the jury, and in either

11 case, probably requires leave of the Court.

12            Is that -- I don't want to leave this out

13 there as a live issue with no evidence on it, and then

14 the other side's got to file a JMOL just to dispose of

15 it.  I think it would be better if we took care of it

16 now.

17            Is there any objection from either the

18 Defendants as to these narrowing of the issues as set

19 forth in the Plaintiff's letter of October the 5th?

20            MS. QUINN:  There's no objection.

21            MR. LEE:  I don't believe there's any

22 objection -- there's not any objection from NLG, Your

23 Honor.

24            THE COURT:  I'll take it, then, that this

25 letter, as submitted to the Court, is a request for

1   leave to withdraw these issues as outlined in the

2   letter.

3              And without objection, I'll grant the

4   leave.  These issues are withdrawn, so they are not live

5   issues in the case.

6              MR. SMITH:  Okay.  And, Your Honor, the

7   one clarification we needed is that what we were

8   intending by withdrawing this, we will also be

9   eliminating from the case a claim of invalidity with

10  respect to the '135 patent and --

11             THE COURT:  Mr. Kent you're talking

12  about?

13             MS. CAMINA:  Yes, sir.

14             MR. SMITH:  Yes, sir.

15             THE COURT:  Have you-all met and

16  conferred with present counsel on this issue?

17             MR. SMITH:  We have asked to.  We have

18  not received a response on that.

19             THE COURT:  This to me looks like

20  something you-all meet and confer on, if not earlier

21  than during the lunch hour today.  This is not going to

22  come up before then I gather.

23             MR. SMITH:  No.

24             THE COURT:  Meet and confer with it over

25  the lunch hour.  After -- after the lunch hour, let me

1  know if there's still an issue I need to take up.

2  If not, is there any reason this wouldn't be timely to

3  take up tomorrow morning at this time?  Meet and confer

4  between now and then, and if it's still an issue, we'll

5  take it up in the morning.

6           MR. ZIVIN:  Your Honor, with respect to

7  the letter, the letter withdraws the '135 patent against

8  Digital River.  However, the Plaintiff also brought this

9  case against NLG and WTH under the '135 patent.

10          They withdrew it several months ago by

11  just not mentioning it anywhere in their expert report.

12  So it seems to me that we need some sort of partial

13  relief that they're not going to assert the '135 patent

14  against any of the Defendants.

15          THE COURT:  Well, let's do it this way,

16  Mr. Zivin:  The Plaintiff's letter in the summary

17  paragraph on Page 2 indicates at trial, DDR will be

18  asserting only six claims as the asserted claims:

19  Claims 13 and 17 of the '572 patent and Dependent Claim

20  20 asserted against all Defendants and Claims 1 and 19

21  of the '399 patent, plus Dependent Claim 3 against

22  NLG/WTH only.

23          Is that correct, Mr. Smith?

24          MR. SMITH:  That's correct.  In the

25  pretrial order, the Plaintiff -- we are not asserting

1   the '135 against NLG.

2              THE COURT:  Then the leave previously

3   granted by the Court for the Plaintiff to withdraw all

4   other live disputed claims encompasses everything except

5   these.  So for the record, it's out.

6              MR. ZIVIN:  Okay.  Thank you.

7              THE COURT:  Anything else, Counsel?

8              MR. SMITH:  Your Honor, during opening,

9   in light of the Court's ruling at the -- the pretrial

10  conference, you asked what might come up that you want

11  to hear about.

12             In light of the withdrawal of the motion

13  in limine dealing with Orbitz, we intend to, in the

14  opening, refer to the existence of license agreements

15  with Orbitz, Travelocity, Expedia, and ICE.  There's no

16  motion in limine prohibiting that, but since you wanted

17  to know if some fireworks are going to start, we suspect

18  there's going to be at least some fireworks on that one.

19             THE COURT:  All right.  Response from the

20  Defendants?

21             MR. ZIVIN:  Yes, Your Honor.  We

22  certainly object to that.  This is sort of late notice

23  that they're going to refer to exhibits or evidence

24  which is not anywhere in the pretrial order.

25             I -- I acknowledge that some of the

1    settlements were just within the last week, but we -- we

2    believe it is improper for them to just throw that to us

3    at the last point.

4              THE COURT:  You're not talking about

5    introducing the license agreements?

6              MR. SMITH:  No, we're not.

7              THE COURT:  You're just referring to the

8    fact that they exist?

9              MR. SMITH:  Yes.

10             MR. ZIVIN:  Your Honor, I don't see what

11   good it is that they refer to the existence of them

12   without mentioning the terms of them.

13             THE COURT:  We're talking about opening

14   statements here.  We're not talking about evidence.

15             MS. QUINN:  Your Honor, we wouldn't

16   object to the mentioning of Orbitz, since it is

17   something that is in evidence, but we object to

18   Travelocity and Expedia of the settlement agreements or

19   license agreements are not in evidence.  They have not

20   been admitted, other than they were recently signed.

21   We just got a copy of them like a week ago, and we don't

22   think that they should come in for any purpose, other

23   than to infer that the -- that the size of those

24   agreements or the sums of those agreements should be

25   comparable to any -- any settlement in this case, which

1  is irrelevant, because their opinions counsel -- the

2  opinions of their expert have never relied on those --

3  on those agreements.

4           MR. SMITH:  Your Honor, if you remember

5  at the pretrial conference, they wanted to get in an

6  unexecuted license agreement with Mercado, and the

7  argument on it was that, well, Mr. Ross said -- made

8  statements about that, that he might have accepted that.

9  And you were asking, well, what's the relevance of an

10 unexecuted license agreement.  When they set the

11 guidelines to allow them to talk about unexecuted

12 license agreements, that opens the door for us to talk

13 about the license agreements that were executed.

14          THE COURT:  As I recall, the ruling in

15 limine on Mercado was that despite the -- what appeared

16 to be an initial agreement, there's no limine

17 prohibition from either side on that.

18          MR. SMITH:  That's correct.  So that will

19 be in, and we believe as a result, if we're going to

20 talk about unexecuted -- things that aren't licenses,

21 then the existence of real licenses that the Plaintiff

22 has agreed to are now in the case.

23          THE COURT:  It's the Plaintiff's

24 intention to mention in opening that these license

25 agreements exist, but I gather it is not your intention

1 to talk about the specific terms.

2                    MR. SMITH:  Correct.

3                    THE COURT:  Or the sums paid or anything,

4 other than the fact that these agreements exist.

5                    MR. SMITH:  Correct.  In the opening, it

6 will simply be that the patent has been licensed.

7                    THE COURT:  Are these going to be a

8 continuing issue beyond the opening?  You expect these

9 to come up at a later date in the trial?

10                    MR. SMITH:  I expect they'll be discussed

11 by DDR witnesses simply saying that their patent has

12 been licensed and who it's been licensed to.

13                    THE COURT:  Let me ask the Defendants,

14 can anybody point me to an order in limine prohibiting

15 something like this?  Is it covered?

16                    Tell me if it is.  I can't think that it

17 is.

18                    MS. QUINN:  The -- the only limine I can

19 recall, Your Honor, is Limine 13, Agreed Limine 13, that

20 refers to settlement negotiations, and to the extent

21 that these agreements bear light on that settlement

22 negotiations, then the willingness of the Plaintiff to

23 accept those licenses, that is part of that limine.

24                    MR. SMITH:  The parties were very careful

25 to word that agreement so it only referred to settlement

1  negotiations and not to licenses or agreements.

2               MS. QUINN:  But you-all are trying to use

3  that evidence to support your contention that should

4  that negotiation had happened, the Plaintiff would have

5  accepted that offer and that is the settlement

6  negotiation.

7               MR. SMITH:  We're not referring to the

8  negotiations.  We're referring to the existence of a

9  license.

10              THE COURT:  All right.  I'll look at this

11  issue.  Before I bring the jury in, I'll give a ruling

12  from the bench.

13              Is there anything else?

14              MR. SMITH:  Nothing else, Your Honor.

15              THE COURT:  Mr. Bunt?

16              MR. BUNT:  Sorry.  I didn't mean to cut

17  you off.

18              In light of your instruction that you

19  don't want anybody yelling surprise during the openings

20  or anything, I think this has already been dealt with by

21  correspondence to the Plaintiff, but just to make sure,

22  during Mr. Govett's opening, he was planning to have

23  Mr. Pichler show how the old system worked.  I believe

24  that's already been --

25              THE COURT:  As a demonstration?

1            MR. BUNT:  Yes, Your Honor.

2            THE COURT:  Plaintiff is aware of that.

3   Is there a problem with that?  Do you know what we're

4   talking about?

5            MS. CAMINA:  Yeah, we weren't made aware

6   of it.

7            THE COURT:  So this is a surprise?

8            MS. CAMINA:  Yes.

9            MR. SMITH:  There's going to be a

10  demonstration.

11           MS. CAMINA:  You were supposed to

12  disclose demos yesterday at --

13           MR. DIAL:  There was not a -- I'm

14  sorry -- we sent a letter last week.

15           THE COURT:  Yeah, let's talk one at a

16  time, Counsel.

17           MR. DIAL:  I'm sorry.

18           THE COURT:  I understand your position.

19  Is that demonstrative in the courtroom and ready to go?

20           MR. DIAL:  Yes, Your Honor.

21           MS. QUINN:  Yes, it is.

22           THE COURT:  Well, I suggest you-all

23  adjourn to the courtroom.  In the next five minutes,

24  look at it and make sure there isn't a problem.  If

25  there is, I need to know about it before I bring the

```
1    jury in.
2                    This is just the kind of thing I don't
3    want to have happen.
4                    MS. QUINN:  Your Honor, they've had
5    access to the system, and they've made copies of the
6    software that's in that courtroom, and they've seen it
7    live before.
8                    THE COURT:  Then, hopefully, it won't be
9    a problem, but let's confirm it.
10                   MR. BUNT:  Thank you, judge.
11                   THE COURT:  Anything else?
12                   MR. SMITH:  None from the Plaintiff.
13                   THE COURT:  All right.  I'll let you
14   adjourn to the courtroom to review this demonstrative
15   that Digital River Defendant proposes to use during
16   opening, and I'll have one of my law clerks check with
17   you in about five minutes to see if this is still a live
18   issue.
19                   In the meantime, I'll look at the issue
20   about the limine and the mention of the existing
21   licenses.
22                   Okay.  You're excused.
23                   (Recess.)
24                   (Jury out.)
25                   COURT SECURITY OFFICER:  All rise.
```

1              THE COURT:  Be seated, please.

2              Earlier this morning, I met with counsel

3  in chambers to review some preliminary issues, and a

4  discussion arose regarding the Plaintiff's intent to

5  refer to certain executed license agreements with prior

6  parties in this lawsuit, those license agreements having

7  only been licensed and executed very shortly prior to

8  the trial and not included in the pre-existing expert's

9  analysis.

10             And accordingly, under 403 and a review

11  of that, at this point, the Court's ruling is that the

12  Plaintiff is prohibited from mentioning that in opening.

13  I'll reserve the issue of whether they can come in under

14  testimony from witnesses during the trial.  I'm

15  instructing the Plaintiff not to go into those in direct

16  examination or otherwise mention them without first

17  approaching the bench and securing a ruling.

18             For purposes of opening, so we can get

19  started, they're not to be mentioned in the Plaintiff's

20  opening this morning.  And as counsel recall, the

21  Court's allotted 30 minutes a side for opening

22  statements.  You may split your time among co-counsel.

23             Have I got the wrong number?

24             MR. LEE:  I thought it was 40 minutes per

25  side, Your Honor.

1          THE COURT:  Okay.  You're right.  It is

2  40 minutes, Mr. Lee.  Thank you.  Forty minutes per

3  side.

4          And you may split your time as you deem

5  appropriate with your co-counsel.  And if you want a

6  warning, ask for it when your first speaker goes to the

7  podium.

8          All right.  I think that's the only

9  remaining matter I needed to bring up with the counsel

10  before we bring the jury in.

11          The Court will recess, we'll bring in the

12  jury while I'm in recess, and then the Court will

13  re-enter.

14          Anything further, Mr. Govett?

15          MR. GOVETT:  Yes, Your Honor.  Just

16  between their opening and the Defense opening, if we

17  could just have a few minutes.  It will take us just a

18  couple of minutes to --

19          THE COURT:  For your demonstrative?  And

20  I understand that's agreed to?

21          MR. GOVETT:  Yes, sir.  And just to move

22  a table over and the easel and all that.

23          THE COURT:  You don't think this is going

24  to take more than a few minutes?

25          MR. GOVETT:  No, Your Honor.

1          THE COURT:  Just proceed, and when you

2  get ready to step to the podium, I'll know you're ready

3  to go.

4          MR. GOVETT:  Thank you, Your Honor.

5          THE COURT:  All right.  Court stands in

6  recess.

7          COURT SECURITY OFFICER:  All rise.

8          (Recess.)

9          COURT SECURITY OFFICER:  All rise for the

10  jury.

11          (Pause in proceedings.)

12          COURT SECURITY OFFICER:  Y'all can be

13  seated, I guess.

14          (Pause in proceedings.)

15          COURT SECURITY OFFICER:  All rise.

16          (Jury in.)

17          THE COURT:  Be seated, please.

18          Good morning, Ladies and Gentlemen.  I

19  want to welcome you back.  Thank you for being here on

20  time.  We are going to try and keep the case moving so

21  we can stick to the schedule that I told you about

22  during jury selection last week.

23          I now have some preliminary instructions

24  that I want to give you this morning before we start

25  with the opening statements from the lawyers and get on

1    to the evidence.

2               You have now been sworn as the jurors in

3    this case, and as the jury, you are the sole judges of

4    the facts, and as such, you alone will decide and

5    determine all the facts in this case.

6               As the Judge, I will give you

7    instructions on the law, decide any questions of law

8    that arise during the trial, handle matters of evidence

9    and procedure, and I'm responsible to manage the flow of

10   the trial and maintain the decorum of Court.

11              At the end of the evidence, I'll give you

12   detailed instructions about the law to apply in deciding

13   this case, and I'll give you a list of questions that

14   you are then to answer.

15              This list of questions is called the

16   verdict form.  Your answers to these questions will need

17   to be unanimous, and your answers will constitute the

18   verdict in this case.

19              I now want to briefly tell you about what

20   this case is about.  This case involves a dispute

21   regarding certain United States patents.

22              Now, I know that you saw the patent film,

23   but I want to give you some instructions here on the

24   record about a patent and how one is obtained.

25              Patents are granted or denied by the

1  United States Patent and Trademark Office, sometimes

2  called the PTO.

3           A valid United States patent gives the

4  patent holder the right for up to 20 years from the date

5  the patent application is filed to prevent others from

6  making, using, offering to sell, or selling the patented

7  invention within the United States or from importing it

8  into the United States without the patent holder's

9  permission.

10          A violation of the patent holder's rights

11  is called infringement.  The patent holder may try to

12  enforce a patent against persons it believes to be

13  infringers by a lawsuit filed in federal court.  That is

14  what we have before us in this case.

15          The process of obtaining a patent is

16  called patent prosecution.  To obtain a patent, one must

17  first file an application with the PTO.  The PTO is an

18  agency of the federal government which employs trained

19  Examiners who review patent -- or review applications

20  for patents.

21          The application includes what is called a

22  specification.  The specification contains a written

23  description of the claimed invention telling what the

24  invention is, how it works, how to make it, and how to

25  use it.

1           The specification concludes or ends with

2    one or more numbered sentences.  These numbered

3    sentences are the patent claims.  When a patent is

4    eventually granted by the PTO, the claims define the

5    boundaries of its protection and give notice to the

6    public of those boundaries.

7           After the applicant files the

8    application, an Examiner reviews the application to

9    determine whether or not the claims are patentable, that

10   is to say appropriate for patent protection, and whether

11   or not the specification adequately -- adequately

12   describes the invention claimed.

13          In examining a patent application, the

14   Examiner reviews certain information about the state of

15   the technology at the time the application was filed.

16   The PTO searches for and reviews this type of

17   information that is publicly available or submitted by

18   the applicant.  This type of information is called prior

19   art.

20          The Examiner reviews this prior art to

21   determine whether or not the invention is truly an

22   advance over the state of the art at the time.  Prior

23   art is defined by law, and I will give you at a later

24   time specific instructions as to what constitutes prior

25   art.

1          However, in general, prior art includes

2   information that demonstrates the tape -- the state --

3   the state of technology that existed before the claimed

4   invention was made or before the application for a

5   patent was filed.

6          A patent lists the prior art that the

7   Examiner has considered.  The items on this list are

8   called the cited references.

9          After the prior art search and

10  examination of the application, the Examiner informs the

11  applicant in writing of what the Examiner has found and

12  whether the Examiner considers any claim to be

13  patentable and thus allowed.  This is called an office

14  action.

15          However, if the Examiner rejects the

16  claims, the applicant has an opportunity to respond to

17  the Examiner to try to persuade the Examiner to allow

18  the claims.  The applicant also has the chance to change

19  the claims or submit new claims.

20          This process may go back and forth

21  between the applicant and the Examiner for some time

22  until the Examiner is satisfied that the application

23  meets the requirements for a patent, and in that case,

24  the application issues as a patent, or in the

25  alternative, if the Examiner's ultimate conclusion is

1  that the application should be rejected, then no patent

2  is issued.

3          Sometimes patents are issued after

4  appeals within the PTO or to a court.  The papers

5  generated during these communications back and forth

6  between the Examiner and the applicant are called the

7  prosecution history.

8          The fact that the Patent and Trademark

9  Office grants a patent does not necessarily mean that

10  any invention claimed in the patent, in fact, deserves

11  protection of a patent.

12          While the issued patent is presumed

13  valid, a person accused of infringement has the right to

14  argue here in federal court that a claimed invention in

15  a patent is invalid.

16          For example, the PTO may not have had

17  available to it all other prior art that will be

18  presented to you.  It is your job as the jury to

19  consider the evidence presented by the parties and

20  determine independently and for yourselves whether or

21  not the Defendants have proven that the patent is

22  invalid.

23          To help you follow the evidence, I will

24  now give you a brief summary of the positions of the

25  parties.

1          The Plaintiff in this case is DDR

2    Holdings, LLC, who I may refer to and you may hear it

3    referred to in the trial simply as DDR.

