**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| **DDR HOLDINGS, LLC** | § | |
| | § | |
| *Plaintiff and Counterdefendant,* | § | |
| | § | CIVIL ACTION NO. 2:06-cv-42-JRG |
| v. | § | |
| | § | |
| **HOTELS.COM, L.P., et al.** | § | |
| | § | |
| *Defendants and Counterclaimants.* | § | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Before the Court are the parties' post-trial motions. Having considered the parties' written submissions, the Court: (1) **DENIES** Defendant Digital River, Inc.'s Renewed Motion for Judgment as a Matter of Law Pursuant to Fed. R. Civ. P. 50(b) (Dkt. No. 540); (2) **DENIES** National Leisure Group, Inc.'s and World Travel Holdings, Inc.'s Renewed Motion for Judgment as a Matter of Law Pursuant to Fed. R. Civ. P. 50(b) (Dkt. No. 539); and (3) **DENIES** Defendant Digital River, Inc.'s Motion for New Trial Pursuant to Fed. R. Civ. P. 59 (Dkt. No. 562).

**I.     BACKGROUND**

DDR Holdings, LLC ("DDR") filed this patent infringement action against multiple defendants on January 31, 2006, alleging infringement of U.S. Patent Nos. 6,629,135 ("the '135 patent") and 6,993,572 ("the '572 patent"). The case was then stayed for almost four years until October 6, 2010, pending the reexamination proceedings at to both of the patents-in-suit. On September 9, 2011, DDR amended its complaint to add additional infringement allegations of U.S. Patent No. 7,818,399 ("the '399 patent"). This case went to trial on October 8, 2012 against Digital River, Inc. ("Digital River"), National Leisure Group, Inc., and world Travel Holdings, Inc. (collectively, "NLG").   Following a five day trial, the jury returned a unanimous verdict finding

that Digital River infringed claims 13, 17, and 20 of the '572 patent and awarded damages to DDR of $750,000 for the period of the issue date of the patent, January 31, 2006, through the verdict date, October 12, 2012. The jury also found that NLG infringed claims 13, 17, and 20 of the '572 patent and claims 1, 3, and 9 of the '399 patent and awarded damages to DDR of $750,000 for the period of the earliest issue date, January 31, 2006, through the verdict date. The jury did not find either infringement to be willful. The jury further found that claims 13, 17, and 20 of the '572 patent was not invalid.

## II.    APPLICABLE LAW REGARDING RULE 50

Judgment as a matter of law is only appropriate when "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a). "The grant or denial of a motion for judgment as a matter of law is a procedural issue not unique to patent law, reviewed under the law of the regional circuit in which the appeal from the district court would usually lie." *Finisar Corp. v. DirectTV Group, Inc.*, 523 F.3d 1323, 1332 (Fed. Cir. 2008). The Fifth Circuit "uses the same standard to review the verdict that the district court used in first passing on the motion." *Hiltgen v. Sumrall*, 47 F.3d 695, 699 (5th Cir. 1995).   Thus, a jury verdict must be upheld, and judgment as a matter of law may not be granted, unless "there is no legally sufficient evidentiary basis for a reasonable jury to find as the jury did." *Id.* at 700. The jury's verdict must be supported by "substantial evidence" in support of each element of the claims. *Am. Home Assurance Co. v. United Space Alliance*, 378 F.3d 482, 487 (5th Cir. 2004).

A court reviews all evidence in the record and must draw all reasonable inferences in favor of the nonmoving party; however, a court may not make credibility determinations or weigh the evidence, as those are solely functions of the jury. *See Reeves v. Sanderson Plumbing Prods., Inc.,*

2

530 U.S. 133, 150-51 (2000). The moving party is entitled to judgment as a matter of law "only if the evidence points so strongly and so overwhelmingly in favor of the nonmoving party that no reasonable juror could return a contrary verdict." *Int'l Ins. Co. v. RSR Corp.,* 426 F.3d 281, 296 (5th Cir. 2005).

## III.   APPLICABLE LAW REGARDING RULE 59

Under Rule 59(a) of the Federal Rules of Civil Procedure, a new trial can be granted to any party to a jury trial on any or all issues "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a). "A new trial may be granted, for example, if the district court finds the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course." *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 612-13 (5th Cir. 1985). The Court must view the evidence "in a light most favorable to the jury's verdict, and [] the verdict must be affirmed unless the evidence points so strongly and overwhelmingly in favor of one party that the court believes that reasonable persons could not arrive at a contrary conclusion." *Dawson v. Wal-Mart Stores, Inc.*, 978 F.2d 205, 208 (5th Cir. 1992).

## IV.   DIGITAL RIVER'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO FED. R. CIV. P. 50(B) (DKT. NO. 540)

Digital River seeks judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b) that (1) the asserted claims are invalid under 35 U.S.C. § 112 as indefinite; (2) the asserted claims are invalid under 35 U.S.C. §§ 102 and 103 as anticipated and/or obvious; (3) the asserted claims are invalid under 35 U.S.C. § 101 as directed to subject matter that is not eligible for patent protection; (4) Digital River does not directly infringe the asserted claims; and (5) DDR did not prove that it is entitled to any damages.

3

## A.  The asserted claims are not invalid under 35 U.S.C. § 112 as indefinite

Digital River contends that it is entitled to judgment as a matter of law that the asserted claims are invalid as indefinite because the patent specification lacks the required objective guidance to allow one of ordinary skill in the art to know when the claimed "look and feel" element has been achieved. (Dkt. No. 540, at 2.) As support, Digital River relies on *Datamize, LLC v. Plumtree Software, Inc.* where the Federal Circuit found the term "aesthetically pleasing" to be indefinite because the patentee "offered no objective definition identifying a standard for determining when an interface screen is aesthetically pleasing." 417 F.3d 1342, 1350 (Fed. Cir. 2005). However, this Court does not find "aesthetically pleasing" to be analogous to the concept of "look and feel" in this case.

35 U.S.C. § 112 ¶ 2 requires claims to particularly point out and distinctly claim the subject matter which the applicant regards as his invention. The purpose of the definiteness requirement is to ensure that the claims delineate the scope of the invention using language that adequately notifies the public of the patentee's right to exclude. *Honeywell Int'l Inc. v. Int'l Trade Comm'n*, 341 F.3d 1332, 1338 (Fed. Cir. 2003). A claim is indefinite when it depends "solely on the unrestrained, subjective opinion of a particular individual purportedly practicing the invention." *Datamize*, 417 F.3d at 1350. However, "[i]f the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree, we have held the claim sufficiently clear to avoid invalidity on indefiniteness grounds." *Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001). Whether a patent claim fails for indefiniteness is a question of law for the Court to decide. *Id.* at 1376.