4          The Defendants are Digital River, Inc.,

5    who I may also refer to as Digital River; National

6    Leisure Group, Inc., who I may refer to as NLG; and

7    World Travel Holdings, who I may refer to as WTH.

8          The Plaintiff, DDR, contends that certain

9    claims of the following patents have been infringed.

10   Patent No. 6,993,572, referred to here as the '572

11   patent, and Patent 7,818,399 referred to here as the

12   '399 patent, these patents may be referred to as a group

13   as the patents-in-suit.

14         DDR does not contend that each Defendant

15   infringed each of the patents-in-suit; rather, it

16   contends that each Defendant infringed only certain

17   claims of certain of the patents-in-suit.

18         The claims that DDR contends have been

19   infringed have been referred to as the asserted claims.

20         Over the course of this case, you will

21   learn more about which claims are asserted against each

22   Defendant.

23         In general, DDR contends that the

24   Defendants have directly infringed the asserted claims

25   by making, selling, or using their e-commerce methods or

1  systems.  I may refer to the Defendants' accused systems

2  or methods as the accused e-commerce websites.

3           DDR also contends that the Defendants are

4  inducing infringement of Claims 17 of the '572 patent by

5  inducing others to perform one step of the patented

6  method while a Defendant performs the other steps.

7           Finally, DDR alleges that the Defendants

8  have willfully infringed the patents-in-suit.

9           The Defendants deny that they are

10  infringing any of the asserted claims of the

11  patents-in-suit.

12           The Defendants also deny that they have

13  willfully infringed the patents-in-suit.

14           The Defendants further deny that DDR is

15  entitled any damages.

16           Furthermore, Defendants contend that the

17  asserted claims are invalid on one or more grounds.

18           Invalidity is a defense to infringement.

19  Therefore, even though the U.S. Patent and Trademark

20  Office or PTO has allowed the asserted claims, you, the

21  jury, must decide whether those claims are invalid.

22           Your job is to decide whether any of the

23  asserted claims have been infringed and whether any of

24  the asserted claims are invalid.

25           If you decide that any claim of the

1   patent has been infringed and is not invalid, you will

2   then need to decide what amount of money damages are to

3   be awarded to DDR as compensation for such infringement.

4                Now, my job in this case is to tell you

5   what the law is, handle the rulings on evidence and

6   procedure, and to oversee the conduct of the trial as

7   efficiently and effectively as possible.

8                In determining the law, it is

9   specifically my job to determine the meaning of any

10  claim language from within the asserted patents that

11  needs interpretation.

12               Claim language is the language in those

13  numbered paragraphs at the end of the patent.  You must

14  accept the meanings I give you and use those meanings

15  when you decide whether any particular claim has or has

16  not been infringed and whether or not any claim is

17  invalid.

18               You'll be given a document in a moment

19  that reflects those meanings which I have determined.

20               Also, any claim term for which I have not

21  provided you with the definition, you should apply the

22  ordinary meaning.

23               If I have provided you with a definition,

24  however, you are to apply my definition to those terms

25  throughout the case.

1          Nevertheless, my interpretation of the

2    language of the claims should not be taken as an

3    indication by you that I have a personal opinion or any

4    opinion at all regarding issues such as infringement and

5    invalidity.  Those issues are yours alone to decide.

6          I will provide you with more detailed

7    instructions on the meaning of the claims before you

8    retire to deliberate and reach your verdict.

9          In deciding the issues that are before

10   you, you'll be asked to consider specific legal rules,

11   and I'll give you an over -- overview of those rules now

12   and then later give you much more detailed instructions.

13         The first issue -- issue you will be

14   asked to decide is whether each of the Defendants has

15   infringed any of the asserted claims.

16         Infringement is assessed on a

17   claim-by-claim basis.  Therefore, there may be

18   infringement as to one claim but no infringement as to

19   another.

20         There also are a few different ways that

21   a patent can be infringed.  I will explain the

22   requirements for each of these types of infringement

23   in -- to you in detail at the conclusion of the case.

24         In general, however, the Defendants may

25   infringe the asserted patents by making, using, selling,

or offering for sale in the United States or importing

into the United States a system or practicing a method

meeting all the requirements of a claim of the asserted

patent.

Defendants may also indirectly infringe

the asserted patents by contributing to infringement by

another person or entity or by inducing another person

or entity to infringe.

I will provide you with more detailed

instructions on the requirements for each of these types

of infringement at the conclusion of the case.

Another issue that you will be asked to

decide is whether the asserted patent is invalid.  A

patent is presumed valid but may be found to be invalid

for a number of reasons, including because it claims

subject matter that is not new or is obvious.

For a claim to be invalid because it is

not new, Defendants must show by clear and convincing

evidence that all of the elements of a claim are present

in a single previous publicly known or used device or

method or sufficiently described in a single previous

printed publication or patent.  We call these prior art.

If a claim is not new, it is said to be

anticipated.

Another way that a claim can be found to

1  be invalid is that it may have been obvious.  Even

2  though every element of a claim is not shown or

3  sufficiently described in a single piece of prior art,

4  the claim may still be invalid if it would have been

5  obvious to a person of ordinary skill in the field of

6  technology of the patent at the relevant time.

7        You will need to consider a number of

8  questions in deciding whether the inventions claimed in

9  the asserted patents are obvious.  I will provide you

10 with detailed instructions on these questions at the

11 conclusion of the trial.

12        If you decide that any claim of the

13 asserted patents has been infringed and is not invalid,

14 that is, its presumption of validity has survived, then

15 you will need to decide what amount of money damages are

16 to be awarded to DDR as compensation for -- compensation

17 to it for the infringement.

18        A damage award must be adequate to

19 compensate DDR for the infringement, but in no event may

20 the damage award be less than what DDR would have

21 received had it been paid a reasonable royalty for the

22 use of its patent.

23        I will instruct you later on the meaning

24 of a reasonable royalty.  The damages you -- the damages

25 you award are meant to compensate DDR and not to punish

1  the Defendants.  You may not include in your award any

2  additional amount as a fine or penalty above what is

3  necessary to fully compensate DDR for the infringement.

4         I'll give you more detailed instructions

5  on the calculation of damages at the conclusion of the

6  trial.

7         Now, you're going to be hearing a number

8  of witnesses in this case, and I want you to keep an

9  open mind while you're listening to the evidence and not

10  decide any facts until you've heard all of the evidence.

11  While the witnesses are testifying, remember that you

12  will be the ones who have to decide the degree of

13  credibility and believability to allocate to each of the

14  witnesses.

15         So while they're testifying, you should

16  be asking yourself:  Does this witness impress you as

17  truthful?  Does he or she have a reason not to tell the

18  truth?

19         Does he or she have any personal interest

20  in the outcome of the case?

21         Does the witness seem to have a good

22  memory?

23         Did he or she have the opportunity to

24  observe accurately the things they testified about?

25         Did the witness appear to understand the

1   questions clearly and answer them directly?

2              And, of course, does the witness'

3   testimony differ from the testimony of other witnesses,

4   and if it does, how does it differ?

5              These are the kinds of things you should

6   be thinking about while you're listening to each

7   witness.

8              The court reporter in front of me,

9   Ms. Holmes, is here taking down everything that is said,

10  but that transcript will not be ready in time for your

11  deliberations.  It's -- it's prepared in the event that

12  there's an appeal to an appellate court to review this.

13  So you'll each have to rely on your memories.

14             In a moment, you're each going to be

15  given a juror notebook.  One of the things in the back

16  of that notebook are blank pages that you can use to

17  take notes.  It's up to each of you to decide whether or

18  not you want to take notes and how detailed you want

19  those notes to be.

20             But, remember, those notes are for your

21  own personal use.  You have to rely on your memory of

22  the evidence, which is why you should pay close

23  attention to the testimony of each witness.

24             You should not abandon your own

25  recollection because somebody else's notes indicate

1  something different.  Your notes are to refresh your

2  recollection, and that's the only reason for which you

3  should be keeping them.

4         I'm now going to ask Mr. Floyd, our court

5  security officer, to hand out these juror notebooks to

6  each of you at this time.

7         Mr. Floyd, if you would.

8         COURT SECURITY OFFICER:  Yes, sir.

9         (Notebooks passed to jurors.)

10        THE COURT:  In these notebooks, Ladies

11 and Gentlemen, you'll see that you each have a copy of

12 the asserted patents that we've talked about.

13        Also in your notebook, you'll see some

14 pages listing the claim terms.  Those are the words that

15 are found in those numbered claims I've told you about

16 and before -- told you about before.

17        And then over under construction, in that

18 column is the definition that the Court has given you to

19 work with as regard those terms.

20        You also will have -- you also have pages

21 with witness photographs and names for the witnesses.

22 New pages for each day's witnesses may be added to your

23 binder each morning before the trial continues that day.

24        Whenever you leave each day, be sure you

25 leave your notebooks in the jury room.  They should

1  either be with you in Court or in the jury room at all

2  times and nowhere else.

3            And you can keep your notes on the legal

4  pad that are in the back of the notebooks, if you want

5  to, and you'll have everything together there in your

6  notebooks.

7            Now, if you would just put those

8  notebooks down for a moment, you'll have plenty of

9  times to -- plenty of time to look through those later.

10  But I want to give you my final instructions before we

11  hear the opening statements from counsel.

12            Each side will make an opening statement

13  in just a moment.  You need to understand that each

14  side's opening statement is not evidence.  What the

15  lawyers tell you is not evidence.  It's simply their

16  explanation of what they hope and expect the evidence

17  will show.

18            The evidence in this case is the sworn

19  testimony of the witnesses together with the exhibits

20  that are admitted into evidence for your consideration.

21  That's the evidence in this case.

22            There are two standards of proof that

23  you'll be asked to apply to the evidence depending on

24  the issue that you're deciding.

25            As the jury, you may apply the burden of

1 proof known as a preponderance of the evidence, as well

2 as the burden of proof known as clear and convincing

3 evidence.

4          I talked about the burdens of proof

5 before you last Monday during jury selection, but I'd

6 like to take a moment to instruct you again on the

7 different burdens of proof.

8          A party has the burden of proof on any

9 claim by a preponderance of the evidence.  This means

10 that you, the jury, must be persuaded by the credible or

11 believable evidence that the claim or affirmative

12 defense is more probably true than not.  Sometimes this

13 is talked about as being the greater weight and degree

14 of credible testimony.

15          Here in the courtroom, you see the statue

16 of the Lady of Justice holding the scales in front of

17 her.  Those scales start out exactly equal.

18          At the close of the evidence, the Court

19 will submit questions to you, and as to the party who

20 has the burden of proof by a preponderance of the

21 evidence, if you find that placing the evidence on those

22 scales tips the scales ever so slightly in that

23 direction you believe to be the greater weight and

24 degree of credible testimony, then that party's met the

25 burden of proof to establish that issue by a

1   preponderance of the evidence.

2                   But on the other hand, when the party has

3   the burden of proving any defense by clear and

4   convincing evidence, it means that you and the jury must

5   have an abiding conviction that the truth of the

6   parties' factual contentions are highly probable.

7                   That's a higher standard of proof than by

8   a preponderance of the evidence.

9                   If you imagine, again, the scales of

10  justice, they have to be tipped more heavily in favor of

11  the party who has the burden of proof by clear and

12  convincing evidence.  It's not enough, as it is with a

13  preponderance of the evidence, that they be tipped ever

14  so slightly.

15                  Now, none of this is to be confused with

16  the burden of proof called beyond a reasonable doubt,

17  which is the burden that we apply in criminal cases.

18  That burden does not apply in this case or in any civil

19  case, so you should not confuse clear and convincing

20  evidence with beyond a reasonable doubt.  Clear and

21  convincing evidence is not as high as beyond a

22  reasonable doubt, but it's higher than a preponderance

23  of the evidence.

24                  Now, I want to talk to you briefly about

25  expert witnesses.  When knowledge of a technical subject

1 may be helpful to you as the jury, a person who has

2 special training and experience in that particular

3 field -- we may refer to them as an expert witness -- is

4 permitted to testify to you about his or her opinions on

5 technical matters.

6                However, you're not required to accept

7 those opinions at all.  It's up to you to decide whether

8 you believe that an expert witness or any witness for

9 that matter is correct or incorrect or whether or not

10 you want to believe what they say.

11                I anticipate that there will be expert

12 witnesses testifying in support of each side in this

13 case, but it will be up to you to listen to their

14 qualifications, and when they have give -- when they

15 give an opinion and explain a basis for it, you will

16 have to evaluate what they say and whether you believe

17 it and to what degree you want to give it any weight.

18                Now, during the trial, I also anticipate

19 that there's testimony that's going to be presented by

20 what we call depositions.  In trials, it's tough to get

21 every witness here at the same time.  So the lawyers

22 from each side, prior to trial, may take the deposition

23 of a witness.

24                In a deposition, they have a court

25 reporter present, the witness is under oath, just as if

1   he or she were personally in court, and the parties ask

2   them questions, and it's recorded.

3                    Portions of those video recordings of

4   these questions may be played to you as a part of the

5   trial so that you can see the witness and hear their

6   testimony.

7                    That deposition testimony is entitled to

8   the same consideration, insofar as possible, and is to

9   be judged as to the credibility, weight and otherwise

10  considered by the jury in the same way as if the witness

11  had been present and had been -- and given the testimony

12  from the witness stand in open court.

13                    Now, during the trial of the case, it's

14  possible that the lawyers will make certain objections,

15  and I'll make rulings on those objections.  It's the

16  duty of an attorney on each side of a case to object

17  when the other side offers testimony or other evidence

18  which the attorney believes is not proper.

19                    Now, upon allowing testimony or other

20  evidence to be introduced over the objection of an

21  attorney, the Court does not, unless expressly stated,

22  indicate an opinion as to the weight or effect of such

23  evidence.

24                    As stated before, you, the jury, are the

25  sole judges of the credibility of all the witnesses and

1  the weight and effect of all the evidence.

2          Now, I want to compliment the parties in

3  this case, because up until today, they have worked very

4  hard, and there -- there may be a lot of exhibits shown

5  to you during the trial.

6          And through pretrial procedures, all the

7  rulings have already been made by the Court about the

8  admissibility of all the exhibits.  We may have a few

9  more as we go along, but a lot of time has already been

10  saved for you because the parties have worked hard in

11  advance of trial to resolve the majority of these

12  objections.

13          So if the parties show an exhibit, it

14  means that I have already ruled on the admissibility of

15  that exhibit.  Then they'll ask such questions as they

16  wish to put it in context.

17          But I just want to let all of you know

18  that both sides have worked very hard to streamline the

19  issues so we all don't have to sit here today during the

20  trial and through the next week and listen to questions

21  about exhibits, such as when was it made; who made it;

22  was it made in the regular course of business.

23          You don't have to listen to that 75 or a

24  hundred or 150 times because it's already been taken

25  care of.  And the parties are to be complimented because

1  they're trying to make the case streamlined and

2  efficient.

3            However, it's still possible -- all that

4  hard work notwithstanding, it's still possible that

5  objections may arise during the trial.

6            If I sustain an objection to a question

7  addressed to a witness, then you must disregard the

8  question entirely and may not -- and may draw no

9  inference from the wording of it or speculate what the

10  witness would have said if I had permitted the witness

11  to answer the question.

12            If I overrule the objection, then you

13  should consider the question and the answer as if no

14  objection had been made.

15            By the way, the law of the United States

16  permits a judge to comment to the jury on the evidence

17  in a case, but such comments from the judge on the

18  evidence are only an expression of the judge's opinion

19  as to the evidence, and the jury may disregard such

20  comments in their entirety, because I remind you once

21  again, you, the jury, are the sole judges of the facts,

22  the credibility of the witnesses, and how much weight

23  you want to give to their testimony.

24            That's not my job; that's your job.  And

25  as I indicated to you earlier, I intend to try very hard

1 not to comment on any of the evidence or the witnesses

2 throughout the trial.

3                We're going to hear opening statements

4 from the lawyers in just a few minutes, so I want to

5 give you a brief roadmap of how the trial will be

6 structured.

7                After the opening statements, DDR will

8 present its evidence in support of its contentions that

9 some of the claims of the asserted patents have been and

10 continue to be infringed by the Defendants.

11                To prove infringement of any claim, DDR

12 must persuade you that it is more likely than not that

13 the Defendants have infringed that claim, that is, by a

14 preponderance of the evidence.

15                After DDR rests, then the Defendants will

16 present their evidence in support of their contention

17 that the claims of the asserted patents are invalid.

18                To prove invalidity of any claim,

19 Defendants must persuade you by clear and convincing

20 evidence that the claim is invalid.

21                In addition to presenting its evidence of

22 invalidity, Defendants will put on evidence responding

23 to DDR's proof of infringement and damages.

24                DDR may then put on additional evidence

25 responding to Defendants' evidence that the claims of

1  the asserted patents are invalid and offer any rebuttal

2  evidence of infringement and damages.

3            This is referred to as rebuttal evidence.

4  DDR's rebuttal evidence may respond to any evidence

5  offered by the Defendants.

6            After all the evidence has been

7  presented, I will give you final instructions in this

8  case.  Those final instructions are called the Court's

9  charge to the jury.

10           The lawyers will then present their

11  closing arguments.  After that, you will retire to

12  deliberate and reach your verdict.

13           Also, I repeat my early instruction to

14  you, you are not to discuss the case at all among

15  yourselves during the trial.  Only when you retire to

16  deliberate and return a verdict, after all the evidence

17  is in, may you discuss the case between yourselves.

18           I also want to remind you that the

19  attorneys and the witnesses here today have been

20  instructed by the Court not to talk to you.

21           So as we take breaks and you see them in

22  the hallway in the courthouse, please don't perceive any

23  of their actions as unfriendly or hold it against them

24  if they don't interact with you.  That's part of what I

25  require of them.

1               With those instructions, we are now going

2    to hear DDR's opening statement followed by the

3    Defendants' opening statement.

4               Counsel for the Plaintiff may proceed.

5               MR. CROSBY:  Thank you, Your Honor.

6               THE COURT:  Do you want a warning on your

7    time, Mr. Crosby?

8               MR. CROSBY:  I should be fine, Your

9    Honor.  Thank you.

10              THE COURT:  All right.

11              MR. CROSBY:  Good morning.  My name is

12   Ian Crosby, and I'm proud to represent Del and Danny

13   Ross and their company, DDR Holdings.

14              Let me tell you a little bit about

15   yourself like you told us about yourselves during jury

16   selection.  I have a wife and two young daughters.  I

17   went to law school at the University of Texas in Austin.