This Court previously defined "look and feel" to be "a set of elements related to visual appearance and user interface conveying an overall appearance identifying a website; such elements include logos, colors, page layout, navigation systems, frames 'mouse-over' effects, or others [*sic*] elements consistent through some or all of the website." (Dkt. No. 309 at 10.) The claims define the question of whether the "look and feel" of the web pages that Digital River serves are "based on" the look and feel of the referring host site. A comparison of visual elements according to the Court's construction between a pair of websites is precisely the type of infringement question for the trier of fact to decide. Such a comparison does not render the jury's decision subjective. Indeed, claims need not have mathematically precise boundaries so long as the patent gives examples and general guidelines. *See Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1335 (Fed. Cir. 2010) (the term "not interfering substantially" does not render claims indefinite); *Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358, 1367 (Fed. Cir. 2001) (terms like "about" and "substantially" are descriptive terms commonly used in patent claims to "avoid a strict numerical boundary to the specified parameter.").

A finding of indefiniteness must overcome the statutory presumption of validity.  *See* 35 U.S.C. § 282. That is, the "standard [for finding indefiniteness] is met where an accused infringer shows by clear and convincing evidence that a skilled artisan could not discern the boundaries of the claim based on the claim language, the specification, and the prosecution history, as well as her knowledge of the relevant art area." *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1249-50 (Fed. Cir. 2008).  The Court does not find that Digital River has met its burden. Accordingly, judgment as a matter of law as to a finding of indefiniteness is denied.

**B.  The asserted claims are not invalid as anticipated and/or obvious**

Digital River contends it has shown by clear and convincing evidence, through the testimony of Mr. Pichler and Mr. Kent, that the asserted claims are invalid. Digital River argues that the claims are invalid as anticipated by the Digital River Secure Sales System ("SSS System"), and also invalid as obvious in light of the SSS System, and/or in light of the combination of the SSS System with U.S. Patent No. 6,141,666 (the "Tobin patent"). Digital River argues that since three of the exemplary "look and feel elements" from the Court's claim construction were included in its prior art system, substantial evidence contradicts the jury's conclusion that the "look and feel" limitation is not met. (Dkt. No. 557 at 5.) The Court disagrees.

As stated earlier, the Court construed "look and feel" to mean

"[a] set of elements related to visual appearance and user interface conveying an overall appearance identifying a website; such elements include logos, colors, page layout, navigation systems, frames, 'mouse-over' effects, or others [*sic*] elements consistent through some or all of the website."

(Dkt. No. 309 at 10.) While Digital River is correct that the list of elements in the Court's construction is exemplary and not exclusive, this term is not necessarily satisfied by matching one, three, or a specific number of the exemplary elements. Rather, it is up to the trier of fact to determine whether the combination of elements making up the overall appearance of a website has a similar "look and feel" as compared to another website.

Indeed, the trial record reveals that the jury heard from Digital River's witnesses about how the SSS System operated and what capabilities it had, and the jury has weighed the credibility of such evidence. The trial record shows that Digital River's Vice President of Product and Innovation, Mr. Gagliardi, testified that earlier Digital River systems (1) had "much more limited functionality" than the recent, infringing systems, (2) had "technical constraints" that made it

6

"difficult to emulate" sites, (3) relied on "rigid predefinition of templates," (4) "only had a logo" match, and (5) required a logo to appear at a fixed location absent a "hack" to change location. (10/8/2012 PM Tr. at 221:10-224:15; 10/10/12 PM Tr. at 161:11-165:2.) DDR's expert witness, Dr. Keller, also offered his opinion that the SSS System and related publications failed to show any "overall match" of appearance because the pair of websites Digital River presented "basically had a matching logo," which falls short of being "based on" the host's "look and feel." (10/11/2012 PM Tr. at 103:2-112:19.) The jury considered such evidence, including the pairs of websites that Digital River displayed, and evidently found no corresponding overall look and feel to render the '572 patent invalid in light of the SSS system.

Turning to the issue of obviousness, there is substantial evidence in the record that that claim 20 of the '572 patent is not obvious in view of the SSS System and/or in light of the combination of the SSS System and the Tobin patent. DDR's expert provided the following testimony that the jury was entitled to consider in rendering their verdict:

> Q.    And when we're talking about obviousness, is it sufficient to put a reference in front of each of the elements, or do you have to show something more?
> A.    You have to show something more.
> Q.    What is that something more?
> A.    It's called a motivation to combine, to combine those references, to put them together.
>                                        ***
> Q.    Okay. Dr. Keller, you looked at Mr. Kent's report with respect to this combination, didn't you?
> A.    Yes, I did.
> Q.    Did he say -- in the report, did he say why someone would be motivated to combine these two references?
> A.    No, he did not.
> Q.    And in his testimony before the jury today, did he give -- did he tell the jury what the motivation was to combine the two references?
> A.    No, he did not.

(10/11/2012 PM Tr. at 121:9-122:8.) In other words, Digital River did not meet their burden to show obviousness by clear and convincing evidence. For these reasons, the Court finds that substantial evidence supports the jury's verdict that the asserted claims are not invalid as anticipated or obvious in light of the SSS System and/or in light of the combination of the SSS System and the Tobin patent.

### C.  Judgment as a matter of law of invalidity for failing to claim patent-eligible subject matter

Digital River contends that the asserted claims are invalid as unpatentable subject matter under 35 U.S.C. § 101 because they are directed to an abstract idea. (Dkt. No. 540 at 13.) In its opposition, DDR incorporates by reference its opposition to a similar argument made by defendant NLG. (Dkt. No. 552 at 7.) In reply, Digital River also incorporates by reference its responsive arguments in NLG's reply to DDR's Opposition. (Dkt. No. 557 at 6.) To similarly avoid repetition, the Court addresses this common issue in Section V(B), below.

### D.  Judgment as a matter of law of no infringement of the asserted claims

Digital River contends that it is entitled to judgment as a matter of law of no infringement because no reasonable jury could find that Digital River directly infringed based on three grounds: (1) the asserted claims require three separate entities, (2) DDR failed to perform the required element-by-element infringement analysis, and (3) substantial evidence does not support the jury's direct infringement verdict because Digital River does not store the "look and feel," as required by the asserted claims. (Dkt. No. 540 at 15-16.)