18              I'm here with my colleagues Ophelia

19   Camina, LeElle Krompass, and you also met Michael Smith

20   during jury selection.  And we're with the firm Susman

21   Godfrey.

22              I tried a patent case in this courtroom a

23   few years ago under Judge Ward, who retired last year,

24   and I'm glad to be here today before Judge Gilstrap.

25              This case is about two corporations,

1 Digital River and World Travel Holdings, which includes

2 what used to be a separate company called National

3 Leisure Group that are using DDR's patented technology

4 without permission or payment.

5        Danny and Del Ross are the DDR in DDR

6 Holdings.  The story of their patented technology begins

7 in the 1990s when they started a company called

8 Nexchange that pioneered a new way to sell on the

9 Internet.

10        It was the fall of 1997.  Del and his

11 college roommate, Joe Michaels, had just finished

12 graduate school.  They moved back to Atlanta to create a

13 startup company on the new Internet frontier.

14        Del's father, Danny, had agreed to help

15 them get started.  He got a career in technology, IBM

16 and Timex.  He also helped other startups get off the

17 ground.  He helped Joe and Del -- he helped Del and Joe

18 form a company, prepare a business plan, and find

19 investors for the new business.

20        Back then, the Internet was still the

21 wild west.  There were only 100,000 websites back then

22 as opposed to more than half a billion today.

23        High-speed access was a thing of the

24 future, Apple was $4 a share, and Google didn't exist.

25        Few people really understood what the

Internet was about back then.  Joe and Del did.  They had both been online for years when they started business school in 1995, and the Internet had just opened for business.

Del and Joe knew the future when they saw it.  They explored every corner.  They studied every trend, and they tracked every innovation.  They didn't even wait to finish school before putting what they learned to use consulting for companies, looking for ways to tame this new frontier.

They kept working as consultants when they finished school, but they didn't wait long to start laying the foundation for their own company.  Their work had taught them that the biggest challenge to selling on the Internet was not building a great online store.  It was getting customers to stores in the first place.

Del and Joe decided to solve this problem by bringing the stores to places that people already were.  Their concept was to insert their store into websites that were already popular.

By the summer of 1998, they had a business plan and a business name, Nexchange.  Danny helped Del and Joe raise money from investors. They hired two talented programmers.  Randy May and Rich Anderson completed the team that would make the

Nexchange idea a reality.  It would work like this:

Nexchange would link stores with products from a variety

of merchants to already popular websites that Nexchange

called hosts.

When a visitor to a host clicked on a

link to buy a merchant's product, they would see a

Nexchange shopping page, but the host sites would not

worry about losing their visitors to Nexchange because

Nexchange would make it seem like they'd never left the

host site.

Nexchange achieved this by closely

matching the look and feel of the host's sites.

Visitors at shopping pages would experience the same

overall appearance of the site from which they came.

They would also still enjoy the confidence of buying

brand name products; yet they would seem to remain on

the host site throughout and beyond the buying process.

Nexchange filed a patent application for

this invention in September of 1998.  In October, its

system went live.  Before long, they started signing up

merchants and making sales.

Over the next two-and-a-half years, they

attracted dozens of merchants and thousands of hosts.

They grew to over a hundred employees.  Everything was

going according to plan.

1          Then the nationwide financial crisis

2   known as the dot com crash wiped them out.  Nexchange

3   closed its doors in December of 2000.  Danny bought the

4   rights to the patent application and formed DDR to

5   continue pursuing it with Del.

6          The Patent Office issued U.S. Patent

7   No. 6,993,572 to DDR on January 31st, 2006, and we call

8   this the '572 patent for short.

9          After many more years, on October 19th,

10  2010, DDR obtained U.S. Patent No. 7,818,399, and we

11  call this one the '399 patent.

12         The '572 claims generally involve -- can

13  you bring up the '572 slide?  There we go -- storing a

14  description of the look and feel of a host website;

15  Receiving a request for a shopping page when an Internet

16  user clicks on a link to the host's website;

17  Creating a shopping page with an appearance based on the

18  host's stored look and feel and content that includes an

19  opportunity to buy from a merchant.

20         You'll see that Digital River is

21  infringing the '572 patent by operating stores that sell

22  software over the Internet using systems called Global

23  Commerce and globalTech.

24         The Global Commerce and globalTech

25  systems save descriptions of the look and feel of the

websites of software makers like Microsoft.  Digital

River uses these look-and-feel descriptions to make its

online stores seem like they're part of the software

maker's own websites.

Digital River also generally requires its

clients to include links to their online stores in their

own websites.  I'll show you one of many examples you'll

see of matching stores that Digital River provides for

its clients.  This image is part of a website of a

software maker called VMware.

If you click on the buy now link, you

will go to a Digital River store that looks like this.

This is a different website running on a different

computer, but from the visitor's perspective, it seems

like they never left VMware's own site.

And if they want to continue shopping for

something else, all of the links to the rest of VMware's

site are there, too.

You may remember that Digital River's

counsel said during jury selection that all of DDR's

patents require the merchant, the host, and the provider

of the store to be different companies in order to be

infringed.

He said Digital River doesn't infringe

because its customers use Digital River's system to sell

1  their own products, because its customers fill the roles

2  of both merchant and the host.  In other words, there

3  are only two companies involved in its system.

4          It is true that there are only two

5  companies involved in Digital River's system, but it

6  does not mean that Digital River does not infringe.

7          I expect the Judge will instruct you that

8  the '572 patent can be infringed even when the same

9  company acts as both the merchant and the host.

10          The '399 patent, on the other hand, says

11  that there must be three separate companies.  That's why

12  DDR's not claiming that Digital River infringes that

13  patent.

14          The '399 patent also requires links from

15  multiple host sites and buying opportunities from

16  multiple merchants.  And it requires the provider of the

17  outsourced store to recognize where the links are coming

18  from.

19          DDR has accused WTH, World Travel

20  Holdings, of infringing both the '572 and the '399

21  patents.

22          WTH sells cruises on shopping pages that

23  it operates for customers in different lines of

24  business.  Examples include airlines, buying clubs, and

25  travel sites.

1            Three different companies serve the roles

2  of merchant, host, and outsource provider in WTH's

3  arrangement.  The cruise lines are the merchants, WTH is

4  the outsource provider, and WTH's customers are the

5  hosts.

6            WTH's servers store look-and-feel

7  descriptions for its customer sites.  It provides those

8  customers with links to their WTH shopping pages to

9  include in their own pages.

10            Clicks by visitors on those links send

11  requests over the Internet to WTH.  WTH recognizes the

12  source of those requests, and it displays a shopping

13  page with the stored look and feel for that customer.

14            So here's an example of what you would

15  see if you followed a link to WTH's store from Orbitz'

16  travel website.

17            This is Orbitz' home page.  The cruise

18  button contains a link to WTH.  When you click on it,

19  you go to this WTH shopping page.  It's hard to tell the

20  difference.

21            And once again, when you're done booking

22  your cruise through WTH, you can continue shopping on

23  Orbitz for other travel products as if you had never

24  left.

25            Others had tried to provide a similar

1  experience to this before Nexchange.  Digital River will

2  try to tell you:  We did it first.  But they never

3  matched the real look and feel of a partner's site until

4  after Nexchange filed its patent application.

5             Digital River's corporate representative,

6  Mr. Gagliardi, sitting right in this courtroom, has

7  admitted as much.  He has testified that in 1998,

8  Digital River wasn't matching more than a logo on its

9  store sites.

10            You will hear him say that they had to

11  hack their system, that is, make it do something it was

12  not designed to do, just to control where that logo

13  appeared on a store page.  And you will see examples

14  showing how little of their customer sites they were

15  able to match back then.

16            You will also see that the Patent Office

17  knew about Digital River's old system, the same one that

18  they claim as prior art.  It had Digital River technical

19  papers and a government filing describing that system

20  when it allowed the '572 patent.

21            You can see them listed right on the

22  patent's face.  And these are all documents about

23  Digital River's alleged prior art system that are

24  right -- listed on the face of the patent among the

25  things that were before the Patent Office when that

patent was examined the first time.

So here are some examples about the kinds of statements about Digital River's old system that were before the Examiner who decided to issue the '572 patent.  The Examiner knew all these statements, had access to all these statements when the '572 patent was allowed.

Digital River said about its system: When customers visiting one of the many websites enhanced with Digital River functionality click on the product descriptions, they're transparently linked to the Digital River site.

That was in front of the Patent Office. The statement:  Customers begin the process of buying online by hitting the purchase button on a client's page.  There's no sensation of being suddenly hustled off to another location.  Customers won't end up at some foreign-looking page where they have to hunt to find products.

That was in front of the Patent Office. The entire transaction takes place in the selling environment created by the client, surrounded by the look and feel of the developer's or dealer's identity, with products presented in a way to encourage sales with no competition.

1              That was in front of the Patent Office.

2              To create a seamless transition between

3     an existing website and Digital River's data base of

4     products, the first step is to create the look and feel

5     of the existing website.  This can be done by recreating

6     buttons, navigable elements, and other graphics to the

7     Digital River site.

8              That was in front of the Patent Office.

9              The Patent Office knew that Digital River

10    was saying it could match its customers' look and feel,

11    but you will see what they meant back then was copying

12    little more than a logo.  It wasn't matching the real

13    look and feel like Nexchange.

14             Still, when DDR filed this lawsuit in

15    2006, Digital River's response was:  We did it first.

16    So DDR asked the patent (sic) to examine the '572 patent

17    all over again.  DDR did not have to do this, but it

18    wanted to be sure that its patent was valid before

19    asking anybody to pay for a license.

20             This time there was even more information

21    before the Patent Office about many systems, including

22    more about Digital River's old system, and the Patent

23    Office confirmed the '572 patent again.

24             This is the re-examination system --

25    certificate that the Patent Office issued confirming the

1  patentability of claims, in particular, Claims 13 and 17

2  and 20 that are asserted in this suit, after the Patent

3  Office had another chance to examine the '572 patent

4  with even more information about Digital River's alleged

5  prior art system.

6             The same information that was in the '572

7  re-exam was also before the Patent Office during the

8  prosecution of the '399 patent.

9             In addition to the documents you saw,

10 this information included actual images of Digital

11 River's stores and customer host sites.

12            So let's bring up an example that shows

13 the host site for a Digital River customer called

14 Bitstream.  This is the Digital River -- this is the

15 Bitstream site, their home page, and a shopping site

16 that was hosted for them by Digital River.

17            This was in front of the Patent Office.

18 This is an example of the kind of capability that

19 Digital River had that the Patent Office was aware of to

20 match just a little bit of a site and not the overall

21 look and feel.

22            These examples just show that Digital

23 River was not matching the real look and feel of its

24 customers' sites back then.  The Patent Office was aware

25 of it.

1          DDR only proceeded with this lawsuit

2    after its patents had been confirmed and reconfirmed in

3    light of all of this information and more.

4          Digital River knows that the Patent

5    Office knew about its old system during both the

6    examination and the re-examination of the '572 patent.

7    But the song remains the same:  We did it first.

8          Digital River will tell you that there

9    was evidence that the Patent Office didn't see about its

10   old system.  They will have a consultant demonstrate

11   what they claim is a reconstruction of that system that

12   was not in front of the Patent Office.

13         But this reconstruction doesn't show any

14   important information that was not before the Patent

15   Office.  The examples you will see don't match the real

16   look and feel of Digital River's customers any better.

17   So here's the home page for a Digital River customer

18   called Digital Frontiers.  And now let's look at the

19   image of the Digital Frontiers store on Digital River's

20   restored system.

21         What's the same?  The logo, a couple of

22   bullets.

23         What's the difference?  Navigation bar,

24   nowhere to be seen.

25         Fonts?  Different.

1          Layout?  Different.

2          Footer?  Completely gone.

3          That is not the real look and feel, and
4 that is the best they've got.

5          You'll also see that the examples from
6 Digital River's prior art system are no better than the
7 main piece of prior art that was considered and
8 discussed by the Examiner, actually discussed in the
9 office actions that caused these patents to be allowed.
10 This references another patent called Tobin, and you'll
11 see that just like Digital River's old system, Tobin
12 matched little more than a logo.

13          The Examiner allowed DDR's patents
14 despite Tobin and similar examples because matching a
15 logo and little else is not the real look and feel of a
16 host site.

17          Another example you'll see is a site
18 called DTP Direct that will be demonstrated to you.  And
19 you'll see on this DTP Direct site that what they'll do
20 is, they'll present the Digital River shopping page
21 within what's called a frame in the browser.  The only
22 thing that Digital River's providing to this site is the
23 contents of this frame, which, again, only includes a
24 logo.

25          And you'll also see that there was prior

1  art before the Patent Office, considered by the

2  Examiner, that included a frame that didn't have

3  anything beyond that to match a look and feel, and the

4  Examiner said that's not prior art.  That's not matching

5  the real look and feel.  There's nothing new here.

6           So what else can Digital River point to

7  that was not before the Patent Office for the '572

8  patent?  It may show you some contracts and proposals by

9  Sabre and its subsidiary Travelocity that talk about

10 building co-branded sites for customers like Yahoo.

11 But the examples they will show you of the sites that

12 Travelocity actually built don't match the look and feel

13 of their host sites.  In fact, they prominently display

14 the Travelocity logo along with the partners to make

15 clear that Travelocity is who is bringing you the site.

16 That's not the real look and feel.

17           The only other thing they can point to

18 that wasn't on the front -- in front of the Patent

19 Office is a banking patent application called Saliba.

20 This patent doesn't even involve selling products on the

21 Internet.  It's not even in the same field of invention

22 as DDR's patents.

23           As for WTH, it didn't even choose to hire

24 an expert to dispute the validity of either of DDR's

25 patents.  Even though it is the only Defendant accused

1  of infringing the '399 patent, WTH will not show you any

2  proof that that patent is invalid.

3             Despite all of this, the Defendants

4  continue to infringe DDR's patents and refuse to pay for

5  a license.  It is time for you to make them.

6             The infringing websites have generated

7  over $300 million for the Defendants.  They know that

8  matching the real look and feel is important for

9  generating that revenue.

10            Digital River's damages expert,

11  Mr. Ugone, has admitted that Digital River has no

12  acceptable alternatives to its infringing conduct.  WTH

13  has called its infringing conduct its core competency.

14  In other words, DDR's invention is what they believe

15  makes their business special.

16            The law says that DDR has a right to no

17  less than a reasonable royalty for the Defendants'

18  unlicensed use of its patented technology.  It's just

19  like you would be owed a royalty if a trespasser started

20  pumping oil and gas out from under your land.

21            DDR will present its expert, Mr. Mark

22  Chandler, to show that 5-1/2 percent of Defendants'

23  infringing revenue is a reasonable royalty for the

24  Defendants' infringement.  That's just about $16 million

25  out of over $300 million in infringing revenues.

1                  For Digital River, that's around $10
2    million for almost $190 million they've made for
3    infringing the '572 patent.
4                  For WTH, it's just a little over $6
5    million for the over $112 million they've made from
6    infringing the '572 and '399 patents.
7                  It is a lot of money, but it's not much
8    compared to what the Defendants have made from their
9    infringement.  And they will make any excuse to get out
10   of paying even this much.
11                 Digital River will keep saying they did
12   it first no matter what the evidence is.  But the
13   evidence will show they never matched the real look and
14   feel of a customer's site until later.
15                 WTH will say their sites don't really
16   match enough to infringe, but their documents say
17   matching their host site is the point of what they do.
18   And you will see, as you saw with that Orbitz' example,
19   they do just that.
20                 The Defendants' excuses don't make sense.
21   They're the excuses of companies that just don't want to
22   pay, companies that think they know better than the U.S.
23   Patent Office, companies that think you don't have the
24   eyes to see it.
25                 You do have the eyes to see it, you have

1  the sense to judge it, and you have the power to stop

2  it.

3           During jury selection, some of you talked

4  about how corporations sometimes need checks and

5  balances to keep them on their best behavior.

6           Ladies and Gentlemen of the Jury, you are

7  the checks and balances.  It is up to you to say enough

8  and to set things right by finding that the Defendants

9  have infringed DDR's valid patents and should pay a fair

10 and reasonable royalty for doing it.

11          Thank you.

12          THE COURT:  Opening statement from the

13 Defendants.

14          MR. GOVETT:  Yes, Your Honor.  Just a

15 minute, please, to get things in order.

16          THE COURT:  That's fine.

17          (Pause in proceedings.)

18          THE COURT:  You may proceed.

19          MR. GOVETT:  May it please the Court.

20          Good morning, Ladies and Gentlemen of the

21 Jury.

22          This is a special occasion, because it's

23 the first time that anyone gets to hear both sides of

24 the story with respect to this dispute.  And we all know

25 that when there's two parties involved, it's very

1  important to hear all sides of the story.

2               I want to show you what I have on the

3  screen here.  This is a picture of the Charters of

4  Freedom, is what it's called.  It's found in the

5  National Archives in Washington, D.C.  And in the center

6  of the screen with the United States flag on each side

7  of it, that is the original of the United States

8  Constitution.

9               On the fourth document to the right below

10 the flag to the right is the signature of George

11 Washington, the original signature of George Washington.

12              To the left of that document, below the

13 mural to the left, is the Declaration of Independence.

14              And to the right of that document over

15 here (indicating) is the Bill of Rights.  And in the

16 Bill of Rights is the Seventh Amendment.  The Seventh

17 Amendment to our Constitution, Ladies and Gentlemen,

18 guarantees us to a right to a trial by jury.

19              It guarantees us the right to come in and

20 challenge these patents as part of the jury system,

21 because the patent system is a two-part process.  The

22 first part of the process is where one party tells one

23 side of the story to the Patent Office, and that's a

24 closed process.  That's its side of the story and only

25 its side of the story.

1              And if they succeed, they get a patent.

2 But if they choose to sue on that patent, then we get to

3 the second part, which requires you.  And the only way

4 that DDR can keep its patent is to come in Court and

5 allow everyone a fair chance, a fair opportunity to be

6 heard and to listen to all of the evidence, which means

7 you, Ladies and Gentlemen of the Jury, get to hear all

8 the evidence.

9              You hear all the facts.  You listen to

10 the cross-examination, and you see all of the evidence.

11              Why?

12              Well if you recall a week ago, when we

13 were here for jury selection, you saw this video.

14              (Video clip playing.)