#### i.      The '572 patent covers two-party systems

Digital River seeks a judgment of no infringement as a matter of law based on the same arguments presented in its motion for summary judgment, which was previously denied by the

8

Court. (*See* Dkt. No. 500.) Digital River argues error in the Court's conclusion that the asserted claims can encompass two-party systems because it was based on a single statement in the specification. Digital River urges that "by allowing that one statement to override the remainder of the prosecution history, the Court committed legal error because even a statement in a patent can be disclaimed." (Dkt. No. 558 at 7.) Digital River asserts that during prosecution, DDR clearly and unmistakably disclaimed two-party systems by distinguishing its invention from certain prior art two-party systems. (*Id.* at 8.) In its opposition, DDR responds that Digital River merely repeats its previously rejected arguments without specifying why there is some mistake within the Court's prior ruling.

On review, the Court does not find error with its previous ruling. Contrary to Digital River's assertion that the Court allowed one statement in the specification to override the entire prosecution history, the Court specifically considered each prosecution history disclaimer argument that Digital River presented. In the Memorandum and Opinion denying Digital River's Motion For Summary Judgment (after considering the parties' written submissions, hearing oral argument, and a thorough review of the full reexamination file of the '572 patent), the Court held there was no clear disavowal of claim scope. (Dkt. No. 500 at 9.) The Court underscored the importance of context in considering the isolated statements cited by Digital River, and specifically found that "[w]hen viewed as a whole, the reexamination file shows that there is no clear and unambiguous disavowal of claim scope that would preclude the two-party embodiment expressly disclosed in the specification." (*Id.* at 8-9.) The Court does not reach a different conclusion when presented with the same (but simply rehashed) arguments post-trial.

For the foregoing reasons, the Court does not find legal error with its prior summary judgment ruling. Accordingly, the Court reaffirms that, as a matter of law, a party may infringe the '572 patent with a two-party system.

ii.     *Substantial evidence supports finding of direct infringement of AutoDesk, Adobe and VMware*

Digital River contends that it is entitled to judgment as a matter of law of no infringement because DDR's infringement expert, Dr. Keller, did not compare each element of the asserted claims with each of the accused systems. Digital River argues that Dr. Keller failed to demonstrate at trial that the AutoDesk, Adobe and VMware websites encompass each element of each asserted claim. (Dkt. No. 540 at 23.)

In its opposition, DDR responds that the jury heard substantial evidence of direct infringement of the overall visual appearance elements of the asserted claims. For example, the jury observed images of the three customers' websites and a list of "visual similarities" between the website pairs, in addition to Dr. Keller's testimony that the hosted sites infringed. (Dkt. No. 552, at 8.) DDR also responds that the jury heard substantial evidence of direct infringement by AutoDesk, Adobe and VMware as to all of the other elements of the asserted claims. DDR submits that during trial, Dr. Keller testified that Digital River accomplished six different infringements (including the three challenged ones) on the same platform called the "Global Commerce System." (*Id.* at 9.) DDR also submits that Dr. Keller testified that the "Global Commerce System" directly infringes the '572 patent by using one of the six infringements as an example for purposes of stepping through the remaining claim elements. (*Id.*) Therefore, DDR argues that this testimony also applies to the other five infringements that use this platform. The Court agrees.

The trial record reflects that DDR presented substantial evidence to support a jury verdict that the AutoDesk, Adobe and VMware websites met each element of the asserted claims. Dr. Keller testified that Digital River accomplished six different infringements via six customers, including the three challenged ones, on the same platform known as the "Global Commerce System." (10/9/2012 AM Tr. at 82.18-86:22.) Dr. Keller walked through, on an element-by-element basis, how the "Global Commerce System" infringed claims 13, 17, and 20 of the '572 patent as to Trend Micro, one of the six Digital River customers. (*Id.* at 88:9-98:15 and 125:24-139:5.) Then, Dr. Keller discussed infringement of the Nuance store, another one of the six Digital River customers, and explained the differences between Global Commerce's operation of the Nuance Store from the Trend Micro store:

> Q.    Does Digital River's operation of Global Commerce to provide the Nuance store differ in any way from the -- its operation of the Trend Micro store on the Global Commerce Platform?
> A.    Just a few ways.
>         First of all, we're displaying -- Digital River is displaying Nuance's products rather than Trend Micro's products, and it's using the look and feel of Nuance's website as opposed to Digital River's -- sorry -- as opposed to Trend Micro's website.
> Q.    So outside of the differences with respect to the particular look-and-feel match and the particular commerce content, did you identify any other differences between the operation of the Global Commerce platform for Nuance site and for Trend Micro site?
> A.    No.

(10/9/2012 AM Tr. at 139:7-22.) Dr. Keller continued in his testimony by comparing the look and feel of each website pair and listing visual similarities between them for the Nuance store (*Id.* at 139:22-145:3), Microsoft store (*Id.* at 145:6-148:8), AutoDesk (*Id.* at 148:10-149:19), Adobe (*Id.* at 149:20-151:5), and VMware (*Id.* at 151:13-153:7.)

The Court finds that Dr. Keller's testimony of how the Global Commerce platform running the Trend Micro store infringes the asserted claims, taken as a whole with the visual comparison of

11

each of the six customer websites, supports a jury finding that each customer website running on the Global Commerce platform infringes in a similar manner. In addition, the exhibits of product pages for each customer's host website and Dr. Keller's comparison to the each customer's outsourced store page served by Digital River's Global Commerce platform constitutes substantial evidence to support the jury's verdict of direct infringement by AutoDesk, Adobe and VMware.[1]

> iii.   *Substantial evidence supports a finding that Digital River directs and/or controls Akamai servers*

Digital River contends there is no substantial evidence in the record that it stores the "look and feel" information as required by the asserted claims because the servers are neither owned nor operated by Digital River. (Dkt. No. 540 at 24.) Digital River asserts that trial testimony showed that it entered into an arms-length contract with Akamai to provide the servers, and such arms-length cooperation is insufficient to support a finding of direct infringement. (*Id.* at 25.)

In response, DDR first argues that Digital River waived this defense by failing to disclose it in advance of trial, pursuant to Fed. R. Civ. P. 37(c)(1), which states: "If a party fails to provide information . . . as required by Rule 26(a) or (e) . . . , the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless." However, Rule 26(a)(3)(A) provides that "a party must provide . . . the evidence it may present at trial *other than solely for impeachment* . . . ." (emphasis added). Digital River replies that its attack on DDR's infringement case is based on Dr. Keller's revelation during cross-examination that he did not investigate the location or owner of the servers that he alleged were involved in infringement, and is thus not waived. (10/9/2012 PM Tr. at 55:21-57:7.) As DDR

---

1  The Court notes that Digital River does not contend judgment as a matter of law of no direct infringement for its other customer websites (e.g. the Microsoft store), even though Dr. Keller did not specifically walk through the Global Commerce platform as to its operation of each website.

has provided no case law compelling the Court to find waiver in such a situation where the rules do not preclude impeachment evidence, the Court does not find waiver occurred.