15              MR. GOVETT:  That first Patent Office

16 process, Ladies and Gentlemen, is private.  By its

17 nature, that process does not consider all of the

18 evidence.  In this case, they had very little evidence

19 about Digital River compared to what you will see and

20 hear.  It's the first time that anyone has considered

21 all of the evidence.

22              Good morning again.  My name is Brett

23 Govett, and I'm privileged to stand before you and

24 represent Digital River in this case.  Digital River is

25 the global leader in providing e-commerce solutions.

1        Since 1996, we're the leader in providing

2  shopping-cart technology over the Internet that matches

3  the look and feel of our clients' websites.  Our

4  clients, which include Microsoft and Adobe, are the

5  hosts of those websites.

6        All the same patent elements and all the

7  same claim limitations that DDR has in its patents, we

8  were doing well before anyone at DDR came up with its

9  idea.  And patent law is clear that if somebody else

10 invented it first, you cannot get a patent on it.

11       The patent law is also clear that if

12 someone else uses it in the public first, you cannot get

13 a valid patent on it.

14       The patent law is clear that if someone

15 else sells it first, you cannot get a valid patent on

16 it.  Those are the three ways that a patent can be

17 invalid.

18       And during this trial, you will hear that

19 Digital River invented it first.  You will hear that

20 Digital River used it in the public first.  And you will

21 hear that Digital River sold it first.

22       And after the eight of you hear all the

23 evidence and all the facts, the patent laws of the

24 United States say that you make the final decision about

25 whether a patent is valid or invalid.  And juries like

1 you have been making those decisions, invalidating

2 patents for over 200 years.

3            Some people on juries tend to think,

4 well, that's too much; I could never second-guess the

5 Patent Office.

6            Don't worry about that.  In a case like

7 this, the issue is very simple.  If someone else did it

8 first, the patent is invalid.  It's really that simple.

9            And what does invalid mean?

10            It means that the patent never should

11 have been issued.  It means the alleged invention was

12 already known and belonged to the public, to you.  That

13 is what invalid means.

14            The three claims of the '572 patent

15 asserted against Digital River are invalid.  Those are

16 the only patent claims that are asserted against Digital

17 River.  An invalid patent claim cannot be infringed.

18            Digital River was the first to make and

19 sell this technology.  That's what matters under the

20 law.  The law does not concern itself with who's the

21 first to the Patent Office.  There's no race to the

22 Patent Office in the United States.  There's no winner

23 of the race to the Patent Office.

24            Being new, the first to invent, that's

25 what matters.  Because Digital River was doing the same

1 thing two years before DDR filed its patent application,

2 the patent is not new.  It should not have issued,

3 because the Patent Office did not have all the

4 information, you'll hear, about what was already out

5 there.

6         The Patent Office had 3 of the 70 prior

7 art documentary exhibits that you will see in this case.

8 And they were up here on the board a little while ago,

9 on the big screen.

10         And with two of those documents, Ladies

11 and Gentlemen, there was no date other than 1998.  In

12 order for it to be prior art, it must be clear to the

13 Patent Examiner that that document came before September

14 of 1998, when DDR filed its patent application.

15         If you recall, when they were up on the

16 screen, they simply said 1998 for two of those

17 documents.  The third document had a date on it, August

18 of 1998.  It was when Digital River went public, but

19 that document, Ladies and Gentlemen, is a Securities and

20 Exchange Commission document.  It was filed with the

21 Securities and Exchange Commission to allow Digital

22 River to sell its stock to members of the public like

23 you and I.

24         It's not the type of information that the

25 Patent Office would look for when it's looking for

1  technical information about how a system works.  That is

2  all that was before the Patent Office during the initial

3  examination and during the re-examination concerning

4  Digital River, 3 of 70 documents.

5           The Patent Office saw less than 5 percent

6  of the documentary evidence that you will see.  You will

7  see the other 95 percent of the documentary evidence,

8  and you'll see even more.

9           The Patent Office never had a chance to

10 see any source code.  Source code is the code that sets

11 inside our computers and allows them to operate.  The

12 Patent Office has no laboratories, no testing

13 facilities, or procedures in place to verify how systems

14 actually work, so the Patent Office did not get to see

15 our system, but you will.

16          It never had a chance to talk to or hear

17 from our expert witness, but you will.

18          It never had a chance to talk to or hear

19 from our witnesses, but you will.

20          Now, while I'm talking about those

21 witnesses, let me introduce them to you, Ladies and

22 Gentlemen.  You're going to hear from Mr. Jim Pichler.

23          Stand up, Mr. Pichler.

24          Mr. Pichler, Ladies and Gentlemen, is the

25 man who invented the Digital River system --

1                     You may sit down.  Thank you.

2                     -- back in 1996 timeframe.

3                     He received his bachelor's in computer

4  engineering from the University of Minnesota in 1992.

5  Shortly after that, he went to a work with the founder

6  of Digital River, a man named Joel Ronning, at a company

7  called Technology Squared.

8                     While he was at Technology Squared,

9  Mr. Ronning introduced him to what his idea was about

10 selling, using shopping-cart technology and the look and

11 feel of a host website over the Internet.  You'll see

12 documents on that from April of 1996, and I'll show them

13 to you in a minute.

14                     He'll tell you that when he saw that, it

15 took him about a second to figure out that he wanted to

16 go to work from that company -- for that company, and

17 that company is Digital River.

18                     Mr. James Gagliardi is our corporate

19 representative.  He's the Vice President and Director of

20 Product Development at Digital River.

21                     Thank you.

22                     He started with Digital River in March of

23 1998, three -- sorry -- five months before this patent

24 application was filed, six months actually, but I'm

25 giving them until the first of September.  It actually

1  was filed on September 17th of 1998.

2              Mr. Peter Kent in the audience, he's our

3  expert witness.  He started working in the Internet --

4  thank you -- in 1993, five years before, about, DDR

5  filed its patent application.

6              And Mr. Kent, Ladies and Gentlemen, we

7  affectionately refer to as an Internet dummy and an

8  Internet idiot.  He wrote these books that I have in my

9  hands right here:  The Complete Idiot's Guide to the

10 Internet and Search Engine Optimization for Dummies.  I

11 say that affectionately, of course.

12             He's an expert in the field.  Mr. Kent

13 has a degree with honors from the University of

14 Sheffield in England.  He learned about computers while

15 he was doing oil and gas logging out in the oil patch,

16 and some of that work he did right here in Marshall,

17 Texas, when he was working in the oil patch.

18             He's done a thorough investigation.  He's

19 spoken to many witnesses, and he's relied on his years

20 of experience relating to the Internet.  He will testify

21 that the three patent claims of the '572 patent asserted

22 against Digital River are invalid, based on his work.

23             I want to introduce you to the rest of

24 our trial team.

25             You met Mr. Chris Bunt during jury

1 selection.  Mr. Karl Dial is here to help us try the

2 case.  Ms. Miriam Quinn also will help us try the case.

3 Mr. Dustin Mauck will help.  Mr. Jim Baker, who's

4 working the computer for us, and Ms. Ann Franklin, the

5 last but not least most important member of our trial

6 team.  She helps keep us altogether.  It's quite a

7 chore.

8 Now, I want to shift to the timeline,

9 which we have over here.  I've got it on the board, and

10 I'll put it up on the screen, because Digital River was

11 doing the same thing in 1996 that it is doing now.

12 And I can show you when Digital River was incorporated.

13 The next document is Defendants' 337.

14 We were incorporated in Minnesota in

15 February of 1994.  It took us a while before we figured

16 out what we wanted to do, but when we came to that in

17 April of 1996, there was no looking back.  And we're

18 doing it today, just like we have since that time.

19 We filed patent applications in June of 1995.  Digital

20 River respects intellectual property, Ladies and

21 Gentlemen.  These patent applications are not at issue

22 in this case.  They're for a different technology, but

23 we do respect intellectual property.  You need to know

24 that.

25 In April of 1996, you'll see the next

1    document, Digital River -- this is the Digital River

2    Internet storyboard, and if we -- is the first page

3    available?

4              This is the document that you will see in

5    evidence that has Mr. Pichler and Mr. Ronning's name on

6    it.  It's the Digital River Internet ordering system.

7    You can see in the middle there in the cloud, that's the

8    Internet.

9              To the right, you'll see All ISV.  That's

10   independent software vendors, and dealer pages are

11   located on the Digital River server.  The ISVs, those

12   are the merchants; those are the creators of the

13   software.

14             And the dealers, those are the hosts that

15   have websites, and you can go to those host websites and

16   buy this software.

17             You'll see down below there's product

18   detail.

19             Go to the next page.

20             On the -- on the second page of this

21   document, you'll see a shopping cart, and you'll also

22   see a data capture level.

23             Excuse me one second.

24             Your Honor, if I may have a warning at 20

25   minutes, please.

1                    THE COURT:  All right.

2                    MR. GOVETT:  Thank you, sir.

3                    The next page, this is where it also

4   comes together.  This is the last page of this document,

5   and it states:  The user will be presented with a page

6   on the Digital River server that is similar in feel to

7   the ISV or dealer page.

8                    That's exactly what we've been doing

9   since July the 1st of 1996, Ladies and Gentlemen.

10                   Defendants' 115, we're capturing the look

11  and feel off of our clients' websites.  And when

12  somebody would click on that page to go to the shopping

13  cart to buy something, that same look and feel would be

14  found on the website.

15                   Let me see Defendants' 123, if I might.

16                   This is a September 1996 document, Ladies

17  and Gentlemen, two years right on the button from when

18  they filed their patent application.  And it's

19  concerning electronics software distribution.

20                   If you see here, the second is out --

21  sorry, go back.  Go back.

22                   Second is out -- that should be:  Our

23  Internet-secure sale server, SSS.  The SSS is where I

24  think our two companies could start working together

25  right away.  The Internet SSS is designed to be a

1 transparent addition to any manufacturer or dealer's

2 website.  The customer would access the electronic

3 purchase and delivery option from within the host's

4 website and be transparently linked to Digital River

5 secure sales server where their order will be

6 electronically processed and fulfilled.

7 　　　　　Here's the key:  The server will carry

8 the visual properties from the host's website through

9 the order process in order to give the customer the

10 comfort of thinking that they're ordering from the

11 respective manufacturer or dealing -- dealer.

12 Same look and feel.

13 　　　　　Next page.

14 　　　　　Digital River's SSS, the secure sales

15 system, brings together software manufacturers and

16 dealers, enabling them to sell and deliver product via

17 the Internet.  Throughout this process, it will appear

18 to the consumer as if the transaction is being processed

19 by the manufacturer or dealer, while the Digital River

20 SSS is handling the whole transaction behind the scenes.

21 Because we have the same look and feel.

22 　　　　　This is Defendants' 123, Defendants'

23 Exhibit 123.

24 　　　　　And look at the next document, Ladies and

25 Gentlemen, the next page from this document.

 1                You see the software manufacturers;

 2   again, those are the merchants.  You'll see Digital

 3   River; that's the e-commerce outsource provider.  And

 4   you'll see the software dealers; those are the hosts.

 5   Exactly what they had up on the screen here during their

 6   opening statement.

 7                But the difficult part for the Plaintiff

 8   is this is two years before they filed for their patent

 9   application, Ladies and Gentlemen.

10                Let's go back to the next exhibit.

11                Now -- actually, I want to talk to you

12   about 1996, because that's the key.

13                The Internet's come a long way since

14   1996, and this is the look and feel that we're talking

15   about in 1996.  But to orient us to 1996, I went to the

16   card store and I got this book, 1996, Remember When.

17                Ladies and Gentlemen, that was the last

18   time the Dallas Cowboys got to the Super Bowl, and they

19   won it that year.  The Atlanta Olympics took place that

20   year.  Baylor graduate and fellow Texan, Michael

21   Johnson, won the 200-meter and 400-meter events during

22   the Atlanta Olympics.  ER and Seinfeld were on

23   television.  Independence Day, Mission Impossible, and

24   Jerry McGuire were on at the movies, and the Macarena

25   was on the radio.

1                 You'll hear more on that, because Digital

2    River used that song during the 1996 to 1997 timeframe.

3    And a gallon of gas in 1996 on average, believe it or

4    not, was 1.22.  Now, it's, of course, three times that

5    amount.

6                 Technology from 1996, this is what a

7    Toshiba laptop looked like in 1996.  This is what a

8    Toshiba laptop looks like in 2012.

9                 And systems that ran the Digital River

10   system from back then, they're over here on the bench.

11   They're big; they're clunky, but, Ladies and Gentlemen,

12   please judge not by appearances.  Don't be fooled.  Just

13   like the clunky Toshiba laptop that I showed you are

14   different than the slick laptops that are so thin today,

15   so do the older websites look different than the ones on

16   the Internet today.

17                 But in both cases, the fundamental

18   technology, the invention itself is the same in 1996 as

19   it is today.  The invention is the same.

20                 I want to show you -- you had some

21   pictures up here on the screen during the Plaintiff's

22   opening statement, but I want to show you a couple of --

23   how the system operated.

24                 If we can pull up the system.

25                 I want to show you one of the first

1   pages.  This is the original code from the system.  This

2   is Digital Frontiers, and if -- can you go ahead and put

3   it -- this is the capturing from the Digital Frontiers

4   website and being put onto our website.

5              And you can see now the Digital River

6   digi-storefront.  Show you that.

7              Next slide on that, please.

8              This is DTP Direct.  This was up on the

9   screen a little bit earlier also but from the Plaintiff,

10  but they didn't have the actual system.  And, of course,

11  we are copying the font.  We're copying the look and

12  feel.  That's part of the deal.  That's part of what we

13  had with our customers, is to use their look and feel,

14  because we didn't want -- as we saw in that Exhibit 123,

15  we didn't want people to be scared off in thinking they

16  were on a foreign website.

17             And you can see right here, these are

18  order buttons down here from Cialis Support Group.  And

19  we'll discuss this more during Mr. Pichler's testimony,

20  and he'll explain to you what he did back in 1996 to

21  create this invention.

22             Thank you.

23             I also want to show you a collage that we

24  have.

25             Put that up, if you would, please.

1              This is a look-and-feel collage.  These

2    are all the Defendants' exhibits.  Well, we were telling

3    our customers we're using the same look and feel.  And

4    to prove to you that the look and feel is identical of

5    what the client has, if you look right here

6    (indicating), a snapshot of your website, we call this a

7    WHACK.

8              We were WHACKing the webpages of our

9    clients' websites to use the exact same logos, the exact

10   same fonts, the exact same information on that website

11   so that when someone came to our shopping cart, they

12   would feel comfortable and feel like they were still on

13   that website.

14             Because you see, all we're talking about

15   in this case, Ladies and Gentlemen, are links on a

16   webpage, and then when you click on that webpage, the

17   same look and feel is transferred to a shopping cart.

18   That's it.  That's the basic, fundamental invention.

19   We were doing it two years before they were doing, and

20   it's been around for a long time.

21             Let's go to Defendants' 28, please.

22             THE COURT:  You've used 20 minutes,

23   Counsel.

24             MR. GOVETT:  Thank you, Your Honor.

25             This is a document from August of 1997.

1  By that time, Ladies and Gentlemen, we had 500 clients,

2  500 clients that were publicly using this, and we were

3  selling it to 500.

4           Let's see the next document.

5           This is Defendants' 28 also.  By

6  December, we had a thousand clients that were using our

7  system, and those 1,000 clients were using the process

8  which meets the three claims at issue of the '572

9  patent.

10          All of that before -- if we can go back

11 to the timeline -- DDR files its patent application in

12 September of 1998.

13          And, of course, one month before they

14 filed their patent application, we went public and sold

15 shares to the public.

16          Now, I want to show you Plaintiff's

17 Exhibit 1, because this is their initial filing that

18 they had with the Patent Office.  And I want to compare

19 that to what I had up on the screen a little bit

20 earlier.

21          The initial filing that they had with the

22 Patent Office had this diagram in it.  It had a

23 merchant, a processor -- that's the outsource

24 provider -- and a host.

25          Let's bring up that graphic.

1              As you'll see, in 1996, on

2    Defendants' 123, we had a merchant, the software

3    manufacturer.  Lines up two years before with their

4    merchant.

5              We also had an e-commerce outsource

6    provider.  That's Digital River.  Lines up with their

7    Nexchange Processor.  That's the e-commerce outsource

8    provider.

9              And you see the software dealers, those

10   are the hosts.  Lines up exactly with the host.

11   But there's more that you'll see in this case, Ladies

12   and Gentlemen.

13              Let me see Plaintiff's 63.

14              This is a document that came from the

15   Plaintiff's files, from DDR files, about syndicated

16   e-commerce.  It was part of a trade show called

17   Affiliate Solutions 2000, which took place in San

18   Francisco, California, in June of 2000.

19              Let's go to the next page.

20              They were talking at the trade show about

21   syndicated e-commerce, which is what Nexchange did, and

22   they talked about the popular website, which they did in

23   opening; that's the host.

24              They talked about the e-commerce

25   outsource provider; that's then.

1              And they talked about the merchant.  And

2    look what they told the audience at this trade show in

3    2000:  This is not new.  It's shopping malls versus main

4    street; it's McDonald's and Walmart.  And they were

5    right, Ladies and Gentlemen.  It is not new.

6              We've been doing it for more than two

7    years before they filed their patent application.  And

8    if you recall back to the video from the -- that we saw

9    last Monday -- go ahead and play that, if you would,

10   please.

11              (Video clip playing.)

12              MR. GOVETT:  Patents are only issued for

13   new ideas.

14              Keep going.  That's okay.

15              (Video clip playing.)

16              MR. GOVETT:  I apologize for that audio

17   on that, Ladies and Gentlemen, but the point is, patents

18   are only issued for new and valuable ideas.  They told

19   the public in June of 2000, this was not new.  They were

20   right.

21              The patent -- the '572 patent issued

22   because the Patent Office did not have all the

23   information.  And this video that we just watched and we

24   watched last Monday told us that the Patent Office knows

25   it may be missing important information or prior art,

art that came before they filed a patent application.
Examiners have a lot of work to do, and important
information may be overlooked or unavailable.  Prior art
that was not located, important information that was
overlooked, what do those two statements mean when you
boil them down?

It's real simple.  The Patent Office did
not have all of the necessary information.  The Patent
Office did not know Digital River was the first to make
and sell this technology.  You will know that, because
you are the only ones to have all of the information.

Ladies and Gentlemen, this box before you
represents the prior art that the Patent Office had.
The black covering on it represents that the process is
done in private.  DDR presented its patent application,
its -- what it thought was its invention in 1998.