DDR next argues that notwithstanding its allegations of waiver, there is substantial evidence to support the jury's verdict of infringement. DDR contends that the jury is entitled to make the reasonable inference that (1) Akamai is Digital River's agent, (2) Akamai serves a duplicated image of Digital River data, and (3) Digital River directs and controls Akamai's activities. (Dkt. No. 552 at 11.) To "use" a system for purposes of infringement, "a party must put the invention into service, i.e., control the system as a whole and obtain benefit from it . . . ." *Centillion Data Sys., LLC v. Qwest Commc'ns Int'l, Inc.*, 631 F.3d 1279, 1284 (Fed. Cir. 2011). The "control" contemplated does not have to be physical or direct control; rather, it is the ability to place the system as a whole into service. *Id.* During trial, the jury heard testimony from Mr. Gagliardi that Digital River had a contract with Akamai to serve data from domains "c5.img.digitalriver.com" and "drh.img.digitalriver.com." (10/10/2012 PM Tr. at 155:4-156:4.) The jury also heard expert testimony from Dr. Keller that Akamai acts on behalf of Digital River by caching copies of Digital River content for faster access:

> Q.      So -- and what does Akamai -- what is Akamai's business? What do they do?
> A.      They bring somebody else's content closer to you. So in this particular case, if Digital River contracts with Akamai to push their content closer to you, they're actually pushing Akamai -- they're actually pushing Digital River's content and sort of making a copy of it closer to you so you can get it quicker, but essentially doing it on behalf of Digital River and acting as -- so -- acting as a -- operating on behalf of Digital River, so it's essentially Digital River's content that came from Digital River's server.
> Q.      So it would be a copy of what's on Digital River's own server, correct?
> A.      That's correct. It's a copy. It's simply copied closer to make it quicker to download.

(10/9/2012 PM Tr. at 86:20-87:10.) Therefore, although Akamai owned and operated servers storing the "look and feel" information on behalf of Digital River, the Court finds that there exists substantial evidence in the record to allow a reasonable inference by the jury that the servers were under the direction and control of Digital River.

### E.  Judgment as a matter of law that DDR's damages model is unsupportable

Digital River contends that no reasonable jury could find that DDR was entitled to recover $750,000 in damages from Digital River because DDR provided no evidence at trial that ties the value of sales transactions to infringement. (Dkt. No. 557 at 10.) The patentee bears the burden of proving damages, which includes the burden to "sufficiently [tie the expert testimony on damages] to the facts of the case." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1315 (Fed. Cir. 2011). Digital River argues that product sales were not properly tied to DDR's damages model because any such sales occurred only after the alleged infringement transpired. (Dkt. No. 557 at 10.) In its opposition, DDR responds that its damages expert, Dr. Chandler, presented substantial evidence tying his damages theory to the accused use of the invention, and that the fact that sales occur immediately after, not during, infringement is immaterial. (Dkt. No. 560 at 7.) The Court agrees with DDR.

The record reflects that Dr. Chandler explained how his damages method determines a value based on the economic benefits derived from the patented product or service. (10/9/2012 PM Tr. at 124:7-126:17; 144:4-5; 176:21-23) For example, Dr. Chandler testified:

> And we looked at this in large sense with an understanding of how the private-label programs work in conjunction with the -- the Defendants. There is a basic operation for their normal course of business, and these incremental transactions contribute an extra margin, an additional margin, additional revenues that have their own profitability. And those revenues would not exist if it weren't for the functionality of the patents-in-suit.

(*Id.* at 125:23-126:6.) In addition, the '572 patent itself ties the infringed claims to the commercial activity through the claim term "commerce object," which the Court defined as a "third-party merchant's: catalog, category, product (goods or services), or dynamic selection," and the claim term "merchant," which the Court defined as a "[p]roduce, distributor, or reseller of goods or services to be sold." (Dkt. No. 560 at 6-7.)

Ultimately, the jury considered the evidence presented and awarded DDR $750,000 for Digital River's infringement of the '572 patent, significantly less than the amount DDR was seeking. On balance, the Court has no basis from which to find that the verdict lacks a sufficient evidentiary basis that a reasonable jury could not have found as the jury did in this case.

### F.  Conclusion

Based on the foregoing, the Court **DENIES** Defendant Digital River, Inc.'s Renewed Motion for Judgment as a Matter of Law Pursuant to Fed. R. Civ. P. 50(b) (Dkt. No. 540).

## V.  NLG'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO FED. R. CIV. P. 50(B) (DKT. NO. 539)

NLG seeks judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b) to (1) vacate the jury verdict of direct infringement of the asserted claims in the '572 and '399 patents, (2) vacate the jury verdict of no invalidity of the asserted claims in the '572 and '399 patents, (3) vacate the jury award because the Court improperly excluded evidence of non-accused websites, and (4) set aside or reduce the damages award as grossly excessive and against the greater weight of the evidence. Interestingly however, NLG does not move for a new trial pursuant to Rule 59 on the grounds that the jury verdict is against the weight of the evidence.

### A.  Judgment as a Matter of Law Regarding Direct Infringement

NLG first contends that the jury determination of direct infringement is not supported by substantial evidence because DDR's infringement expert, Dr. Keller, did not establish all of the requisite claim elements. (Dkt. No. 539 at 4.)

   i.      *The "look and feel" elements*

NLG argues that Dr. Keller failed to offer competent or satisfactory evidence of the correspondence of look and feel between the host and NLG websites because he offered only conclusory and non-specific statements about how the "look and feel" elements are satisfied. On review of the record, the Court disagrees. As an initial matter, the jury had the published images of all nine website pairs as evidence before it to make the ultimate factual determination that the look and feel of the host corresponded to the accused NLG websites. (*See* PX617, pp. 1-2, 20-21, 35-36, 49-52, 53-54, 55-56, 57-60, 61-62, 63-64.) Additionally, DDR presented expert testimony comparing the websites pairs for substantial similarities and listing out the similarities in a demonstrative exhibit before the jury. *(*10/9/2012 PM Tr. at 8:3-36:22.) Thus, the jury's verdict is supported by substantial evidence of infringement as to the "look and feel" elements.

   ii.     *Claim 17 of the '572 patent*

NLG contends that there is no substantial evidence that NLG directly infringes step (a) of claim 17 in the '572 patent by controlling or directing its partners to provide links to NLG's site on their host sites. (Dkt. No. 539 at 6.) However, both DDR's expert witness, Dr. Keller, and NLG's expert witness, Mr. Gray, testified at trial that NLG gives the URL or link to their partners to place on their host websites for customers to access the outsource website. (10/9/2012 PM Tr. at

17:15-23; 10/11/2012 AM Tr. at 126:11-19.) Thus, the jury was presented with evidence sufficient to show that NLG controls its partners' action by giving them the link to place on their host sites.