And what did the Patent Office have at
the time?

Well, you've seen it.  They had a snippet
of what was available.  This block of information, it
represents the three publications that were up here on
the screen.  Two of those publications, Ladies and
Gentlemen, did not have a date on them such that you
could determine that they came before the filing of the
patent application.

1              The third publication was a Securities

2  and Exchange Commission document.

3              THE COURT:  Counsel, if you'll speak

4  before the microphone.

5              MR. GOVETT:  Oh, sorry.  I'm just about

6  to take this off.

7              But when you come into this Court, Ladies

8  and Gentlemen, you get all the information.  You get to

9  see not only those three documents but everything -- the

10  systems, the witnesses -- because the privacy comes off.

11  Everything's out in the open.

12              And you'll see that Digital River was two

13  years before, and they had the invention in the public

14  in use two years before they filed their patent

15  application.

16              The Patent Office did not have all the

17  information that you will see.

18              And if we can see this graphic.

19              This is what you will see in evidence, 70

20  documents.  You'll see the system.  You'll hear about

21  the source code.  You'll hear from Mr. Pichler, the

22  creator of the system.  You'll hear the sworn testimony

23  of Mr. Gagliardi and the sworn testimony of Mr. Kent.

24              Let's see how all that compares.  This is

25  what the Patent Office had, Ladies and Gentlemen.  They

had three documents in front of it.  Two of them were

undated, one of them a financial document.

And what you will have, overwhelming

evidence of invalidity that we did it first; we sold it

first; and it was first in public use.

The patent claims asserted against

Digital River, Ladies and Gentlemen, are invalid.

We can go to the next graphic.

An invalid patent claim cannot be

infringed.  It's that simple.  You cannot infringe an

invalid patent claim.

We look forward to presenting our case to

you, because at the end of it, we will ask that you find

that the three '572 patent claims are invalid based all

of the evidence.

Thank you very much for your jury service

and for your attention.  We appreciate it.

Mr. Lee will have some remarks about his

client for you now.

Thank you, Your Honor.

MR. LEE:  Could I get a warning at five

minutes, Your Honor?

THE COURT:  Yes, Counsel.

MR. LEE:  Thank you.  May it please the

Court, Counsel.

1                    Ladies and Gentlemen of the Jury, my name

2    is Lance Lee, and together with Mr. Norman Zivin and Ms.

3    Tonia Sayour, we're very pleased to represent National

4    Leisure Group and World Travel Holdings.

5                    We have with us today, Ms. Debbie

6    Fiorino, with World Travel Holdings as our corporate

7    representative.

8                    Ladies and Gentlemen, this is the first

9    time that I've had an opportunity to visit with you.

10   And having said that, I'd like to start by telling you a

11   little bit about our clients.

12                   NLG started out as a very small travel

13   agency that specialized in cruises.  It started its

14   business by setting up small offices within larger

15   retail centers and retail stores, similar to what you

16   might see in the aisles of a mall, or if you're in

17   Walmart, I recall a few years back having a Vision for

18   Less in the Walmart in Texarkana where I'm from.

19                   By early 1998, with more use of the

20   Internet, we expanded our business into online

21   operations.  Now, our business continued to focus on

22   booking cruises for folks.  Some of this business was

23   conducted under what we call our own brand names.

24   Say, for example, Cruises Only or cruises.com would be a

25   brand name that NLG used, but other of our business was

1  conducted with partners.  An example that you're going

2  to hear about of a partner of ours was American

3  Airlines.

4          Now, I've never taken a cruise, but I

5  understand them to be a different animal from booking a

6  hotel reservation, if you're going to a football game,

7  or booking a flight.  There are substantial differences

8  in those things, and there are more issues that you have

9  to consider.

10          There's more options that you have to

11  take into account in booking a cruise, because you're

12  not just saying I want to leave on Sunday and come back

13  Monday at this time.

14          Now, given this fact, we believe that the

15  evidence is going to show you that only a small

16  percentage of our cruises are booked online.  Because

17  you have to have so many questions answered, you have to

18  have a certain level of interaction with the actual

19  travel agents.

20          The vast majority of our cruises, we

21  believe, will be shown to be booked via the telephone.

22  As a result of this fact, my clients maintain a large

23  call center that employs hundreds of people to staff the

24  telephones so that when you call wanting to book a

25  cruise, they're there to answer your questions and help

1  you with the prices.

2          Now, by the beginning of 2006, NLG had

3  run into some pretty severe financial issues.  In fact,

4  during the summer of 2006, it was on the verge of

5  liquidation.  And in July, World Travel Holdings came in

6  and purchased NLG.  World Travel Holdings is another

7  travel agency that focuses, again, on cruising.

8          Now, let's talk a little bit about our

9  websites.  You've seen something Mr. Crosby put up.

10  That's what we're here to talk about, is the websites

11  that we have and that we use and the pages that are

12  associated with those sites.

13          First of all, Ladies and Gentlemen, we

14  design our sites and our webpages using readily

15  available software.  We don't use any special automatic

16  capturing techniques or anything of that nature.

17          Second, as I mentioned a few moments ago,

18  we have partners.  And as part of this partnership that

19  we have, we get the permission of those partners to use

20  their logos, and we pay them a percentage of our

21  revenues for -- for that reason, that we use those

22  logos.

23          Third, when we set up our webpages, our

24  partners give us direction in how to do it.  Some of our

25  partners choose to include only their own logos.  So,

1  for example, American Airlines may just want their logo

2  on it.

3            Other of our partners may choose to have

4  a combination of their logos together with our

5  house-brand logos.

6            Finally, Ladies and Gentlemen, our

7  partner webpages have nearly the same content as the

8  webpages for our house brands, and they all run off the

9  same platform.

10           So why are we here?

11           Well, as you heard the Plaintiff mention,

12  we're accused -- they are accusing us of infringing the

13  two patents at issue in this case, the '572 and the '399

14  patents.

15           And you've heard a little bit about those

16  patents already, and you're certainly going to hear more

17  during the course of the trial.

18           When you get this case, you're going to

19  have to determine infringement.  You're going to have to

20  determine whether or not our websites and pages infringe

21  the claims of these patents.

22           And in doing so, you're going to have to

23  look at every element in the claims and apply those to

24  the websites that we have.

25           And, Ladies and Gentlemen, I believe, as

1 Judge Gilstrap will instruct you, you have to find every

2 one of those elements.  If any one of those elements is

3 missing, then you can't find infringement.

4                 You're going to see during the course of

5 the evidence a lot of different websites, a lot of

6 different webpages.  And you're going to see that the

7 Plaintiff is accusing only those websites that use

8 partner logos, like American Airlines.

9                 At the end of the day, Ladies and

10 Gentlemen, we believe that the question you're going to

11 need to ask -- or you're going to need to answer --

12 excuse me -- is, how can that one type of website, when

13 compared to another type of website that may have a

14 house-brand logo, infringe when the other does not?

15                 Ladies and Gentlemen, the answer to that

16 question, after looking at the evidence, is going to be

17 they can't.  Neither of those infringe these patents.

18 I don't like to do it, but the issue has been raised,

19 and it's necessary for me to talk about damages.  And in

20 the event that you disagree with us about the issue of

21 infringement, you're going to have to consider the

22 question of damages.

23                 As you've already heard from Plaintiff,

24 they're claiming an entitlement to a fairly substantial

25 amount of money, in my view.  I don't believe that

1  you're going to be surprised that we have a difference

2  of opinion as to what should be awarded in this case,

3  should you find infringement.

4              THE COURT:  Five minutes remaining,

5  Counsel.

6              MR. LEE:  Thank you, Your Honor.

7              If you consider damages, if you get to

8  that point, you're going to have to determine what

9  dollar figure, what royalty amount that the Plaintiff is

10 entitled to.  And in making this assessment, you have to

11 decide how much of our revenue and our income is

12 specifically attributable to the use of their patents,

13 if any.

14             That's as opposed to some other activity

15 within our business.  It has to be related to our

16 alleged use of those patents.  That's where you have to

17 find your damages, if any.

18             Now, Ladies and Gentlemen, I also believe

19 that the evidence is going to show that DDR is asking

20 for damages that are almost two times of our net income

21 in this line of our business for the last six years.

22 Two times of our net income for the last six years.

23 We believe this to be a completely unreasonable

24 position, given all of the facts and circumstances that

25 you're going to consider.  And we, through our expert,

1  will present you with evidence that we believe

2  establishes what is truly a reasonable royalty in this

3  case.

4           Ladies and Gentlemen, I want to thank you

5  for your service.  I want to thank you for your

6  attention that you've given me.  And I'm at the

7  conclusion of this part of our presentation.  We look

8  forward to making our case and our presentation to you.

9           Thank you.

10           Thank you, Your Honor.

11           THE COURT:  Counsel, does anyone wish to

12  invoke the Rule at this time?

13           Hearing nothing from either Plaintiff or

14  Defendants, I'll assume that neither party elects to

15  invoke the Rule.

16           Ladies and Gentlemen of the Jury, at this

17  time, we have soon been here two hours or getting close

18  to it.  I'm going to let you take a break at this point.

19           I have a couple matters to take up with

20  the lawyers, and then I'll give them a break and bring

21  you back in.

22           Stretch your legs, get a drink of water.

23  I remind you again -- and you're going to get awfully

24  tired of hearing this from me, but I'm going to say it

25  over and over, so I'm just warning you now -- don't

1  discuss the case or anything about it with each other or

2  anyone else.

3           I'm going to let you recess at this time.

4  We'll bring you back in shortly.

5           COURT SECURITY OFFICER:  All rise for the

6  jury.

7           THE COURT:  You're welcome to leave your

8  notebooks in the chairs or take them to the jury room,

9  whichever is more convenient for you.

10          (Jury out.)

11          THE COURT:  All right.  Be seated,

12  please.

13          Previously during one of our pretrial

14  hearings, I instructed all counsel in general, and

15  Mr. Crosby in specifics, not to refer to anyone by first

16  names.  Mr. Crosby, in his opening, specifically

17  referred to one of the principals in DDR as Danny.

18  That's in direct violation of my instruction.

19          I want you to understand I give these

20  instructions for a reason.  I believe that a party

21  attempting to refer to someone on their side by first

22  name does it solely to gain an advantage and to confer a

23  prejudice on the other side.

24          I also think the use of first names as to

25  any counsel, party, witness, or any individual tends to

1  raise the likelihood of confusion with the jury when

2  only a first name is used and not a complete name.

3            If anybody else in this trial violates

4  that instruction, I am going to sanction that person and

5  their client.  This is my final warning on this.

6  Is everybody clear?  Does everybody understand that?

7  Mr. Smith?

8            MR. SMITH:  Your Honor, at the risk of

9  asking for clarification, our problem is, is that it's

10  Daniel D. Ross, Sr. and Daniel D. Ross, Jr.

11            THE COURT:  One goes by Danny Ross and

12  one goes by Del Ross, and you can refer to them as

13  Mr. Del Ross or Mr. Danny Ross.  But Danny and Del

14  doesn't do it.

15            MR. SMITH:  Thank you, Your Honor.

16            THE COURT:  You understand?

17            MR. SMITH:  Yes, I do, Your Honor.

18            THE COURT:  Okay.  Any other questions?

19            All right.  With -- we're going to take a

20  recess in just a minute.  During that recess, Defendants

21  are to remove these demonstratives.  The Court's policy

22  is you're certainly entitled to use demonstratives, but

23  they don't just stand up there throughout the rest of

24  the trial until somebody asks to take them down.

25            Once you're through with them, take them

```
 1  down and return the courtroom to an orderly fashion, and
 2  that will apply throughout the trial as well.
 3                    All right.  We're going to take a
 4  10-minute recess at this time.
 5                    COURT SECURITY OFFICER:  All rise.
 6                    (Recess.)
 7                    (Jury out.)
 8                    COURT SECURITY OFFICER:  All rise.
 9                    THE COURT:  Be seated, please.
10                    Would you bring in the jury, Mr. Floyd?
11                    COURT SECURITY OFFICER:  Yes, sir.
12  All rise for the jury.
13                    (Jury in.)
14                    THE COURT:  All right.  Be seated, Ladies
15  and Gentlemen.
16                    At this time, Counsel, if you have
17  witnesses in the courtroom who are going to testify, if
18  you'd bring them forward, we'll swear them all at one
19  time.
20                    If you'll come up, our courtroom deputy
21  will administer the oath.  We'll get this done once and
22  not have to do it over and over again.
23                    (Witnesses sworn.)
24                    THE COURT:  Okay.  Return to your seats,
25  please.  Thank you.
```

```
 1              Counsel, if you should call a witness
 2   later to trial who was not among this group, please call
 3   it to the Court's attention, and we'll swear them
 4   individually at that time.
 5              And with that having been completed, the
 6   Plaintiff may call Plaintiff's first witness.
 7              MS. CAMINA:  Your Honor, we call
 8   Mr. Daniel Delano Ross, Jr.
 9              THE COURT:  You may proceed, Counsel,
10   whenever you're ready.
11              MS. CAMINA:  May it please the Court.
12              My name is Ophelia Camina, and I
13   represent the Plaintiff DDR Holdings.
14   DANIEL DELANO ROSS, JR., PLAINTIFF'S WITNESS, SWORN
15                   DIRECT EXAMINATION
16   BY MS. CAMINA:
17      Q.   Would you please state your full name for the
18   record.
19      A.   Daniel Delano Ross, Jr.
20      Q.   Do you have a nickname?
21      A.   Yes, I do.
22      Q.   What is it?
23      A.   Del.
24      Q.   Do you go by Del Ross?
25      A.   Yes, I do.
```

1      Q.   Do you have children?

2      A.   Yes, I have four.  Sarah is almost 14; she'll

3  be 14 later this month.  Caroline is 12.  Daniel is 9.

4  And our baby, Amelia, is 4.

5      Q.   So I guess that means you're married?

6      A.   Yes.  Jamie and I have been married for 19

7  years.  We've been friends since high school.

8      Q.   Where are you from?

9      A.   I was born in Shreveport, but I grew up in

10  Atlanta, Georgia.

11      Q.   Where did you go to school?

12      A.   I went to high school in Atlanta, and then for

13  college, I went to Georgetown University in Washington,

14  D.C.  Worked for a few years, and then I went to

15  graduate school at the Wharton School of Business at the

16  University of Pennsylvania.

17      Q.   Okay.  Let's talk about your undergraduate

18  education.

19           What did you study at Georgetown?

20      A.   I majored in theology and psychology.

21      Q.   All right.  And what about the Wharton

22  Business School, what did you study?

23      A.   My concentrations were finance and management.

24      Q.   All right.  Where do you work today?

25      A.   I work for a company called IHG.  It stands

1  for Intercontinental Hotels Group.  It's a big hotel

2  company that's best known for our Holiday Inn and

3  Holiday Inn Express brand.

4      Q.   What do you for IHG?

5      A.   I'm the Vice President of Sales and Marketing

6  for the Americas.

7      Q.   What are your areas of responsibility as -- as

8  Vice President of Sales and Marketing for the Americas?

9      A.   We're responsible for trying to get as much

10  business from travelers who need a hotel as possible to

11  stay in our hotels.  Our franchisees -- we're mostly

12  franchised.  Most of our hotels are independently owned

13  and operated.  They depend on me and my team for most of

14  their revenues and for most of their success.

15      Q.   How long have you worked for IHG?

16      A.   11 years.

17      Q.   And what were you doing before you went to

18  work for IHG?

19      A.   I worked with -- in a startup e-commerce

20  company with my father, Danny Ross, and my college

21  roommate and grad school friend, Mr. Joe Michaels.

22      Q.   Okay.  And you used a word that some of us may

23  not be familiar with, e-commerce.  What is that?

24      A.   It's -- it's work online, on the Internet

25  to -- to sell, to conduct commerce.

1      Q.   Okay.  And what was the name of the startup

2  that you and your friend, Joe Michaels, started?

3      A.   It was called Nexchange, Nexchange

4  Corporation.

5      Q.   All right.  And what did you do before

6  Nexchange?

7      A.   I was in grad school.

8      Q.   Okay.  Are you one of the inventors of the

9  patents that are involved in this lawsuit?

10      A.   Yes, ma'am.

11      Q.   Are there other co-inventors?

12      A.   Yes, there are.

13      Q.   Who are they?

14      A.   There are five of us.  It was myself, my dad,

15  Danny Ross, Joe Michaels, Randy May, and Rich Anderson.

16      Q.   The Plaintiff in this lawsuit is called DDR

17  Holdings.  Do you know who DDR Holdings is?

18      A.   Yes, I do.

19      Q.   What is DDR Holdings?

20      A.   It's a company that was set up by my dad to

21  own the patents.

22      Q.   And what is your relationship to DDR Holdings?

23      A.   I'm a minority owner of DDR Holdings.

24      Q.   And who are the other owners of DDR Holdings?

25      A.   It's just me and my dad.  He owns 80 percent,

```
 1  and I own 20 percent.

 2              THE COURT:  Okay.  Ms. Camina, you're

 3  just a little bit soft-spoken.  Pull that microphone

 4  down just a little bit.

 5              MS. CAMINA:  I'm sorry.  Thank you, Your

 6  Honor.

 7              THE COURT:  Uh-huh.

 8      Q.   (By Ms. Camina) What did you and the other

 9  inventors invent?

10      A.   We invented a way for retailers wanting to

11  sell online to open up their stores on popular websites

12  all around the Internet without letting visitors feel

13  like they were leaving those popular websites, by

14  matching that look and feel really closely.

15      Q.   Okay.  And you use another term that was new,

16  look and feel.  What do you mean by that?

17      A.   I mean the overall impression of -- of where

18  you were -- what website you're on; the -- the entire

19  experience that let's you know which site you're on and

20  which site you're not on.

21      Q.   Okay.  Now, can you explain to the jury how

22  you came to invent this technology related to the

23  Internet?

24      A.   Well, I've always been really comfortable with

25  technology.  My dad was a personal computer pioneer back
```

1  in the early '80s.  We always had computers and

2  technology magazines, things like that, in our house, so

3  I grew up around the stuff.

4       I -- I actually used the Internet back before

5  there was a World Wide Web.  And when I was in high

6  school, I used to convince my teachers that instead of

7  writing term papers, they'd let me write computer

8  programs, which was pretty fun.

9       Q.   All right.  And tell me, what did you learn

10  from these early experiences?