### iii.     Claim 13 of the '572 patent

NLG argues that DDR did not establish that the NLG computer processor is in communication through the Internet with the host web page as required by claim 13 of the '572 patent. (Dkt. No. 539, at 6.) However, DDR's expert witness testified that "When the computer server receives a request, when a link is clicked on or activated on the host webpage, that's how the host webpage is communicating through the Internet with the computer processor or the server." (10/9/2012 PM Tr., at 12:17-25.) Thus, the record contains clear and substantial evidence to support a jury finding that this claim element is met.

### iv.     Claims 1 and 19 of the '399 patent

NLG argues that DDR did not establish that its system automatically recognizes or identifies the source web page as required by claims 1 and 19 of the '399 patent. (Dkt. No. 538 at 7.) Although NLG acknowledges that Dr. Keller's testimony and his report establish that the computer processor determines the partner using a code (e.g., OBWEB for Orbitz), NLG contends there is no evidence that the computer processor identifies the source page. (*Id.* at 7-8). However, NLG does not show where in the claim language or the Court's claim construction is there a requirement for a party to recognize the exact web address of the source web page to infringe. When opposing experts differ on how a claim limitation is met, as is the case here, it is up to the jury to decide which opinion is more credible in light of the evidence. In this case, the jury made such a determination based on substantial evidence in the record to support their finding that this claim element is met.

*v.*        *Infringement for more than one day*

NLG also takes issue with the fact that DDR did not show infringement except for the single days on which Dr. Keller examined each website. (Dkt. No. 539 at 8.) However, Dr. Keller testified that, in forming his opinions, he considered the systems as a whole, "both documents about them and source code," including "the date that they -- that they used to operate these systems" and "deposition transcripts where the people who work for the Defendants describe how their systems operated." (10/9/2012 AM Tr. at 80:18-81:17.) In addition, Dr. Keller testified that, "with respect to the host websites that are partners with the Defendants," he "looked at the websites sometimes the present current website, also past websites in order to be able to see whether the look and feel of the outsource website matches an overall appearance, the look and feel of the host website." (*Id.*) Dr. Keller further testified that he looked at "past websites" using Internet archives. (*Id.* at 81:16-82:3.)

Dr. Keller also reviewed technology NLG was currently using and compared that to "different technology" that NLG used in the past and found that although the "software [that] implemented [it] changed, … the basic functionality is unchanged" and "the data is the same," including "the same data describing the stores, the look-and-feel description, et cetera." (10/9/2012 PM Tr. at 3:22-4:15.) Moreover, Dr. Keller testified that, from his examination of source code throughout the period of infringement, he did not find anything that "had changed in any substantial way" compared to the examples that he gave during specific testimony discussing the various hosts. (*Id.* at pp. 4-45.)

The record before the Court and the evidence presented at trial is clear that Dr. Keller considered the accused systems as a whole, including the dates of operation, how the systems

operated, the current website, as well as past websites. There is substantial evidence to support the jury's finding that NLG infringed for more than the one day during which a screenshot was captured.

## B. Judgment as a Matter of Law Regarding Invalidity For Failing to Claim Patentable Subject Matter

NLG asks the Court to find the asserted claims of the '572 and '399 patent invalid as unpatentable subject matter under 35 U.S.C. § 101 because the invention is merely a business model known as "syndicated commerce" applied to the Internet. (Dkt. No. 539 at 9.) NLG points to the trial transcript for support because the named inventors used the word "idea" at least 25 times to describe his invention. NLG argues that there is nothing computer-specific about making two e-commerce web pages look like each other, and the asserted claims recite only generic functionalities that any general purpose computer can perform.

### i.   *Applicable Law*

35 U.S.C. § 101 defines the four categories of inventions or discoveries that are eligible for patent protection:

> Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.

35 U.S.C. § 101. "In choosing such expansive terms … modified by the comprehensive 'any,' Congress plainly contemplated that the patent laws would be given wide scope." *Bilski v. Kappos*, 130 S.Ct. 3218, 3225 (citing *Diamond v. Diehr*, 450 U.S. 175, 308, 100 S.Ct. 2204 (1981)). "Congress took this permissive approach to patent eligibility to ensure that 'ingenuity should receive a liberal encouragement.' " *Id.* (citing 450 U.S. at 308-309, 100 S.Ct. 2204).

The Supreme Court has recognized three specific exceptions to the broad domain of patentable subject matter encompassed by § 101: "laws of nature, physical phenomena, and abstract ideas." *Bilski*, 130 S.Ct at 3225. Laws of nature and physical phenomena are not patentable subject matter "because those categories embrace 'the basic tools of scientific and technological work.'" *Research Corp. Techs., Inc. v. Microsoft Corp.*, 627 F.3d 859, 867-68 (Fed. Cir. 2010) (citing *Gottschalk v. Benson*, 409 U.S. 63, 67 (1972)). The Court can determine invalidity of a patent under 35 U.S.C. § 101 for failing to claim patentable subject matter as a matter of law. *Arrhythmia Research Tech., Inc. v. Corazonix Corp.*, 958 F.2d 1053, 1055 (Fed. Cir. 1992).

However, the rule against patents on naturally occurring things is "not without limits," for "all inventions at some level embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas," and "too broad an interpretation of this exclusionary principle could eviscerate patent law." *Association for Molecular Pathology, et al. v. Myriad Genetics, Inc., et al.*, --- S.Ct. ---, 2013 WL 2631062, at *7 (citing *Mayo Collaborative Services v. Prometheus Laboratories, Inc.*, 132 S.Ct. 1289, 1293 (2012)). "As we have recognized before, patent protection strikes a delicate balance between creating 'incentives that lead to creation, invention, and discovery' and 'imped[ing] the flow of information that might permit, indeed spur, invention.'" *Id.* (citing 132 S.Ct. at 1305). Moreover, "a process is not unpatentable simply because it contains a law of nature or a mathematical algorithm," and "an *application* of a law of nature or mathematical formula to a known structure or process may well be deserving of patent protection." *Diamond v. Diehr*, 450 U.S. 175, 187, 100 S.Ct. 1048 (1981) (internal quotation marks omitted).