11      A.   Well, I learned that -- that computers could

12  really change the way things worked, right?  They could

13  take old processes and make them totally different.

14  I learned that people were really interested in

15  technology and how it could be used and what it could do

16  for them.

17      And I learned that the world was changing

18  really quickly because of computers.

19      Q.   Okay.  Let's turn to 1997.  When did you

20  graduate from Wharton?

21      A.   I actually finished in 1997, the spring of

22  1997.

23      Q.   What did you do when you graduated from

24  Wharton?

25      A.   Well, my friend, Joe Michaels, and I started a

consulting company to help companies with the Internet.

Q.   What do you mean consulting about the Internet?

A.   What I mean is there are companies that -- well, the Internet was new, so nobody really understood it fully.  And companies were trying to figure out how they could use the Internet for their businesses.  And Joe Michaels and I were in the business of helping them make up -- figure out what they could do.

Q.   Okay.  And did you start a company at this point?

A.   Yes, we did.

Q.   What -- what kind of company was it?

A.   We were called Century Technology Group, a consulting company.

Q.   Okay.  And can you explain to the jury what kind of consulting you were doing with Century Technology Group.

A.   Well, most companies that we worked with were trying to figure out how to use the -- the Internet to sell their products direct -- you know, to sell more of their products.

      And we were giving them advice and suggestions about how they might be able to use Internet technology to do that, to make that happen.

1    Q.   Okay.  And I just want to make sure.  You were

2  fresh out of MBA school, right?

3    A.   Yes.

4    Q.   So can you explain to us about why you thought

5  you had the expertise to advise others about the

6  Internet.

7    A.   Yeah.  I know looking back it seems pretty

8  crazy to me that fresh out of school with not a lot

9  of -- of experience, we were advising big companies, but

10  it's just the way it was then.  It was all new.  It was

11  new to everybody.

12       And there weren't a lot of rules that were --

13  that were written there.  So Joe Michaels and I used the

14  Internet all the time in grad school.  We read

15  everything we could read about it, all the articles

16  we -- we searched -- searched around.  We went to a lot

17  of different websites.  And then we combined that with

18  what you we were learning in the classroom about

19  traditional business.

20       That combination of the traditional business

21  education, plus what we were learning and experiencing,

22  gives the confidence that we could give advice to

23  companies as they were beginning their learning process

24  about the Internet.

25    Q.   All right.  Had you done any consulting about

1  the Internet before you had formed Century Technology

2  Group?

3      A.   Yes, we did, while we were in grad school.

4      Q.   Okay.  And were you consulting with any

5  companies we might recognize?

6      A.   I think so.  One of the companies that we --

7  they worked with was called the Franklin Mint.  They

8  make collectibles.  People might remember their Civil

9  War chess set or Star Wars collectibles.  They made a

10 series of very popular plates that were collectible for

11 various themes.  That was one of our companies -- the

12 company that I worked with.

13     Q.   Okay.  Why is they -- why are they memorable?

14     A.   Well, they were looking -- they wanted to

15 figure out something very simple.  They wanted to know

16 if they could use the Internet to sell their products

17 directly online.  So they came looking for help, and we

18 helped them out.

19          We gave recommendations, and -- and the funny

20 thing was, at the end of the -- of the -- of the

21 project, they actually paid us with collectibles.

22     Q.   So you mean instead of paying you with cash,

23 they paid you with merchandise?

24     A.   Yeah.  I actually still have it.  I have a

25 replica Star Trek phaser.  It's really cool.  I have a

1  die-cast car, and my wife still sometimes wears this

2  string of fake pearls that were modeled after the Jackie

3  Kennedy pearls that John-John was holding.  And so,

4  yeah, we have fond memories of that experience.

5      Q.   What did you learn from your experiences of

6  consulting about the Internet?

7      A.   Well, we learned a lot.  One of the things we

8  learned was how hard it is to get people, visitors, to

9  come to a website.  That is -- and still remains one of

10  the toughest challenges of operating any kind of store

11  on online.  That was probably the biggest takeaway we

12  had at the time.

13      Q.   Okay.  What else did you do to learn about how

14  to attract people to the Internet?

15      A.   Well, we actually built our own websites just

16  for the purpose of trying out different techniques to

17  get people to come to the site.

18      Q.   Okay.  And so can you tell us what kind of

19  websites you built?

20      A.   We built one site called freemagazines.com.

21  It was a site where you could sign up for trial

22  subscriptions for magazines.  We used that site as kind

23  of a laboratory, and we tried everything that we could

24  find, every way of advertising and marketing the site to

25  get people to try it.  We figured out what worked, what

1  didn't work, the relative cost and benefits of those

2  different techniques.

3     Q.   All right.  I'd like for you to take us back

4  to 1997, and describe for us what the Internet looked

5  like at that time period.

6     A.   Well, it was -- it was all new.  Our -- our

7  counsel, Mr. Crosby, referred to it as the wild west,

8  and I think that's a really good description.

9          There weren't a lot of rules about how things

10 were supposed to have been done.  Even Amazon was in its

11 infancy then.  There weren't a lot of people using it.

12 Only about 1 in every 25 people were even using the

13 Internet at that time.  So it was kind of unstructured

14 and just coming together.

15    Q.   Do you know when the Internet opened for

16 business?

17    A.   The -- the real commercial Internet that

18 people use today was in late 1994, early 1995.

19    Q.   Okay.

20    A.   That's what we call the World Wide Web.

21    Q.   All right.  So who was using this Internet in

22 that time period?

23    A.   Most people using the Internet in that -- in

24 the mid-'90s were students, techies, and, you know,

25 people like that, not a lot of mainstream people.  I

1   mean, at the time, e-mail was still pretty new to most

2   people, and a lot of people didn't even have e-mail

3   accounts.

4        Q.   Okay.  So let's go to when you started Century

5   Technology Group.

6             How long did you do that consulting work under

7   Century Technology Group?

8        A.   We were in business less than a year.

9        Q.   Okay.  And why so short?

10       A.   Well, as we were consulting with companies, we

11  actually found that consulting wasn't really what we

12  wanted to do.  Rather than advise other companies about

13  how they could build businesses on the Internet, we

14  wanted to build one of our own and -- and -- and grow

15  that ourselves.

16       Q.   All right.  So what did you do next?

17       A.   So Joe and I spent time talking about

18  different business ideas we had, different things we

19  could do to build an Internet business.  We were working

20  out of a spare office in my dad's company, and we -- we

21  would just talk, you know, whenever we had a moment.

22  And very often, my dad would actually come by and join

23  the conversations.

24            And he'd had experience starting lots of

25  different technology companies, so his experience and

1  opinions were valuable, and we had a lot of very engaged

2  discussions about what was possible.

3      Q.   Okay.  What kinds of things did you brainstorm

4  about that was possible?

5      A.   Well, we had ideas about how we could improve

6  banking online.  We talked about ideas for insurance

7  businesses, government services, even industrial sales,

8  but when -- what really got us excited and got the most

9  energy is when we talked about the challenges of facing

10 online retailers.

11     Q.   All right.  And why online retailers?

12     A.   Well, we saw, as we had experienced ourselves,

13 that they were really having a hard time getting --

14 finding easy ways or effective ways of getting people to

15 come to their websites.  And that was a big challenge.

16     Q.   Was that the problem you were trying to solve?

17     A.   That's what we felt if -- that -- that we

18 could solve, and we knew if we could solve it, we'd be

19 very successful.

20     Q.   Okay.  Tell me a little bit more about this

21 problem.  Why was it so hard to find customers for a

22 website for a retail website?

23     A.   Well, even though there weren't as many

24 websites as there are today, I have read for every

25 website there is today -- every website then, there are

1  probably about 5,000 websites today.  There were still a

2  lot, and it's hard to make a website stand out.

3  It's kind of like finding a needle in a stack of

4  needles.  So that was one of the challenges.  How do you

5  make it stand out and have them find you in the first

6  place, and then, of course, want to buy from you.

7      Q.   Okay.  So let's go to solving the problem.

8  What did you do -- what ideas did you come up with to

9  solve -- to solve the problem?

10     A.   So as we were sitting around brainstorming

11 about how we could get people to go to online web

12 stores, it suddenly occurred to us -- and this -- I

13 remember this vividly -- that we were asking the wrong

14 question.

15          Instead of working really hard to try and get

16 people to go to a different web store, why wouldn't we

17 just take the web store and put it where the people

18 already were on popular websites.

19     Q.   What do you mean by that?

20     A.   Well, I guess if you think about it in --

21 in -- in real-world retailing, offline retailing, there

22 are three rules of success:  Location, location,

23 location, right?

24          You've got to have the right spot.  You can

25 have a great store, but if it's in a bad location,

 1  you're not going to do as well as a store in a good

 2  location.  And we just thought, well, gosh, if we can do

 3  the same thing on the Internet and put the store in the

 4  right location, the popular website where that -- that

 5  right customer was already going, we could do a lot of

 6  good, and we could actually sell a lot of products and

 7  services.

 8      Q.   Okay.  So tell us, what was your idea?

 9      A.   So the idea was this:  We would -- we created

10  a technology that enabled these merchants to actually

11  create a version of their store that could be put inside

12  a popular website and match that look and feel of that

13  popular website, enabling them access, that site's

14  visitors without taking the visitor away.

15      Q.   Okay.  So can you give me a real-life,

16  not-Internet, real-world example of that concept?

17      A.   Sure.  So we -- we put it up on -- we created

18  some slides to try and help with this.  You want -- you

19  want to go through that?

20      Q.   Well, first, I want you to tell me -- give me

21  an example of a real-world.

22      A.   Oh, real-world.  Right.

23           Well, one of the things that Counsel -- I'm

24  sorry; I don't remember his name -- was showing us from

25  the Defense was a slide that mentioned Walmart and

1  McDonald's.  It's a great example.

2       So everybody's heard of McDonald's.  One of

3  the brilliant ideas they had was not just opening

4  standalone McDonald's stores, but putting stores -- or

5  putting McDonald's restaurants into Walmart stores where

6  shoppers get hungry.

7       Great idea, right?  They could actually not

8  have to worry about getting people to go to the

9  restaurant itself.  They could go to shoppers that were

10 already there and serve them in a real McDonald's store.

11      Well, that's kind of what we were doing.  We

12 were doing this, but we were doing it on the Internet,

13 which is what was new.

14    Q.   And -- but what was unique about your

15 invention that was different from just putting the

16 Walmart inside of -- I mean, putting a McDonald's inside

17 the Walmart?

18    A.   Right.  A lot of it was new.  A lot of it was

19 unique, including the fact that it was being done on the

20 Internet.

21      But what really made our -- our -- our

22 invention special was our ability to capture the real

23 look and feel, the overall impression of being on that

24 popular website, and never leaving it, even though

25 you're shopping in a merchant's store.

1    Q.   Okay.  I want to go to this slide.

2         MS. CAMINA:  Can you pull up PX 63 and go

3    to Page 13?

4    Q.   (By Ms. Camina) The jury was shown a slide

5    during opening, and I want to make sure there is

6    absolutely no confusion about what you invented.

7         What does this slide say?

8    A.   This slide was from a presentation at a

9    conference and it says:  This is syndicated e-commerce

10   in action.

11   Q.   Okay.  And you see the last bullet point says:

12   This is not new?

13   A.   Uh-huh.

14   Q.   It talks about the McDonald's in Walmart.  You

15   see that?

16   A.   Yes, I do.

17   Q.   Okay.  Is this what you invented?

18   A.   We did not invent McDonald's and we did not

19   invent Walmart, and we didn't invent putting McDonald's

20   in Walmart.

21   Q.   Did you invent syndicated commerce?

22   A.   No.  The idea of having stores in a lot of

23   different places is not something we came up with.

24   Q.   So you did come up with something new?

25   A.   Yes.

1    Q.    And what is it?

2    A.    The big difference was, we invented this for

3  the Internet, the idea of putting the store in --

4  multiple stores in right locations, right?  Taking

5  something that worked in the real world and doing it on

6  the Internet, that was new.

7    Q.    And what else was unique about how you were

8  doing that?

9    A.    Well, we were doing it in a way that nobody

10 else was able to do.  We were actually putting it into a

11 website, preserving that website's look and feel, that

12 overall experience with -- with great -- great amount of

13 detail so that the visitor never felt like they were

14 being taken away to another website.  They knew they

15 were still on that popular website just in the store

16 portion of that website.

17    Q.    And what do you call that?

18    A.    What do we call it?

19    Q.    Yeah.

20    A.    Well, in that presentation, we called it

21 syndicated e-commerce.  That was a pretty technical

22 crowd, and we thought that name sounded pretty cool.

23    Q.    And what did you call it that you had that

24 look?

25    A.    We called that -- you know, creating the

1  overall impression of being on-site, of capturing that

2  real look and feel.

3      Q.   Okay.  And I heard Mr. Crosby talk about the

4  real look and feel.

5           Can you tell us what -- what you understood

6  that to mean?

7      A.   Again, it's that idea of the overall

8  impression, right?  Not just taking one element and

9  reusing that, but actually being able to identify the

10 parts of a website that gave the user the sense of where

11 they were and copying that, storing it for later use,

12 and then combining that with a merchant store.

13          Basically taking away the content part and

14 putting a store in its place, all the while giving that

15 user that impression that they haven't gone anywhere

16 new.  They're still on the site where they started.

17     Q.   Okay.  So let's go back to the creation of

18 this idea, all right?

19          What did you and the other inventors do with

20 your idea?

21     A.   So we got excited about the idea and -- and

22 this is Joe Michaels and my dad and me.  And we spent

23 the next several days talking about it and putting our

24 ideas on paper.

25          As the idea began to -- to crystallize, we --

1  we turned that into a business plan.  We actually

2  originally called that MicroShops.  We thought that was

3  a pretty cool name, but later had to change the name to

4  Nexchange.

5      Q.   Why did you change the name MicroShops to

6  Nexchange?

7      A.   We did a little research and found that

8  somebody else was already using that name.

9      Q.   All right.  So what name did you come up with?

10     A.   If anybody's ever tried to come up with a name

11 for a private company, you know it's really hard.  We

12 had a lot of brainstorming, but kept coming back to this

13 idea of the Internet and an exchange, like a market.

14 And so Internet plus exchange became Nexchange, and that

15 became the name of the business.

16     Q.   All right.  How did you go about -- well, did

17 you actually form Nexchange?

18     A.   We actually did.

19     Q.   All right.  And how did you go about forming

20 Nexchange?

21     A.   We -- we realized we needed a couple of

22 things.  We needed investors; we needed some money; and

23 we needed some great technologists.  So we created a

24 company, created a business plan around that.

25          My dad helped us raise the money, and he had a

1  lot of experience in attracting investors.  And then we

2  went out looking for some great technologists who would

3  help us make it happen.

4      Q.   Okay.  Did you find some technologists?

5      A.   We did.

6      Q.   Who are they?

7      A.   Randy May and Rich Anderson, two brilliant

8  software programmers, who joined us later.  I can't

9  remember when it was, but in -- in somewhat early 1998.

10     Q.   All right.  And what happened after Mr. May

11  and Mr. Anderson joined you, your dad, and Mr. Michaels?

12     A.   We sat down and we wanted to share with

13  Mr. May and Mr. Anderson the idea.  We wanted to talk to

14  them about it, make sure we knew what we wanted to

15  build.

16          Now, they had a lot of experience with -- with

17  technology in general and the Internet technology in

18  particular, and they had some additional ideas.  They

19  made a lot of suggestions about how we could improve our

20  concept, our idea.  And we got real excited.  This was

21  making it better.

22          So we -- we got to a point where we said,

23  okay, we know what we want to build, and we started

24  working on -- started building it.

25     Q.   Okay.  How long did this process take?

1   A.   The whole idea process, the whole invention

2   process really began in late '97 and went through the

3   summer of 1998, through all of these conversations and

4   process.  So I think about six to nine months.

5   Q.   All right.

6   A.   But it never really stopped.  I mean, we -- we

7   actually -- even after we launched the service, we

8   continued to improve the idea for the next couple of

9   years.

10   Q.   Okay.  I want you to introduce to us how the

11   Nexchange system worked.

12   A.   Okay.

13   Q.   Can you kind of walk us through just the

14   basics of how the Nexchange system worked?

15   A.   Yeah, I'd be happy to.  We can take you

16   through the system, the technology, and how it worked.

17   Q.   All right.

18   A.   First, it's important to note, when we say

19   host, what we're talking about is -- is a popular

20   website.  That was our name for popular website.

21   Q.   All right.  And I want to stop here for a

22   minute.

23   A.   Yeah.

24   Q.   During opening, Mr. Govett had a slide and it

25   talked about hosts.  Did you invent hosts?

1     A.   No, we didn't invent the idea of hosts or

2  popular websites.

3     Q.   All right.  Just wanted to make sure.

4     A.   Okay.

5     Q.   Let's go to the next slide.

6     A.   Okay.  So for us, a retailer we called a

7  merchant, all right?  That was our name in the Nexchange

8  system for -- for a retailer.

9     Q.   Okay.  Same question, during opening,

10  Mr. Govett showed a slide talking about merchants.

11        Did you invent the concept of merchants?

12     A.   No, we did not.

13     Q.   All right.  How did you -- how did Nexchange,

14  to put your words, put the merchant into the host

15  website?

16     A.   So what we did is you take the host website

17  and you actually would insert the merchant's site into

18  the host website, but keeping that real look and feel,

19  all right?  They were no longer separate places to go.

20  It was one combined experience.

21     Q.   Okay.  And, again, the combination of putting

22  a merchant inside a host wasn't new, correct?

23     A.   Well, the idea of -- of -- of embedding a

24  store wasn't new, but the way we were doing it was very

25  new.

1    Q.   Okay.  And you said that Nexchange was in the
2  middle of all this?
3    A.   Right.
4    Q.   Right?  Can you tell us how Nexchange was in
5  the middle of all this?
6    A.   Well, we were the system that was making this
7  happen.  We were the ones connecting that -- that
8  shopper and creating the -- the store that had that real
9  look and feel around it.
10    Q.   Okay.  And did you actually put -- and I'm
11  not -- I'm talking about now the Internet world --
12    A.   Uh-huh.
13    Q.   -- okay?  The e-commerce world, not the real
14  world.
15      Did you actually put the merchant inside the
16  host?
17    A.   No.  And this is pretty important.  We were
18  actually putting a -- creating a version of the -- of
19  the merchant's own web store.  They had their own
20  website separate completely from ours most of the time,
21  and we actually created a version of that.
22      And when the -- when the -- those pages were
23  being served, they were on our system.  They were coming
24  off of our computers.
25    Q.   Okay.  So was the visitor -- I'm on the

1  Internet, and I'm visiting the host page.  Am -- I've

2  now gone through the Nexchange system.