In addition, "[a]bstractness, also a disclosure problem addressed in the Patent Act in section 112, also places subject matter outside the statutory categories." *Research Corp.*, 627 F.3d at 868. An abstract idea "should exhibit itself so manifestly as to override the broad statutory categories of eligible subject matter and the statutory context that directs primary attention on the patentability criteria of the rest of the Patent Act." *Id.* "[I]nventions with specific applications or improvements to technologies in the marketplace are not likely to be so abstract that they override the statutory language and framework of the Patent Act." *Id.* at 869.

Furthermore, "it bears remembering that all issued patent claims receive a statutory presumption of validity … that presumption applies when § 101 is raised as a basis for invalidity in district court proceedings." *CLS Bank Int'l, et al. v. Alice Corp. Pty. Ltd.*, 2013 WL 1920941, at *12 (Fed. Cir. May 10, 2013) (Lourie, J., *et al.*, concurring).

*ii.    Analysis*

NLG only asserts the application of the "abstract ideas" exception in this case. NLG contends claims 13, 17, and 20 of the '572 patent and claims 1, 3 and 9 of the '399 patent are invalid under 35 U.S.C. § 101 because they do not satisfy the machine-or-transformation test and otherwise disclose an abstract idea. Claims 13 and 17 of the '572 patent are independent claims. They read:

> **Claim 13.** An e-commerce outsourcing system comprising:
>     a) a data store including a look and feel description associated with a host web page having a link correlated with a commerce object; and
>     b) a computer processor coupled to the data store and in communication through the Internet with the host web page and programmed, upon receiving an indication that the link has been activated by a visitor computer in Internet communication with the host web page, to serve a composite web page to the visitor computer wit [*sic*] a look and feel based on the look and feel description in the data store and with content based on the commerce object associated wit [*sic*] the link.

**Claim 17.** An e-commerce outsourcing process comprising the steps of:

a) storing a look and feel description associated with a first website in a data store associated with a second website;

b) including within a web page of the first website, which web page has a look and feel substantially corresponding to the stored look and feel description, a link correlating the web page with a commerce object; and

c) upon receiving an activation of the link from a visitor computer to which the web page has been served, sewing to the visitor computer from the second website a composite web page having a look and feel corresponding to the stored look and feel description of the first website and having content based on the commerce object associated with the link.

Claim 1 of the '399 patent is an independent claim. It reads:

**Claim 1.** A method of an outsource provider serving web pages offering commercial opportunities, the method comprising:

(a) automatically at a server of the outsource provider, in response to activation, by a web browser of a computer user, of a link displayed by one of a plurality of first web pages, recognizing as the source page the one of the first web pages on which the link has been activated;

(i) wherein each of the first web pages belongs to one of a plurality of web page owners;

(ii) wherein each of the first web pages displays at least one active link associated with a commerce object associated with a buying opportunity of a selected one of a plurality of merchants; and

(iii) wherein the selected merchant, the outsource provider, and the owner of the first web page are each third parties with respect to one other;

(b) automatically retrieving from a storage coupled to the server pre-stored data associated with the source page; and then

(c) automatically with the server computer-generating and transmitting to the web browser a second web page that includes:

(i) information associated with the commerce object associated with the link that has been activated, and

(ii) a plurality of visually perceptible elements derived from the retrieved pre-stored data and visually corresponding to the source page.

Claim 13 is a system claim. Claim 17 and claim 1 are process and method claims. The Court finds no meaningful distinction between the asserted "system," "process," and "method" claims for purposes of this § 101 analysis, and will consequently analyze them together. *Bancorp Services, L.L.C. v. Sun Life Assurance Co. of Canada (U.S.), et al.*, 687 F.3d 1266, 1276-77 (Fed. Cir. 2012).

In its analysis, the Court looks "not just to the type of claim but also 'to the underlying invention for patent-eligibility purposes.'" *Id.* (citing *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1374 (Fed. Cir. 2011)). Thus, as the Supreme Court has explained, the form of the claims should not trump basic issues of patentability. *See Parker v. Flook*, 437 U.S. 584, 593, 98 S.Ct. 2522 (1978). Here, each of the claims at issue involves storing and serving webpages having the similar look and feel of another and different webpage. There is little material difference between these categories of claims in the asserted patents for patentability analysis.

NLG's primary argument boils down to a contention that the claims disclose the business method of making two e-commerce web pages look alike; the method is no more than an abstract idea that is not dependent on computer components. In response, DDR asserts that the invention is not a method of doing business, but rather methods of displaying composite web pages that require the computer and processor to have specific tangible parts, be programmed in certain particular ways, contain specific data, and be capable of performing specific steps recited in the claims. On review of the claims at issue, the Court concludes that they are not "so manifestly" abstract as to override the statutory language of § 101. *Research Corp.*, 627 F.3d at 868.

The claimed e-commerce outsourcing system discloses a specific set of physical linkages, including, coupling between the data store and the processor, the data store storing a look and feel description associated with a host web page and the processor programmed in certain ways to serve a composite web page. The claimed e-commerce outsourcing process requires a similar interaction between a data store storing a look and feel description of a web page and an activation of a link from a visitor computer to receive a composite web page. The method of an outsource provider also discloses a server that responds to activation by a web browser of a computer user by

retrieving pre-stored data from storage, then generating and transmitting visual elements corresponding to the source page. Each of these claimed inventions "presents functional and palpable applications in the field of computer technology." *Research Corp.*, 627 F.3d at 868. Like the claimed invention in *Research Corp.*, the process of displaying composite web pages represents an improvement to computer technologies in the marketplace. "[I]nventions with specific applications or improvements to technologies in the marketplace are not likely to be so abstract" as to be ineligible for patent protection. *Id.*

The claimed invention also passes the machine-or-transformation test. "Under the Court of Appeals' formulation, an invention is a 'process' only if: '(1) it is tied to a particular machine or apparatus, or (2) it transforms a particular article into a different state or thing.'" *Bilski*, 130 S.Ct., at 3225-6 (citing *Diamond*, 450 U.S. at 182). Although the machine-or-transformation test is not the sole test for deciding whether an invention is patent-eligible, it remains a useful and important indicator in the § 101 analysis. *Id.* at 3227.