3       Am I on the merchant page?  Am I on the host

4  page?  Where am I?

5     A.   You're not on either of the merchant's website

6  or the host website in -- in true technical terms.

7  You're on a computer that -- that was on Nexchange's

8  system, so our technology.

9     Q.   And what was the innovative part of your

10 technology?  What was -- what was it that made it unique

11 and original?

12    A.   Well, you wouldn't really be able to tell.  A

13 typical user wouldn't notice that they were no longer on

14 the same computers that they were when they were on that

15 host website, right?

16         To -- to them, the overall impression was that

17 they were still in that host website.

18    Q.   All right.

19    A.   And that was really -- that was unique and

20 that was the -- one of our strengths.

21    Q.   So I want to make clear.  The visitor never

22 went to the merchant's website --

23    A.   No, ma'am.

24    Q.   -- when they were using the Nexchange system?

25    A.   That's correct.

1    Q.    And the merchant -- or the visitor had left

2  the host website when they were using the Nexchange

3  system?

4    A.    That's right, in fact.

5    Q.    All right.  What did the merchant, the

6  retailer, have to do to make the Nexchange invention

7  work for them?

8    A.    Well, they had to sign up with Nexchange, you

9  know, become a merchant.  And that meant they had to

10  give us access to their products, their pricing, all the

11  things that we would need in order to create a store

12  that could represent and sell for them.

13    Q.    Okay.  And what did the host, the popular

14  website, have to do to make the Nexchange invention work

15  for them?

16    A.    There were actually a few steps they had to go

17  through after they signed up.

18    Q.    Okay.  Can you walk me through those?

19    A.    Sure.  The first step was after they signed

20  up, they had to give us a page from their website that

21  they felt was a good example of their overall look and

22  feel, their real look and feel, and share with us the

23  parts that were content and the parts that were look and

24  feel.

25        Our -- our system would then analyze that and

1   separate that and store the look and feel so that we

2   could reuse it later when we wanted to put a store in

3   the middle of it, all right?  That was the first part.

4           Then they had to create links in the rest of

5   their site that would promote the store.  And the way

6   they would do that is they would go into the Nexchange

7   system.  They would pick the products or product

8   categories they wanted to promote.  We would then give

9   them code, software code, that they could take and

10  insert into the rest of their website, and they would

11  create a link.

12          And then finally, their visitors would be on

13  their websites and see those links, click on the link,

14  and be taken to a website that had the store in it with

15  the products or product categories they were looking

16  for, but it was all surrendered by that real look and

17  feel of the -- of the host.

18      Q.   What else did they have to do?

19      A.   Well, that -- that was their major

20  responsibilities as far as working with us.  They had to

21  tell us how to pay them, because they got -- they got

22  paid for the service when we actually sold products.

23      Q.   Okay.  Now, we -- we've talked about what was

24  unique about your invention.

25          Can you tell us how -- you know, why what you

1    were doing was different than what other companies were

2    doing on the Internet at that time in terms of retail?

3         A.   Yes.   There were a lot of companies that were

4    selling advertising or doing marketing online.   There

5    were a lot of companies offering e-commerce technologies

6    that companies could buy or use.

7              But there was nobody that was actually doing

8    what we were doing, which is taking that merchant's

9    store and putting inside the real look and feel of the

10   websites of these popular websites.

11        Q.   Okay.   And we have a flow chart here, and I'd

12   like for you to walk us through how the other companies,

13   the pre-Nexchange companies I'm going to call them --

14   how they were doing it, and then I want to talk about

15   the Nexchange process flow.

16        A.   Okay.

17        Q.   Can we do that?

18        A.   Sure.

19        Q.   Okay.

20        A.   Sure.   So this is --

21        Q.   Tell us what this is.

22        A.   It's like a diagram that -- that would be like

23   a normal website would be designed.   So it's a popular

24   website maybe with a logo and some content and some

25   links in it.

```
 1              Some of those links are inside the site.
 2   Others are to -- to advertisers.  So if somebody clicked
 3   on a -- one of these links to a merchant who was
 4   advertising on the site, they would actually leave the
 5   popular website and go to the merchant website.
 6              And while they're there, they shop around.
 7   They add things to the shopping cart, right?  Click on
 8   that, and they go to finish the purchase.  Whether they
 9   finish the purchase or not -- let's just assume they
10   make a purchase, then they're done, and they go off and
11   do whatever else they're going to do.  They're lost to
12   that original popular website.
13        Q.   And by lost, you mean what?
14        A.   Well, they can go wherever they want.  They
15   already were removed from that website.  They've now
16   engaged in a completely website's transactions, and
17   they're gone.
18              They -- they -- if -- if the first website
19   wants them back, they're going to have to go out and try
20   and find them again.
21        Q.   Okay.  So now let's go to the Nexchange model.
22        A.   Okay.
23        Q.   And explain to us how what Nexchange was doing
24   was different and original.
25        A.   Sure.  So the same website, right, same kind
```

1    of idea, but this time, the links are a little bit --

2    they operate a little bit differently.

3            When a -- when a customer would click on that

4    link to the merchant's product, instead of going to a

5    new site, they were taken to a page within this same

6    website, still in the popular website, but that other

7    website content was kind of scooped away, and the

8    merchant's store was put in the middle of it.

9            They could then shop inside that page, all

10   right?  Inside that popular website in the merchant

11   store, same way.  They make a purchase.  They finish

12   their shop.  And when they're finished with their

13   shopping, whether they buy or not, they're still in the

14   popular website, so they can go right back to where they

15   started or explore the other parts of the host's

16   content.

17       Q.   Okay.  Now, you said the popular website, the

18   host.

19       A.   Uh-huh.

20       Q.   You said they -- they were on.

21            Are they actually on -- when they're shopping

22   and checking out, are they actually on the popular

23   website?

24       A.   To the -- to the visitors, it looked like

25   they'd never left the site, but the reality was they

1  were now on the Nexchange computer servers throughout

2  that whole shopping and buying process.

3      Q.   Okay.  And then after they checked out, how

4  would they go back to the popular website?

5      A.   Well, again, they never thought they left it,

6  so the entire time they're shopping, that website worked

7  the same way.  All the links still worked.  The design

8  was the same.  The look and feel was the same.

9          And so they would just seamlessly return back

10  to where they started, or they could go anywhere else on

11  that popular website they wanted to go in the first

12  place.

13      Q.   Okay.  And looking at this Nexchange model,

14  tell us what was original.  Now looking at the model,

15  tell us what was original about this.

16      A.   That whole idea of keeping that -- that --

17  that real look and feel and putting the -- the merchant

18  store into that, that was unique.  No one was doing it.

19  People might have talked about the idea of doing this,

20  but nobody had figured out actually how to do it.

21  Our technology worked, and it made this possible.

22      Q.   Okay.  All right.

23          MS. CAMINA:  We can take that slide down.

24      Q.   (By Ms. Camina) Do you mean that it was

25  impossible for a user, a visitor, to tell that they had

1 navigated away to the Nexchange servers, when they had

2 clicked the link to go make a purchase?

3      A.   No.   A customer who wanted to figure out what

4 server they were on, what system they were on, they

5 could figure it out.

6      Q.   Okay.  You used the term, the overall look and

7 feel, the look and feel impression several times.

8           Why was that important?

9      A.   Well, it was important to a lot of people.

10 Pretty much everybody involved, it was important to

11 them.

12      Q.   Okay.  Well, let's take them one at a time,

13 the host, the popular website.

14      A.   Uh-huh.

15      Q.   Why was the overall look and feel important to

16 the host?

17      A.   The host wanted to benefit from having

18 e-commerce or a store on their site or the sales they

19 could get from that, but they didn't want to lose the

20 visitor.

21           So this allowed them to keep the visitor and

22 benefit from selling things on their site without

23 actually having to become a retailer or send that

24 visitor away.

25      Q.   Okay.  And did the host also want to be making

1  commissions at this time?

2      A.   Right.  Exactly.  They made commissions.

3  That's mostly how they -- they earned their money by

4  taking a piece of the sale of anything that was sold on

5  their websites in the merchant's store.

6      Q.   So -- so there was an incentive for them to

7  want to engage in retail transactions?

8      A.   That's right.  A lot of people were trying to

9  make money, and that was -- that was the goal.

10         And in this website, operators were really

11  trying hard to find ways to take -- to take advantage of

12  the popularity of their website to make money.  And this

13  was a great one.

14     Q.   All right.  Now, the retailer, the merchant,

15  why was the overall look and feel important to the

16  merchant?

17     A.   The main thing the merchants were interested

18  in was selling their products online, making more sales.

19  By having the ability to embed their store into the

20  other -- the host website, it enabled them to access

21  those sites' traffic, get in front of their customers.

22  And this was a big deal to them.

23         Nexchange, through our network of sites,

24  reached almost half of all the Internet users by the

25  time we -- we were -- we went out of business.  So that

1  was really attractive to merchants, and that was

2  possible because of the way that we did it, the ability

3  to replicate that overall look and feel, the overall

4  impression.

5      Q.   And did you have some of your merchants on

6  multiple host websites?

7      A.   Absolutely.  We had a lot of websites,

8  thousands of them that were participating in our system.

9      Q.   And so as a merchant -- like give me an

10  example of how many host websites could I be in.

11      A.   Really, it was -- there was no limit.  Our

12  technology could support a lot by the -- by the end of

13  2000, we had literally thousands of websites with lots

14  of merchants and over thousands of websites, including

15  some really big popular websites, like CNN.com.

16      Q.   So that would be important to the merchant,

17  wouldn't it?

18      A.   It's huge.  I mean, it's like having your

19  physical store in the most busy intersection with

20  pedestrians and cars in a city, the best place for a

21  store.

22      Q.   And it sounds like it was in multiple cities.

23      A.   In lots of cities, every popular intersection

24  where your customers might be going, that was our goal.

25      Q.   Okay.  Now, let's talk about the visitor, the

shopper, the user.

Why was the overall look and feel important to the user?

A.   Well, trust and confidence are really important to a user.  They wanted to trust they were buying branded goods from a retailer that they could trust.  They also like the people who told them to go in the first place was standing behind them.  So this whole look and feel gave the credibility of the referral and the merchant combined together.

Q.   So when you say trusted, are you talking about the host or the merchant?

A.   It's really the combination of the two that -- that increase their trust and their confidence, which made them more likely to complete a purchase.

Q.   So I'm buying.  I'm on what website?  Give me an example of a host.

A.   So one host we -- we worked with was CNN.com.  And, obviously, people trusted them as a source for news and information.

Q.   Right.

A.   And when they recommended that people, you know, buy something, let's say a Mother's Day gift, right, and a store -- or they offered a store, like Zales was one of our clients, Zales Jewelry store, they

1    would actually take that customer and say:  Here, why

2    don't you shop in a Zales store inside of CNN.com.

3        Q.   Okay.  So you've got a trusted host, right?

4    And a known trusted merchant, right?

5        A.   Yes.

6        Q.   And what did that combination -- how did that

7    combination result in terms of sales?

8        A.   It -- the magnification of trust really

9    mattered a lot, right, especially -- if you think about

10   it, back then, people weren't sure about this Internet

11   thing, but knowing who you're buying from and where

12   you're buying it made people feel a lot more confident,

13   and they were much more likely to complete a purchase.

14       Q.   When you were with Nexchange, did you find

15   that the increase in the overall look and feel increased

16   sales?

17       A.   Yeah.  The -- the better you could -- you

18   could replicate that look and feel, that overall

19   impression of the host website, the better your chances

20   were of getting a customer to buy something.

21       Q.   So was there a nexus between the two:  Look

22   and feel and increase in sales?

23       A.   Absolutely.

24       Q.   Okay.  I think we put together a little

25   demonstration to walk the jury through what a visitor

1    might have seen back in this time period.

2        A.   Uh-huh.

3        Q.   Let's first talk about, again, the

4    pre-Nexchange model, so the way shoppers were shopping,

5    if they were shopping, on the Internet before

6    Nexchange --

7        A.   Okay.

8        Q.   -- okay?

9        A.   So you remember our -- our diagram of the

10   pre-Nexchange model where you have a popular website

11   like ESPN.  You have a merchant store, in this case,

12   MLB.com's web store, Major League Baseball's store, and

13   the guest would go to -- start at ESPN, they'd click

14   over to the MLB.com store, shop, and then leave.

15       Q.   Okay.  Now, let's look at a demo of what the

16   visitor might actually see.

17       A.   This site is the Nexchange model.

18       Q.   Okay.  Sorry.  Let's go to the Nexchange

19   model.

20       A.   All right.  And so -- so what we'll show here

21   is the same -- same exact partners, right, but ESPN is

22   the site where the visitor starts, the popular website,

23   but this time, instead of going an MLB.com website,

24   separate site, you go to the MLB.com store within ESPN,

25   you do all the same shopping, and then when you're done,

1  you just go back to enjoying ESPN.com.

2       Q.   So is this part the MLB store?

3       A.   The part you're highlighting in the middle

4  there is the MLB store inside of the ESPN real look and

5  feel.

6       Q.   And the ESPN is up here (indicating)?

7       A.   Right.  It's all around it.

8       Q.   Okay.  All right.  And then when they checked

9  out, what were they looking at?

10      A.   Well, they're still in the ESPN site.  So

11  before, during, and after the shopping process, they

12  could still go and surf around the ESPN site.  When they

13  finished an actual purchase, they could go right back

14  where they started.

15      Q.   Okay.  All right.  Let's -- let's do an actual

16  demonstration so that we can see what it would look

17  like --

18      A.   Okay.

19      Q.   -- again, going back to the version of

20  shopping before the Nexchange model came out.

21      A.   Okay.  All right.  So this is a blown-up

22  version here.  This is the ESPN site pre-Nexchange.  A

23  visitor goes to the site, they're reading about the

24  Texas Rangers.  They notice on there there's a link for

25  a Texas Ranger shirt.

1          So they're a big fan.  They click on the link,

2   interested in buying that, and they're taken to MLB.com,

3   a completely different website.

4          They look at the site; they see something they

5   like, in this case, the red shirts, ladies' shirts; they

6   click on that; they add it to their cart; they make a

7   purchase; they get a nice thank you message; and then

8   they're done, right?

9          They're finished with their transaction, and

10  they can go anywhere else they want or finish the

11  Internet, whatever -- whatever they want to do.

12      Q.   Okay.

13          MS. CAMINA:  And I want to go back to the

14  slide before this.

15      A.   Uh-huh.

16          MS. CAMINA:  Okay.  Let's go to the first

17  slide.  Sorry.

18      Q.   (By Ms. Camina) And so you're on ESPN here,

19  right?

20      A.   Yes.

21      Q.   And then you hit the Ranger's shirt, right?

22      A.   Right.

23      Q.   If I'm going to buy a shirt for my son, who

24  may be the only fan left, then we're going to go to

25  MLB.com shop?

1      A.    Now, your son probably wouldn't like those red

2  shirts because they're for girls.

3      Q.    Okay.  But I've now gone to a different shop.

4  Is that it?

5      A.    That's right.

6      Q.    To a total different website.

7      A.    You've left the ESPN website.

8      Q.    All right.  Now, let's walk through the

9  Nexchange model.

10     A.    Okay.  Okay.  So same site, same scenario.

11  You're reading about the Rangers, you notice the link

12  for the shirts, and you decide you want to click on it.

13     Q.    Okay.

14     A.    This time you're taken to another page inside

15  of the ESPN website that contains an MLB shop that's

16  selling those shirts.  Just like you would have before,

17  you're shopping inside that site, you find something you

18  like, those red shirts, right?  You click on that; you

19  buy it.

20          Now, you make -- you make that the purchase;

21  you get the thank you message; but then you're still

22  inside of ESPN's website.

23          So you can still read more sports articles,

24  look at other scores, do all the other stuff that ESPN

25  offers, or if you want to, just go back -- click that

1   done shopping button, and you just go back to where you

2   started, which you can do now.

3        Q.   All right.  But before we do that --

4        A.   Okay.

5        Q.   -- I want -- all right.  We've already done --

6   all right.  So this is where I would -- I would go,

7   which is where I started?

8        A.   Right.  In that case, they just went right

9   back where they started.

10       Q.   Okay.

11            MS. CAMINA:  Now, go back to the slide

12   before this.

13       A.   Uh-huh.

14       Q.   (By Ms. Camina) All right.  So this is the MLB

15   store here?

16       A.   Yes.

17       Q.   And I am -- have the look and feel here of the

18   ESPN store all around me, correct?

19       A.   Right, exactly.

20       Q.   And which part is the ESPN look and feel?  Is

21   it this part, the top?

22       A.   So the way their site is designed, the content

23   is really like the lower left portion.  So the upper

24   part in the right-hand part is what -- what we would

25   determine would be their -- the essence of their look

1   and feel, and the other part's content.

2        Q.   So all of this and all around it (indicating)?

3        A.   We -- we call that --

4        Q.   Is that fair?

5        A.   Right.  What's surrounding the actual shopping

6   part.

7        Q.   Okay.

8             MS. CAMINA:  And let's go to the last

9   slide so we can see if that's right.

10       Q.   (By Ms. Camina) Okay.  So we see the same top,

11  the same side, the same all the way around, right?

12       A.   Yes.

13       Q.   Okay.  Do you -- let's do a side-by-side

14  comparison of the shopping page.  It is a pre-Nexchange

15  model?

16       A.   That's right.  So you're on MLB shopping, and

17  you can see that you've got there the shirts and prices

18  and all that stuff, but you're inside the MLB store's

19  website.

20       Q.   All right.  And I don't see any ESPN anywhere

21  on this page.

22       A.   That's because you're not on the ESPN site

23  anymore.

24       Q.   Okay.

25       A.   You're on their site.

1      Q.   You're on MLB store?

2      A.   MLB.com.

3      Q.   Okay.  And over here, this is the Nexchange

4  model we just looked at, right?

5      A.   That's correct.

6      Q.   And here you have the MLB store in the middle

7  of what is essentially the ESPN site?