As discussed above, the asserted claims disclose a specific set of physical linkages that involve a data store, server, computer, that together, and through the claimed interconnectivity, accomplishes the process of displaying composite web pages having the look and feel of the source web page. NLG urges the Court to find the invention is only a business method of making two web pages look alike. While the '572 and '399 patents do, indeed, cover the concept of two web pages with visually corresponding elements, there is more to the asserted claims when considered as a whole. "*Diehr* emphasized the need to consider the invention as a whole, rather than 'dissect[ing] the claims into old and new elements and then … ignor[ing] presence of the old elements in the analysis.'" *Bilski*, 130 S.Ct., at 3230 (citing *Diehr*, 450 U.S. at 177). When the asserted claims are

considered as a whole, the claimed invention lies in stark contrast to the facts of *Bancorp*. In *Bancorp*, the claimed "mathematical concept of managing a stable value protected life insurance policy" was found unpatentable as an abstract idea because mere mathematical computer was not dependent upon the computer components required to perform it. 687 F.3d at 1279-80. In contrast, the interactions and linkages of computer machinery to generate composite web pages in this case are integral to each of DDR's asserted claims. Accordingly, the first prong of the machine-or-transformation test is satisfied. That being the case, this Court needs not address the transformation prong at this time.

The Court is also not persuaded that the inventor's use of the word "idea" at least 25 times to describe his invention is evidence of unpatentable subject matter. The inventor's testimony was given during a one week trial, and it is not unusual to explain a patent claim as a "gist" or "core idea." Such testimony is not instructive that a claim is an abstract idea for purposes of § 101 patentability. Moreover, "all inventions at some level embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas," yet, "too broad an interpretation of this exclusionary principle could eviscerate patent law." *Mayo*, 132 S.Ct. at 1293.

Accordingly, the Court does not find that NLG has met its burden to show by clear and convincing evidence that the asserted claims of the '572 and '399 patents are invalid for failure to claim patentable subject matter under 35 U.S.C. § 101.

### C.  Judgment as a Matter of Law that the Asserted Claims are Indefinite as a Matter of Law

NLG contends that the "look and feel" terms render the asserted claims invalid as indefinite because there is no objective standard for determining whether a pair of web pages has the same "look and feel." (Dkt. No. 539 at 16.) NLG's argument is essentially a repeat of Digital

River's renewed motion for judgment of law on the same subject (Dkt. No. 540). Although Digital River's motion addressed only the '572 patent and not the '399 patent, the indefiniteness arguments center on similar claim terms present in both patents. The Court previously construed "visually perceptible elements" in the '399 patent to mean "look and feel elements that can be seen." (Dkt. No. 309 at 10.) Thus, the Court's ruling that Digital River has not met its burden to show by "clear and convincing evidence that a skilled artisan could not discern the boundaries of the claim based on the claim language, the specification, and the prosecution history, as well as her knowledge of the relevant art area," is equally applicable to NLG's parallel arguments. *Halliburton*, 514 F.3d at 1249-50.

The one extra point that NLG makes in this Motion is that indefiniteness can be found in DDR's inconsistent infringement contentions, where Dr. Keller opined that web page pairs for NLG and its partners have the same look and feel, whereas web page pairs for the current American Airlines page are not alleged to have the same look and feel. (Dkt. No. 539 at 18.) For support, NLG cites Dr. Keller's trial testimony. (10/9/2012 PM Tr. at 62:4-9.) In response, DDR clarifies that shortly after NLG's citation of Dr. Keller's testimony, and in the same testimony sequence, Dr. Keller said "I haven't made an opinion as to whether they are substantially the same or not right now in my report." (10/9/2012 PM Tr. at 68:4-6.) The Court does not find Dr. Keller's testimony to be inconsistent. The Court finds that NLG has failed to meet its burden by clear and convincing evidence to establish that the "look and feel" claim term is insolubly ambiguous.

Accordingly, judgment as a matter of law as to a finding of indefiniteness is denied.

### D.  Judgment as a Matter of Law that the Court Improperly Excluded Evidence of Non-accused Websites

NLG contends the Court committed prejudicial error by precluding it from questioning witnesses or eliciting testimony relating to non-accused websites, but does not identify the remedy it seeks. (Dkt. No. 539.) Although this is raised in a 50(b) motion, NLG's argument is more in line with the requisite standard for a motion for new trial under Rule 59. "A new trial may be granted, for example, if the district court finds the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course." *Transworld Drilling*, 773 F.2d at 612-13. Therefore, the Court will construe this issue as a request for a new trial.

The core of NLG's contention is that the Court acted unfairly by excluding evidence of non-accused websites that run on the same platform as the accused websites, although such evidence is "directly relevant to issues of non-infringement, invalidity for indefiniteness, and invalidity for failing to claim patentable subject matter," and "would have helped to make clear the issues in this case for the Court and the jury." (Dkt. No. 539 at 19.) In response, DDR argues that the Court did not bar NLG from questioning witnesses or eliciting testimony relating to non-accused websites generally. The Court agrees. The Court's grant of DDR's motions *in limine* Nos. 2 and 3 (Dkt No. 481) was not a definitive ruling on the admissibility of evidence, but is merely an order requiring the offering party to first approach the bench and seek leave from the Court prior to mentioning such matters before the jury. When the parties approached the bench on a particular evidentiary matter regarding the American Airlines site, the Court considered the parties arguments, and exercised its discretion in making a limited ruling:

> The Court:        "Okay. There is a clear point in time at which the Plaintiffs
> have accused you of infringement. The sites and screenshots that take place outside

of that clear point of reference in time, to me, I don't see the relevance. That's what I understand the basis of your objection is.

Mr. Crosby:     That is, yes.

The Court:      You're welcome -- you're welcome to cross-examine this witness on materials that come from his report that relate to the period of time in which your client's accused of infringement, but to put up screenshots that are later in time than the period of the infringement or the accused infringement is potentially confusing and irrelevant.

(10/9/2012 PM Tr. at 71:6-19.) Nonetheless, the Court still permitted trial testimony relating to the non-accused American Airlines website, even though NLG may consider it to be limited. (*Id.* at 67:19-68:17.)

Also, the Court does not find that NLG has shown that the evidence it would have presented about the non-accused websites "points so strongly and overwhelmingly" in its favor that reasonable persons could not have arrived at a contrary conclusion as the jury verdict. *Dawson*, 978 F.2d at 208. NLG presents no specific reasons why the jury would have ruled in NLG's favor had they seen more evidence of non-accused websites; its arguments can be boiled down to hollow allegations that such evidence "would have helped to make clear the issues in this case." (Dkt. No. 539 at 19.) Accordingly, the Court does not find that it has precluded NLG from questioning witnesses or eliciting testimony relating to non-accused websites or permitted such prejudice toward NLG as to warrant a new trial.