8      A.   Exactly.

9      Q.   All right.

10          MS. CAMINA:  We can take that slide down.

11     Q.   (By Ms. Camina) How long did it take you and

12  the other inventors to actually invent this whole system

13  called the Nexchange system?

14     A.   As I mentioned, it was probably about a six-

15  to nine-month process of getting the invention, the

16  idea, where it needed to be and -- before we actually

17  launched something that did it, and then we continued to

18  work on the idea for the next couple of years.

19     Q.   When did you start selling the technology that

20  you had invented to hosts and merchants?

21     A.   We launched the business publicly so people

22  could actually use it in October of 1998.

23     Q.   Okay.  And did you continue to work on the

24  system?

25     A.   Absolutely.  We were always improving it,

1  adding new enhancements, making it better.  And we did

2  that really up until Nexchange closed its doors.

3      Q.   Okay.  Did you apply for a patent for your

4  invention?

5      A.   Yes, we did.

6      Q.   Okay.  When did you apply for a patent for

7  your invention?

8      A.   We filed a provisional application for a

9  patent in September of 1998, shortly before we opened

10 the -- the service to the public.

11     Q.   Okay.  You used another word most people

12 aren't familiar with, provisional patent.  What does

13 that mean?

14     A.   It's a -- kind of a placeholder within the

15 patent system.  You describe the invention as best you

16 can, and you have a year to complete the full

17 application, which -- which we then did, the regular

18 application.  You got to -- you got to -- it's more

19 thorough; it's more complete.

20     Q.   So did you file the more thorough, full

21 application?

22     A.   Yes, we did.

23     Q.   Okay.  Why -- tell the jury, why did you want

24 a patent?

25     A.   We knew our idea was new.  We knew it was a

1  really good idea that people -- that would work.  And we

2  also knew that in the Internet, it's -- ideas spread

3  fast, and we wanted to make sure we could protect our

4  idea so that we could build this business.

5      Q.   Okay.  And you said the system was launched in

6  1998.  How did it go once Nexchange was -- went live?

7      A.   It was really exciting.  We launched the site.

8  Within a fee weeks, we'd attracted several websites'

9  hosts and some merchants and started selling some

10  products.

11      Q.   Okay.  Was Nexchange successful?

12      A.   Yes and no.

13      Q.   Okay.  Let's talk about the yes, and then

14  we'll talk about the no.

15      A.   So --

16      Q.   Tell me what you mean by yes, it was

17  successful.

18      A.   Well, we -- we attracted a lot of merchants.

19  We had about 50 merchants.  By the end, we had thousands

20  of websites.  We were reaching about -- more than half

21  of the people that were using the Internet at the time.

22  We were hitting all of our milestones in our business

23  plan.  We employed about a hundred people.  We raised a

24  lot of money for this.  But then the dot com crash came,

25  and we were forced to close.

1      Q.   And is that the no part of the answer?

2      A.   That was the no part.

3      Q.   Okay.  And how -- how well did the technology

4  work?  Let's talk about the Nexchange technology.  How

5  well did it work when you were running it?

6      A.   It worked great.  Everything worked just as we

7  designed it.

8      Q.   All right.  And how did this thing called the

9  dot com crash in 2000 affect Nexchange?

10     A.   Well, we were -- we were growing; we were

11  doing well; but we still needed investment money to run

12  the business.  We weren't yet turning a profit.

13  The dot com crash came, and nobody was investing in

14  Internet companies anymore.  No matter how good the idea

15  was, it just wasn't attractive.  Everyone was running

16  away from the Internet.

17          So we tried every possible way of getting

18  investors and couldn't.  And so we were -- we were

19  forced to close our doors.

20     Q.   And when you were -- when you closed the

21  doors, how many years had Nexchange been in operation?

22     A.   It was about two-and-a-half years.

23     Q.   Okay.  And did you have a business plan?

24     A.   Yes, we did.

25     Q.   And did that business plan have projections

1    about what you were going to have to have in order to

2    become profitable?  In other words, how long it was

3    going to take to become profitable?

4        A.   Yes.  We had our projected financials and what

5    we planned to do.

6        Q.   And was Nexchange on plan when the dot com

7    crash happened?

8        A.   We were.  We were always updating our plans,

9    but, yes, we were -- we were on plan.  We were hitting

10   all of our milestones.

11       Q.   Okay.  When did you -- when did Nexchange

12   close its doors?

13       A.   Just before Christmas 2000.

14       Q.   Okay.  And what was the status of the patent

15   application at the time that Nexchange closed its doors?

16       A.   The Patent Office had not yet reviewed the

17   application or -- or given us a decision about whether

18   they would be allowing the patent.

19       Q.   Okay.  And what did that mean:  Allowing the

20   patent?

21       A.   Saying, yes, this is an original useful idea,

22   and you invented it.

23       Q.   Okay.  So the Patent Office hadn't made their

24   decision yet?  Is that what you're saying?

25       A.   No.  There was still a pending application at

1  the time.

2      Q.   Thank you.

3           What happened to the patent application when

4  Nexchange closed its doors?

5      A.   Not long after we -- we wound down the

6  company, my dad bought the -- the rights to the -- the

7  application from the other investors of Nexchange.  And

8  later he created DDR Holdings to own those applications.

9  He asked me to come aboard to help him with the rest of

10 the process to get those patents approved.

11     Q.   Okay.  And was the original patent

12 application, was it approved?

13     A.   Yes, it was.

14     Q.   Okay.  And when did it get approved?

15     A.   Around September of 2003.

16     Q.   Okay.  Can you please take a look at

17 Plaintiff's Exhibit 2.

18            MS. CAMINA:  If you can put it up on the

19 screen.

20     Q.   (By Ms. Camina) Is this the first patent?

21     A.   Yes, it is.

22     Q.   And it's U.S. Patent No. 6,629,135, right?

23     A.   Yes, ma'am.

24     Q.   Okay.  Now, we didn't hear about this patent

25 during the opening; is that right?

1    A.    That's correct.

2    Q.    And is this patent at issue in this lawsuit?

3    A.    No, it's not.

4    Q.    All right.  Was obtaining a patent easy?

5    A.    No.  One of the -- one of the members of the

6 jury pool made that comment that it's really hard to get

7 a patent.  It's true.  It takes a long time.  It's a lot

8 of work.  It costs money to -- to get that done.  And,

9 yeah, it's -- it's hard.

10    Q.    And what do you mean it's hard?

11    A.    Well, the -- the amount of documentation you

12 have to -- to provide, the effort you have to go to show

13 that it was an original idea.  There's a ton of back and

14 forth with the Patent Office.

15         And -- and it just takes forever.  We applied

16 in 1998.  We didn't hear from the Patent Office for five

17 years as to whether they would approve the patent.  So

18 that combination was tough.

19    Q.    Okay.  How many patents in all are there from

20 this family?

21    A.    We have -- we -- we have three patents that

22 have been issued, and one pending patent.

23    Q.    Okay.  What does that mean:  Patent pending?

24    A.    We -- we applied for a fourth patent, and

25 recently, we've received notice that it will be allowed,

1   but we have -- it has yet to be issued.

2          So it doesn't have a patent number.  It's not

3   officially issued yet.

4      Q.   And when you say allowed, what does that mean?

5      A.   Means that this -- the Patent Office has said

6   yes, that that's also an original patentable idea.

7      Q.   Okay.  Why more than one patent?

8      A.   Well, before I went into this, I didn't really

9   know a whole lot about how patents worked.  And so I

10  thought, and we all thought, you just have to write down

11  a really good description of the idea and try to provide

12  some pictures and a good explanation of how your

13  invention works, and that's a patent.

14         But it turns out that what -- what really

15  matters are these things called claims, right, where

16  they actually list exactly what it is that you are

17  claiming to have invented.

18         And we got the first patent, that '135 patent,

19  with some claims in it, but we learned that those claims

20  didn't really describe or cover everything that we had

21  invented that was important.  So we went back to the

22  Patent Office with additional applications to get more

23  claims.

24     Q.   Okay.  And what additional claims did you get?

25     A.   The second patent was the '572 patent, and we

1  got claims there that mainly talked about how we

2  captured -- or how we got and stored that real look and

3  feel and -- for later use.

4      Q.   Okay.  And I want to show you Plaintiff's

5  Exhibit 3.

6      A.   Uh-huh.

7      Q.   And is this the second patent?

8      A.   Yes, it is.

9      Q.   Is this the patent that's referred to as the

10  '572 patent?

11      A.   Yes, ma'am.

12      Q.   Okay.  All right.  Did you make corrections to

13  the '572 patent?

14      A.   After it was issued, yes, we did.  We

15  corrected the -- the official document approving the

16  patent.

17      Q.   And why did you do that?

18      A.   The Patent Office had some typographical

19  errors in their approval document that had to be

20  corrected so that we -- it was properly documented.

21      Q.   And is Plaintiff's 65 the certificate of

22  correction that was filed with the Patent Office?

23      A.   Yes, it was.

24      Q.   Did you get any other claims besides the '572

25  patent?

1      A.    We did.   The third patent that we had issued

2  was the '399 patent.   And that mainly covered the claims

3  that are covered, how you track which hosts drove the --

4  or are responsible for the sales for which merchant,

5  kept track of everything.

6      Q.    All right.

7              MS. CAMINA:   Can you put up Plaintiff's

8  Exhibit 4.

9      Q.    (By Ms. Camina) And I want to ask you, is this

10  the third patent?

11      A.    Yes, it is.

12      Q.    And is this the patent that is referred to as

13  the '399 patent?

14      A.    Yes, ma'am.

15      Q.    Okay.

16              MS. CAMINA:   We can put that one down.

17      Q.    (By Ms. Camina) Were all four -- you now have

18  four patent applications, three of which have been

19  approved, one of which has been allowed, which I

20  understand you to say means it's going to be issued; is

21  that right?

22      A.    Yes, ma'am.

23      Q.    Okay.   So of these four applications, were

24  they examined by the same Patent Examiner, all four of

25  them?

1      A.    No.   They -- they weren't.

2      Q.    Okay.  How many Patent Examiners reviewed the

3  applications for the four -- the four applications that

4  became the -- the '135, the '572, the '399, and the one

5  that's been allowed?

6      A.    The first two patents were -- and this is my

7  understanding.  The first two patents were reviewed by

8  the same Examiner, and then the next two have been

9  examined by two different Examiners.

10     Q.    Okay.  So the '572 patent had an Examiner that

11 was different than the '399?

12     A.    That's correct.

13     Q.    Okay.  Now, we've heard about something called

14 a re-exam.  Can you tell us what a re-exam is?

15     A.    This is when you go back to the Patent Office

16 for -- to get -- to have them review their original

17 decision to issue a patent and to make sure that it's

18 actually a valid patent.

19     Q.    Okay.  Did -- and so you're going to go

20 through the examination process all over again?

21     A.    Pretty much.

22     Q.    Okay.  Since you described it as such a

23 pleasant experience the first time, did DDR voluntarily

24 ask the Patent Office to re-examine its patents?

25     A.    Yes, ma'am.

1    Q.   Okay.  Well, which patents did you ask the

2  Patent Office to re-examine?

3    A.   Well, there were only two at the time.  The

4  '135 and the '572 patents had been issued, and we asked

5  them to re-examine those two patents.

6    Q.   And why not the third patent, the '399?

7    A.   It hadn't been issued yet.

8    Q.   Okay.  So the '572 has been looked at by the

9  Patent Office now twice is what you're saying.

10   A.   Yes, ma'am.

11   Q.   Okay.  Now, why did -- well, did the Patent

12  Office -- when they were doing the re-exam, did they

13  have more materials to consider during the

14  re-examination process?

15   A.   Yes, ma'am.

16   Q.   So more materials than they had the first

17  time?

18   A.   Yes, a lot more.

19   Q.   Okay.  What happened as a result of the

20  re-examination of the '135 and the '572?

21   A.   The -- the Patent Office decided to allow the

22  patents yet again.  They confirmed their prior decision

23  to allow the patents.

24   Q.   Okay.  And is that the terminology they used:

25  Confirmed?

1    A.    Yes, I believe that's correct.

2    Q.    All right.  Did you get something from the

3  Patent Office saying to you that they had confirmed the

4  '135 and the '572?

5    A.    Yes.  We received a certificate of

6  confirmation.

7    Q.    Okay.  Can you please take a look at

8  Plaintiff's Exhibit 69.

9              MS. CAMINA:  And can we blow up the top

10 part of this?

11   Q.    (By Ms. Camina) Is this the certificate that

12 you're talking about?

13   A.    Yes.

14   Q.    Now, if you can look on the second page of

15 this document.

16             MS. CAMINA:  Can you blow that part up

17 for me, please?

18   Q.    (By Ms. Camina) It says:  Ex parte

19 Re-examination Certificate issued under 35 U.S.C. 307.

20 As a result of re-examination, it has been determined

21 that the patentability of Claims 1, 4, 5, 13, and 17

22 through 27 is confirmed, right?

23   A.    Yes, that's what it says.

24   Q.    And are some of these claims at issue in this

25 lawsuit?

1    A.    Yes.

2    Q.    Okay.

3              MS. CAMINA:   We can take that slide down.

4    Q.    (By Ms. Camina) Why did you file this lawsuit?

5    A.    We had learned that there were companies that

6    were using our ideas.  And as thrilled as we were to see

7    our ideas still living, it bothered us that people were

8    trespassing on our property, our rights, our ideas,

9    without our permission.

10   Q.    Did you --

11   A.    And --

12   Q.    Go ahead.

13   A.    Go ahead.

14   Q.    I'm sorry.

15   A.    No.  I was just going to say, you know, this

16   was troublesome.  They're making money with our idea.

17   Q.    Okay.  When did you learn that the Defendants

18   were trespassing on your property?

19   A.    Well, I've always been a big Internet user

20   before, during, and after Nexchange, and I was always

21   keeping an eye on what was going on, even to this day,

22   and we came across -- I don't remember exactly when we

23   learned about the -- each of these companies and the

24   fact that they were using our ideas, but when we saw it,

25   you know, we -- I think it was even before the first

1 patent -- patent was even issued, we discovered that

2 some of these -- these guys were -- were using our

3 ideas, and -- and that's -- that's -- that's how it came

4 about.

5      Q.   What did you do when you learned that the

6 Defendants were trespassing on your property?

7      A.   Well, we let them know.  We -- we -- we

8 contacted the Defendants and -- and gave them notice

9 that they were -- they were using our ideas, that they

10 were trespassing on our -- our patents, and we -- we

11 told them that we were aware of this, and -- and we

12 thought that they should pay us for that.

13      Q.   Did either of them agree to buy a license for

14 your technology and patents?

15      A.   No, they -- they didn't.

16      Q.   How did that make you feel?

17      A.   We weren't happy.  I mean, this was somebody

18 taking our property and using it for their own gain, and

19 they didn't have our permission and really wouldn't even

20 work with us on how to make it right.

21      Q.   So what did you do then?

22      A.   Well, we felt like we had no choice but to

23 file a lawsuit.

24           MS. CAMINA:  I pass the witness, Your

25 Honor.

```
 1                THE COURT:  All right.  Before you start
 2   the cross-examination, Defense counsel, this is a good
 3   place.  It's a quarter till 12:00.  We're going to break
 4   and take our lunch break here.
 5                Mr. Ross, you may step down from the
 6   witness stand.
 7                Ladies and Gentlemen of the Jury, we're
 8   going to break for lunch.  To keep us on schedule, we're
 9   going to need to limit this to an hour.  The fact that
10   we're 15 minutes ahead may put you in the front of the
11   line at the local places to eat.  Several of them are
12   close by and within walking distance.
13                If you will, because we're going to be
14   out for the -- for the lunch hour, take your jury books
15   with you, leave them on the table in the jury room over
16   the lunch hour.
17                And as you've heard me say before and
18   will again, I promise you, don't discuss the case among
19   yourself or with anybody else.
20                If you'll be back in the jury room about
21   a quarter till or as close to that as you can, we'll
22   start back promptly, and we'll begin with the
23   cross-examination of the Plaintiff's first witness by
24   the Defendants.
25                Until then, we stand in recess for lunch.
```

```
 1  You're excused.

 2                  COURT SECURITY OFFICER:  All rise.

 3                  (Jury out.)

 4                  THE COURT:  All right.  Counsel, I'll

 5  remind you of our discussion earlier about your

 6  continuing meet-and-confer obligations in light of the

 7  possibility you may have some time to work on that over

 8  the lunch hour.

 9                  Other than that, is there anything from

10  the Plaintiff before we break for lunch?

11                  MR. SMITH:  No, Your Honor.

12                  THE COURT:  Anything from the Defendants?

13                  MR. ZIVIN:  Yes, Your Honor.

14                  Are we permitted, in view of that

15  questioning, to now ask this witness about the '135

16  patent, even though it's not in suit?  I don't want to

17  violate the MIL.

18                  THE COURT:  Well, there wasn't an

19  objection when the Plaintiff went into it.  It's

20  clearly, based on the filings over the weekend and the

21  leave granted by the Court this morning, no longer in

22  the case.  I don't see any relevance there.  You're

23  going to have to convince me why it's important to go

24  into it.

25                  MS. CAMINA:  He testified that it's not
```

1  at issue in the lawsuit.

2              MR. ZIVIN:  Well, I think it's relevant,

3  Your Honor, to the issue of the last -- very last

4  testimony where Mr. Ross said that he gave notice to the

5  Defendants about their patents, but the only patent he

6  gave notice about was the '135 patent.

7              THE COURT:  Well, I think that's

8  relevant.  If -- if the notice asserting that the

9  Defendants were infringing only referenced the '135 and

10 not the others, I think you can ask him that question.

11             MR. ZIVIN:  Thank you.

12             THE COURT:  But I'd limit it to that

13 specific area.

14             MR. ZIVIN:  Thank you.

15             THE COURT:  All right.  Anything further?

16 Then we stand in recess for lunch.

17             (Lunch recess.)

18             * * * * * * * * * * * * * * * * *

19

20

21

22

23

24

25

## CERTIFICATION

I HEREBY CERTIFY that the foregoing is a true and correct transcript from the stenographic notes of the proceedings in the above-entitled matter to the best of my ability.

/s/_____                    _____
SHELLY HOLMES, CSR                           Date
Official Court Reporter
State of Texas No.:  7804
Expiration Date  12/31/12

/s/_____                  _____
SUSAN SIMMONS, CSR                         Date
Official Court Reporter
State of Texas No.:  267
Expiration Date  12/31/12