### E. Judgment as a Matter of Law that the Jury's Damages Award Should be Set Aside

NLG contends that the jury's damages award should be set aside or reduced because it is grossly excessive and against the greater weight of the evidence. NLG argues the damages award is flawed and lists multiple reasons why DDR's damages claim was improper, including application of the 5.5% royalty rate, ignoring deductible costs, including telephone sales in the royalty base, and failure to consider acceptable non-infringing substitutes. DDR responds that

28

even if NLG's criticisms are correct, showing error in DDR's damages claim does not demonstrate any error in the jury's damages award. The Court agrees. Determining the credibility of the evidence and weighing the evidence are within the exclusive purview of the jury. *Reeves*, 530 U.S. at 150-51. Absent evidence that points so overwhelmingly in favor of NLG that no reasonable jury could return a contrary verdict, the Court properly assumes that the jury chose to believe or disbelieve the testimony they heard as a part of weighing all the evidence and then reaching their verdict. *RSR Corp.,* 426 F.3d at 296.

NLG also argues that the damages award is grossly excessive because DDR did not establish infringement for more than one specific date for which Dr. Keller presented screen shots in his report. This is an obvious repetition of NLG's earlier argument that DDR did not show infringement except for the single days on which Dr. Keller examined each website. (Dkt. No. 539, at 8.) As discussed earlier, the record is clear that Dr. Keller considered the accused systems as a whole and DDR's claims are not limited to the specific date the screen shots were captured.

The Court has no specific insights into how the jury precisely arrived at its award in this case. Consequently, NLG cannot attempt to reverse engineer the jury's math in reaching the $750,000 award and use its substituted, and purely speculative, analysis to call the award excessive. Absent further insight into the jury's apportionment, the Court does not find that the verdict lacks sufficient evidentiary basis for a reasonable jury to find as this jury did in this case.

### F.  Conclusion

Based on the foregoing, the Court **DENIES** National Leisure Group, Inc.'s and World Travel Holdings, Inc.'s Renewed Motion for Judgment as a Matter of Law Pursuant to Fed. R. Civ. P. 50(b) (Dkt. No. 539).

## VI.    DIGITAL RIVER'S MOTION FOR NEW TRIAL PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 59 (DKT. NO. 562)

Pursuant to Fed. R. Civ. P. 59, Digital River moves for a new trial with respect to invalidity of the '572 patent based on lack of enablement, invalidity based on anticipation and/or obviousness, non-infringement, and damages. (Dkt. No. 562.) All of Digital River's arguments, with the exception of the enablement issue, rely on the same arguments as addressed above in the section on Digital River's renewed judgment as a matter of law. Based on the same reasoning as discussed above, the Court disagrees with each of Digital River's arguments and does not find the verdict to be against the weight of the evidence. The Court will now specifically address the enablement argument.

### A.  Digital River waived its enablement defense as to the "look and feel" elements

Digital River contends that it is entitled to a new trial on the issue of whether the asserted claims of the '572 patent are invalid for lack of enablement because it fails to teach one of ordinary skill in the art the concept of "look and feel." (Dkt. No. 562 at 3-4.) Digital River argues that it had presented more than sufficient evidence at trial to support the submission of a question and instruction on enablement in the jury charge, which the Court denied. Digital River also argues that it was prejudiced by the Court's failure to instruct the jury where a lack of enablement constitutes an independent ground for invalidating all the asserted claims.

In response, DDR asserts that Digital River waived its new enablement defense by failing to disclose it in advance of trial, either through its interrogatory answers or its invalidity contentions. (Dkt. No. 564 at 1.) Although Digital River touched on lack of enablement in light of another claim term, DDR contends that none of those disclosures hint at a non-enablement defense relating to the "look and feel" term.

Local Patent Rule 3.3(d) requires each party opposing a claim of patent infringement to serve invalidity contentions which disclose "[a]ny grounds of invalidity based on indefiniteness under 35 U.S.C. § 112(2) or enablement or written description under 35 U.S.C. § 112(1) of any of the asserted claims." On review of Digital River's amended invalidity contentions, the Court finds that it only asserted lack of enablement based on the "link correlated with a commerce object" limitation. (*See* Dkt. No. 564, Ex. 3.) Digital River did not put forward a lack of enablement based on the "look and feel" element at any point before trial either by complying with its disclosure obligations, responding to discovery, or in its invalidity expert report. Further, Digital River did not raise this issue during trial. During the charge conference, the Court struck the non-enablement jury instruction because Digital River had presented no arguments or evidence at trial based on the disclosed enablement defense. Nonetheless, Digital River did not specifically mention lack of enablement of the "look and feel" term in making its objection. (10/12/2012 AM Tr. at 10:8-13:15.) In essence, Digital River did not provide notice to DDR or the Court of its enablement defense based on the "look and feel" term until raising it for the first time in their Rule 59 motion.

One purpose of Patent Rule 3.3 is for early disclosure and notice of the Defendant's invalidity-based defenses to facilitate discovery and the preparation of both sides' claims and defenses well in advance of trial. Just as a prior art reference has to be specifically disclosed on an element-by-element level in a claim chart format, a § 112(2) defense must at least identify the claim element that causes a claim to fail for lack of enablement. Contrary to Digital River's argument, the Court does not find there to be sufficient disclosure of this issue in the pleadings or at any time prior to this motion. Additionally, this Court is not receptive to Digital River's argument that it may disclose the specific theory of non-enablement for the first time in the trial

testimony. Such would emasculate Rule 3.3 and return the litigants to the discredited practice of trial by ambush.

For the foregoing reasons, the Court finds that Digital River has waived its enablement defense as to the "look and feel" element. Accordingly, the Court does not reach the merits of Digital River's invalidity defense for lack of enablement of the "look and feel" element.

### B.  Conclusion

Based on the foregoing, the Court **DENIES** Defendant Digital River, Inc.'s Motion for New Trial Pursuant to Fed. R. Civ. P. 59 (Dkt. No. 562).

## VII.    CONCLUSION

For the reasons discussed, the Court: (1) **DENIES** Defendant Digital River, Inc.'s Renewed Motion for Judgment as a Matter of Law Pursuant to Fed. R. Civ. P. 50(b) (Dkt. No. 540); (2) **DENIES** National Leisure Group, Inc.'s and World Travel Holdings, Inc.'s Renewed Motion for Judgment as a Matter of Law Pursuant to Fed. R. Civ. P. 50(b) (Dkt. No. 539); and (3) **DENIES** Defendant Digital River, Inc.'s Motion for New Trial Pursuant to Fed. R. Civ. P. 59 (Dkt. No. 562).

**So Ordered and Signed on this**

**Jun 20, 2013**

_____
RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE